# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET A. CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:07cv00682-WKW** |
| | ) | |
| **DIALYSIS CLINIC, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.      STATEMENT OF THE CASE

Plaintiff was a Charge Nurse with Dialysis Clinic, Inc. ("DCI") in Union Springs, Alabama.  In 2007, Plaintiff took an extended leave of absence following a heart attack.  She exhausted all of the Family and Medical Leave Act ("FMLA") leave to which she was entitled. At the end of her FMLA leave, DCI granted Plaintiff an additional 30-day personal leave of absence in accordance with company policy.  At the end of her extended leave of absence, DCI terminated Plaintiff's employment because she was not able to return to her full-time work schedule, and she declined the potential opportunity to work two, twelve-hour shifts per week.

Plaintiff has asserted one cause of action in this case: retaliatory discharge in violation of the FMLA.  (Complaint ¶30-31).  DCI is entitled to summary judgment because Plaintiff cannot show (1) that there was a causal connection between her discharge and her FMLA leave or (2) that DCI's reason for discharging her was a pretext for unlawful retaliation.

## II.     STATEMENT OF FACTS

DCI is a not-for-profit corporation that provides treatment to patients with end-stage renal disease in both a chronic care setting (at stand-alone DCI clinics) and in an acute care setting (generally off-site at local hospitals).  (Affidavit of Dan Watson ("Watson Aff.")  ¶3).  DCI provides dialysis treatment throughout the United States.  (Id.).  The company's headquarters are located in Nashville, Tennessee.  (Id.).

DCI is an equal employment opportunity employer with well-known policies against unlawful discrimination and harassment.  (Watson Aff. ¶4, Ex. A).  DCI's Equal Employment Opportunity Policy expressly encourages employees with questions or concerns about any type of discrimination in the workplace to bring those issues to the attention of their supervisors, the Administrator, or the Corporate Human Resources Department.  (Id. ¶4, Ex. A).  The policy assures employees that they can raise their concerns and make reports without fear of reprisal.  (Id.).  The policy, furthermore, provides that "anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action up and including termination of employment."  (Id.).

DCI hired Plaintiff as a staff nurse at its clinic in Union Springs, Alabama in 2000.  (Complaint ¶7-8; Watson Aff. ¶6).  The Union Springs clinic was a small clinic.  (Watson Aff. ¶6).  During 2005, there were approximately 4 full-time nurses assigned to the clinic.  (Id.).  Soon after her employment began, DCI promoted Plaintiff to the Charge Nurse position at that clinic.  (Complaint ¶9).  She reported to the Nurse Manager (Denise Damron in 2004 and Karen Hamilton in 2005).  (Deposition of Margaret Carter ("Plaintiff") p. 23, l. 20 – p. 24, l.10).  The Nurse Manager reported to Mr. Lee Ashbury, Jr., Administrator, who is deceased.  (Id. p. 21, l. 11 – p. 22, l. 4).  Mr. Ashbury was responsible for the day-to-day operation of several clinics in

Alabama.  (Watson Aff. ¶6).  His office was located in a DCI clinic in Montgomery, Alabama.
(Plaintiff p. 21, l. 20-22).

Throughout Plaintiff's employment, DCI had a written FMLA Policy.  (Plaintiff p. 23, l.
1-9, Ex. 3; Watson Aff. ¶5).  DCI included a thorough explanation of the FMLA in its handbook
and provided a copy of that handbook to all employees, including Plaintiff.  (Plaintiff p. 22, l. 7 –
p. 23, l. 9, Ex. 2 and Ex. 3; Watson Aff. ¶5).  Plaintiff acknowledged that she received the
handbook and was aware of the FMLA policy.  (Id. p. 22, l. 7 – p. 23, l. 9, Ex. 3).  Plaintiff also
admitted that management approved and facilitated four leaves of absence for her: a personal
leave of absence in 2003, her first FMLA leave in 2004, a second FMLA leave in 2005, and a
second personal leave in 2005.  (Id. p. 32, l. 21 – p. 35, l. 2, p. 39, l. 4-23, p. 83, l. 9-15).

In January of 2003, DCI allowed Plaintiff to take a thirty-day personal leave of absence
following the death of her fiancé.  (Plaintiff p. 33, l. 4 – p. 35, l. 2, Ex. 5).  In a letter dated
January 6, 2003, Mr. Ashbury explained to Plaintiff her rights and obligations and encouraged
her to contact him if she had any questions.  (Id. p. 35, l. 5-10, Ex. 6).  He specifically advised
her that her job was not protected during her leave.  (Id. Ex. 6).  When that personal leave
expired, Plaintiff returned to her former job with no changes in the terms and conditions of her
employment.  (Id. p. 34, l. 14 – p. 35, l. 2).

When Plaintiff had health problems in 2004, DCI granted her request for FMLA leave.
(Plaintiff p. 39, l. 4-23; Complaint ¶14).  While she was on her FMLA leave, Mr. Ashbury
communicated with her in order to ensure that she understood her rights, obligations, and
employment status.  (Plaintiff p. 40, l. 5 – p. 41, l. 2, Ex. 8).  In his letter to Plaintiff dated
November 30, 2004, Mr. Ashbury advised Plaintiff, "If you have any questions about the leave,
you can find information about it on pages 53-57 of our employee handbook.  If you still have

questions or do not totally understand the provisions of the leave, please feel free to call me or Denise Damron, R.N., Nurse Manager."  (Id. Ex. 8).  When Plaintiff's first FMLA leave expired in December of 2004, she returned to her former position with no changes in the terms and conditions of her employment.  (Id. p. 41, l. 3-16).  No one made any negative remarks to her about her FMLA leave.  (Id.).

When Plaintiff had a heart attack in May of 2005, DCI granted her request for a second FMLA leave.  (Plaintiff p. 47, l. 17 – p. 48, l. 9; Complaint ¶12-13).  As he had done previously, Mr. Ashbury communicated with Plaintiff while she was on leave in order to ensure that she understood her rights, obligations, and employment status.  (Plaintiff p. 82, l. 21 – p. 83, l. 5, Ex. 13).  In his letter to Plaintiff dated May 30, 2005, Mr. Ashbury assured Plaintiff, "If you have any other questions about the leave, you can find information about it on pages 53-57 of our employee handbook.  If you still have questions or do not totally understand the provisions of the leave, please feel free to call me, Karen Hamilton, R.N., Nurse Manager, or Carolyn Green." (Id. Ex. 13).

During Plaintiff's leave of absence, DCI adopted new work schedules for all nurses and patient care technicians at the Union Springs clinic.  (Affidavit of Karen Hamilton ("Hamilton Aff.") ¶4; Plaintiff p. 61, l. 6-12, p. 76, l. 7-22).  Under the former schedule, full-time nurses worked approximately ten hours per day, four days per week.  (Hamilton Aff. ¶4; Plaintiff p. 44, l. 21 – p. 46, l. 4).  Under the new schedule, full-time nurses worked approximately twelve to thirteen hours per day, three days per week.  (Hamilton Aff. ¶4; Complaint ¶19).  DCI made the schedule change based on the number of patients, its standards for patient care, and cost considerations, including the desire to reduce overtime.  (Hamilton Aff. ¶4).  The schedule change applied to all nurses and technicians.  (Id. ¶4; Plaintiff p. 61, l. 6-12).

4

Plaintiff received all of the FMLA leave to which she was entitled. (Plaintiff p. 84, l. 14-17). When Plaintiff exhausted all of her available FMLA leave, she was not able to return to work. (Hamilton Aff. ¶3; Complaint ¶13-14). Rather than terminate Plaintiff's employment, Mr. Ashbury placed her on a 30-day personal leave of absence in accordance with Company policy. (Plaintiff p. 86, l. 17-21, Ex. 16; Hamilton Aff. ¶3). In his letter dated June 27, 2005, Mr. Ashbury again made sure that Plaintiff understood her status and encouraged her to contact him if she had any questions. (Plaintiff Ex. 16). He also told her that, while he could not guarantee her reinstatement upon the expiration of her leave, DCI would consider her for any open positions if her physician released her to return to work. (Id. Ex. 16).

Plaintiff's personal leave ended on July 23, 2005, but she was not able to return to a full-time work schedule. (Plaintiff p. 53, l. 9 – p. 54, l. 22). Plaintiff's physician opined that, starting on July 25, 2005, Plaintiff could work eight-hour shifts for two weeks. (Plaintiff p. 53, l. 23 – p. 54, l. 22, Ex. 18). At that time, the nurses at the Union Springs clinic were working twelve to thirteen hours per day, three days per week. (Hamilton Aff. ¶4-5). Ms. Hamilton told Plaintiff that the clinic could not accommodate her request to work eight hours per day. (Plaintiff p. 65, l. 23 – p. 66, l. 9; Complaint ¶23). Ms. Hamilton suggested that DCI might allow Plaintiff to work two twelve-hour shifts per week. (Plaintiff p. 90, l. 5-10; Hamilton Aff. ¶5). Although Plaintiff persuaded her physician to modify her work restrictions to allow two twelve-hour shifts per week, she never disclosed the modified restrictions to Ms. Hamilton or Mr. Ashbury or discussed her modified restrictions with them. (Id. p. 67, l. 5-17, p. 90, l. 5 – p. 93, l. 1; Hamilton Aff. ¶6).

Ms. Hamilton informed Mr. Ashbury about Plaintiff's status and her request to work eight hours per day. (Hamilton Aff. ¶5). Mr. Ashbury consulted with Dan Watson, Associate

Director of Human Resources.  (Watson Aff. ¶7).  Mr. Watson advised him that discharge was appropriate if Plaintiff could only work eight hours per day.  (Id. ¶7).

In a letter dated July 26, 2005, Mr. Ashbury advised Plaintiff that DCI was terminating her employment effective July 25, 2005.  (Plaintiff p. 92, l. 16-19, Ex. 20).  He explained that eight-hour shifts were not compatible with the clinic's scheduling requirements.  (Id. Ex. 20).  However, he also told her that "we might be able to accommodate, on a temporary basis, two twelve hour shifts."  (Id.).  Plaintiff never responded to Mr. Ashbury's suggestion regarding two, twelve-hour shifts.  (Plaintiff p. 67, l. 5-17, p. 91, l. 5 – p. 93, l. 1; Hamilton Aff. ¶6).

Plaintiff testified that no manager or supervisor ever said or did anything that indicated that he or she was upset about her use of FMLA leave.  (Plaintiff p. 31, l. 11 – p. 32, l. 7, p. 97, l. 1-10).  Plaintiff also cannot identify any nurse at DCI who was allowed to work a reduced hours schedule following the expiration of a leave of absence.  (Id. p. 96, l. 18-23).

### III.    ARGUMENT

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).  If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action.  (Id.).  If the defendant does so, the plaintiff then must show that the defendant's proffered reason is pretextual.  (Id.).

In this case, Defendant is entitled to summary judgment on two grounds.  First, Plaintiff cannot show that there is a causal connection between her FMLA leave of absence and her

discharge.  Second, assuming Plaintiff can establish all elements of her *prima facie* case, she

cannot demonstrate that DCI's reason for her discharge was a pretext for unlawful retaliation.

**A.    Plaintiff cannot show that there is a causal connection between her FMLA leave of absence and her discharge.**

There is no evidence of the necessary causal connection between Plaintiff's FMLA leave

and her discharge.  In fact, the undisputed evidence shows that DCI took affirmative steps to

ensure that its employees understood their rights under the FMLA and made sure that Plaintiff

received all of the FMLA leave to which she was entitled.

Throughout Plaintiff's employment, DCI included a thorough explanation of the FMLA

in its handbook and provided a copy of that handbook to all employees, including Plaintiff.

(Plaintiff p. 22, l. 7 –p. 23, l. 9, Ex. 2 and Ex. 3).  Plaintiff acknowledged that she received the

handbook and was aware of the FMLA policy.  (Id. p. 22, l. 7 – p. 23, l. 9, Ex. 3).  There is no

genuine dispute that management approved and facilitated four leaves of absence for Plaintiff: a

personal leave of absence in 2003, her first FMLA leave in 2004, a second FMLA leave in 2005,

and a second personal leave in 2005.  (Id. p. 32, l. 21 – p. 35, l. 2, p. 39, l. 4-23, p. 83, l. 9-15).

When Plaintiff had health problems in 2004, DCI granted her request for FMLA leave.

(Plaintiff p. 39, l. 4-23; Complaint ¶14).  While she was on her FMLA leave, Mr. Ashbury

communicated with her in order to ensure that she understood her rights, obligations, and

employment status.  (Plaintiff p. 40, l. 5 – p. 41, l. 2, Ex. 8).  When Plaintiff's first FMLA leave

expired in December of 2004, DCI returned her to her former position with no changes in the

terms and conditions of her employment.  (Id. p. 41, l. 3-16).  No one made any negative remarks

to her about her FMLA leave.  (Id.).

When Plaintiff had a heart attack in May of 2005, DCI granted her request for a second

FMLA leave.  (Plaintiff p. 47, l. 17 – p. 48, l. 9; Complaint ¶12-13).  As he had done previously,

Mr. Ashbury communicated with Plaintiff while she was on leave in order to ensure that she understood her rights, obligations, and employment status.  (Plaintiff p. 82, l. 21 – p. 83, l. 5, Ex. 13).  In his letter to Plaintiff dated May 30, 2005, Mr. Ashbury assured Plaintiff, "If you have any other questions about the leave, you can find information about it on pages 53-57 of our employee handbook.  If you still have questions or do not totally understand the provisions of the leave, please feel free to call me, Karen Hamilton, R.N., Nurse Manager, or Carolyn Green." (Id. Ex. 13).

When Plaintiff exhausted all of her available FMLA leave, she was not able to return to work.  (Complaint ¶13-14; Hamilton Aff. ¶3).  Rather than terminate Plaintiff's employment, Mr. Ashbury placed her on a 30-day personal leave of absence in accordance with Company policy.  (Plaintiff p. 86, l. 17-21, Ex. 16; Hamilton Aff. ¶3).

Plaintiff's personal leave ended on July 23, 2005, but she was not able to return to a full-time work schedule.  (Plaintiff p. 53, l. 9 – p. 54, l. 22).  Plaintiff's physician opined that, starting on July 25, 2005, Plaintiff could work eight-hour shifts for two weeks.  (Plaintiff p. 53, l. 23 – p. 54, l. 22, Ex. 18).  At that time, the nurses at the Union Springs clinic were working twelve to thirteen hours per day, three days per week.  (Hamilton Aff. ¶4-5).  Ms. Hamilton told Plaintiff that the clinic could not accommodate her request to work eight hours per day.  (Plaintiff p. 65, l. 23 – p. 66, l. 9; Complaint ¶23).

Ms. Hamilton informed Mr. Ashbury about Plaintiff's status and her request to work eight hours per day. (Hamilton Aff. ¶5).  Mr. Ashbury consulted with Dan Watson, Associate Director of Human Resources.  (Watson Aff. ¶7).  Mr. Watson advised him that discharge was appropriate if Plaintiff could only work eight hours per day.  (Id. ¶7).

In a letter dated July 26, 2005, Mr. Ashbury advised Plaintiff that DCI was terminating her employment effective July 25, 2005. (Plaintiff p. 92, l. 16-19, Ex. 20). He explained that eight-hour shifts were not compatible with the clinic's scheduling requirements. (Id. Ex. 20). However, he also told her that "we might be able to accommodate, on a temporary basis, two twelve hour shifts." (Id.). Plaintiff never responded to Mr. Ashbury's suggestion regarding two, twelve-hour shifts. (Plaintiff p. 67, l. 5-17, p. 90, l. 5 – p. 93, l. 1).

No manager or supervisor ever said or did anything that indicated that he or she was upset about Plaintiff's use of FMLA leave. (Plaintiff p. 31, l. 11 – p. 32, l. 7, p. 97, l. 1-10). Plaintiff also cannot identify any similarly situated, full-time nurse at DCI who was allowed to work a reduced hours schedule following the expiration of a leave of absence. (Id. p. 96, l. 18-23). Based upon the preceding undisputed facts, DCI submits that Plaintiff cannot establish a genuine issue of material fact regarding a causal connection between her use of FMLA leave and her discharge.

**B.     Plaintiff cannot demonstrate that DCI's reason for her discharge was a pretext for unlawful retaliation.**

In order to establish pretext and to avoid summary judgment, the plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that the employer's reason is pretextual. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). When considering whether the employer's reason was pretextual, however, the court will not decide whether business decisions are prudent or fair. Instead, the court's sole concern is whether unlawful discriminatory animus motivated the challenged employment decision. Damon v Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

In this case, DCI discharged Plaintiff because, after using all FMLA leave and personal leave to which she was entitled, she was not able to return to her full-time work schedule, and

she declined the potential opportunity to work two, twelve-hour shifts per week.  Plaintiff cannot

establish that this legitimate, non-discriminatory reason for discharging her was a pretext for

FMLA retaliation.

The undisputed facts support DCI's reason.  There is no genuine dispute that Plaintiff

exhausted all of the FMLA leave and personal leave to which she was entitled.  There is no

genuine dispute that, upon the expiration of her leaves of absence, she could not return to the

work schedule of a full-time nurse (i.e., 12-13 hour shifts three days per week).  There also is no

genuine dispute that Plaintiff never responded to Mr. Ashbury's suggestion regarding the

possibility of working two, twelve-hour shifts.  (Plaintiff p. 67, l. 5-17, p. 90, l. 5 – p. 93, l. 1).

There is no evidence that DCI's reason was insufficient to justify the discharge decision.

Plaintiff cannot identify any similarly situated, full-time nurse at Union Springs who was

allowed to work a reduced hours schedule following the expiration of a leave of absence.

(Plaintiff p. 96, l. 18-23).

Finally, there is no proof that the asserted reason was not the actual motivation for the

discharge decision.  Plaintiff cannot offer any evidence that any decision-maker had some

negative reaction or feeling about Plaintiff's use of FMLA leave.  In fact, Plaintiff testified that

no manager or supervisor ever said or did anything that indicated that he or she was upset about

Plaintiff's use of FMLA leave.  (Plaintiff p. 31, l. 11 – p. 32, l. 7, p. 97, l. 1-10).

DCI had a well-publicized FMLA policy, and the Company helped Plaintiff with multiple

leaves of absence, including two FMLA leaves.  DCI took affirmative steps to ensure that

Plaintiff always understood her rights and obligations.  DCI did not discharge Plaintiff after her

first FMLA leave in 2004.  She returned to her former job with no change in her hours, duties, or

pay.  DCI also did not discharge Plaintiff after her second FMLA leave of absence, even though

she was not able to return to work.  Instead, DCI granted her an additional thirty day personal leave of absence in the hopes that she would recover.  Upon the expiration of that personal leave, DCI even suggested a possible modified schedule (two twelve hour shifts per week), but Plaintiff never expressed any interest in that opportunity.  Given these undisputed facts, Plaintiff cannot show that DCI's reason for her discharge was a pretext for retaliation.

## IV.    CONCLUSION

Based upon the foregoing facts and applicable law, DCI submits that Plaintiff's claim of FMLA retaliation should be dismissed as a matter of law.

DATED this 13th day of June, 2008.

Respectfully submitted,

s/Davidson French
Davidson French (TN BPR#015442)
Tim K. Garrett (TN BPR #12083)
Bass, Berry & Sims, PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6240
(615) 742-2740 Fax
Email: dfrench@bassberry.com


Henry C. Barnett, Jr. Esq. (AL BAR 037)
Capell & Howard P.C.
150 South Perry Street
Montgomery, Alabama 36104
(334) 241-8000
(334) 241-8214 Fax
Email: hcb@chlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th of June, 2008 a copy of the foregoing Memorandum in Support Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to

    John D. Saxon
    Russell P. Parker
    Attorneys for Plaintiffs
    2119 Third Avenue North
    Birmingham, AL 35203

Parties may access this filing through the Court's electronic filing system.

                       s/Davidson French

6826982.1

21

1     time to get my feet wet, to readjust to the

2     schedule and all like that. She

3     continued -- I remember at some point

4     asking her does Lee know about this,

5     corporate. I was told twice -- two

6     different times that there was nothing we

7     can do for you. It wasn't nothing that she

8     could do. She made the statement a couple

9     of times there's nothing we can do to help

10     you. So ...

11  Q.  You just mentioned somebody named Lee.

12  A.  Ashbury. He was her boss, I guess.

13  Q.  Was he the administrator?

14  A.  I believe so. Montgomery.

15  Q.  And Karen Hamilton was the nurse manager?

16  A.  Nurse manager.

17  Q.  Was she the highest ranking person at the

18     Union Springs clinic?

19  A.  Yes, sir.

20  Q.  Lee Ashbury did not work at the Union

21     Springs clinic, did he?

22  A.  No, sir. He was in Montgomery.

23  Q.  But Ms. Hamilton reported to Mr. Ashbury?

22

1   A.   From my understanding, yes, sir.

2   Q.   And Mr. Ashbury is deceased as far as you

3        know?

4   A.   Uh-huh (positive response).

5                    (Defendant's Exhibit 2 was marked

6                     for identification.)

7   Q.   Let me hand you another document that's

8        been marked Exhibit Number 2 and ask if

9        that's your signature at the bottom of it.

10  A.   Yes, sir.  That's my signature.

11  Q.   Do you recall getting a copy of the DCI

12       benefits package book?

13  A.   Yes, sir.

14  Q.   Do you still have a copy of that?

15  A.   My -- Mr. Saxon has a copy of it.

16  Q.   I think we sent Mr. Saxon a copy.  Did you

17       give Mr. Saxon a copy?

18  A.   Yes, sir.  I gave him -- I brought one to

19       him.

20                 MR. FRENCH:  If we could mark this

21              document as Exhibit 3, please.

22            (Defendant's Exhibit 3 was marked

23               for identification.)

23

1    Q.    Let me ask you to review Exhibit 3 and tell

2          me if you recognize it.

3    A.    Yes, sir.

4    Q.    Can you tell me what that is?

5    A.    Well, it's just about the family medical

6          leave policy.

7    Q.    Was it Dialysis Clinic, Inc.'s family

8          medical leave policy?

9    A.    Yes, sir.

10                    (Defendant's Exhibit 4 was marked

11                      for identification.)

12   Q.    Let me hand you a document that's been

13         marked Exhibit 4 and ask if you recognize

14         that document.

15   A.    Yes, sir.

16   Q.    To the best of your recollection, was that

17         DCI's personal leave policy while you were

18         an employee?

19   A.    To the best of my recollection, yes, sir.

20   Q.    When you started at DCI, who was your

21         immediate supervisor?

22   A.    Denise Damron.

23   Q.    And she was the nurse manager?

24

1    A.    Uh-huh (positive response).  Yes, sir.

2    Q.    Who followed Denise Damron as the nurse

3          manager?

4    A.    When Denise left, it was Karen Hamilton.

5    Q.    Did you ever have an immediate supervisor

6          other than Ms. Damron or Ms. Hamilton?

7    A.    No, sir.

8    Q.    So as of May 2005 Karen Hamilton was your

9          immediate supervisor?

10   A.    Yes, sir.

11   Q.    Was Denise Damron still working with DCI at

12         that point?

13   A.    No, sir.

14   Q.    Do you know why she left DCI?

15   A.    Her and her family moved to Montgomery and

16         I believe -- and she got a job in

17         Montgomery.  That's about all I know.

18   Q.    Have you had any contact with Ms. Damron

19         since your employment ended?

20   A.    The only -- I've seen her mother because

21         they're from Union Springs.  I've seen her

22         mother and asked about her, but I have not

23         personally seen Denise.

31

| | | |
|---|---|---|
| 1 | Q. | What was Bobby Streeter's position? |
| 2 | A. | Well, he did all the ordering and machine |
| 3 | | upkeep and things like that. |
| 4 | Q. | Another technical position? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Do you recall what his problem was that |
| 7 | | caused him to need a leave of absence? |
| 8 | A. | I would have to guess on that one. |
| 9 | Q. | Well, don't guess.  Do you remember? |
| 10 | A. | No.  I can't be specific, no. |
| 11 | Q. | Did Mr. Ashbury ever say anything to you |
| 12 | | that made you think that he didn't like it |
| 13 | | when people took leaves of absence? |
| 14 | A. | No, sir. |
| 15 | Q. | How about Ms. Hamilton, did she ever say |
| 16 | | anything to you that made you think she |
| 17 | | didn't like it when people took a leave of |
| 18 | | absence? |
| 19 | A. | Well, I mean, she was only DON or clinical |
| 20 | | manager a short time before I had my heart |
| 21 | | attack, so that would -- I really couldn't |
| 22 | | honestly answer that yes or no because she |
| 23 | | wasn't there long enough, you know, before |

32

1        I had my heart attack.

2    Q.   But while she was there, did she ever say

3        anything that made you think that she

4        didn't like it when people took a leave of

5        absence?

6    A.   To the best of my knowledge, I don't recall

7        anything.

8    Q.   Did any other employees complain to you

9        about Lee Ashbury or Karen Hamilton?

10   A.   Well, you know, nobody -- I guess, you

11       know, if you complain you complain to your

12       coworkers.  Just trivial -- I mean, nothing

13       major.  I can't even remember.  You know,

14       just trivial things.  Oh, so-and-so did

15       this and I didn't like it.  You know, just

16       trivial things.  Nothing major.

17   Q.   You can't even remember anything today?

18   A.   No.  I mean, it's just trivial stuff.

19                (Defendant's Exhibit 5 was marked

20                   for identification.)

21   Q.   Let me hand you a document that's been

22       marked Exhibit 5 and ask if you recognize

23       that.

33

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Can you tell me what this is? |
| 3 | A. | My fiance died. |
| 4 | Q. | But this is a leave of absence form and you |
| 5 | | requested time off when your fiance passed |
| 6 | | away? |
| 7 | A. | Yes. |
| 8 | Q. | And it was January of '03? |
| 9 | A. | Yes. |
| 10 | Q. | Who did you talk to about needing a leave |
| 11 | | of absence? |
| 12 | A. | Denise Damron.  She was wonderful. |
| 13 | Q. | And did DCI approve this? |
| 14 | A. | Yes. |
| 15 | Q. | Do you know if Mr. Ashbury was involved? |
| 16 | A. | No, I don't. |
| 17 | Q. | Do you recognize the signature that's under |
| 18 | | your signature? |
| 19 | A. | No, I don't.  It looks like it -- I don't |
| 20 | | know what that is. |
| 21 | Q. | Is that your signature at the bottom of the |
| 22 | | page? |
| 23 | A. | That's mine above it, yes. |

34

| | | |
|---|---|---|
| 1 | Q. | And Ms. Damron was wonderful when you asked |
| 2 | | her about this leave? |
| 3 | A. | I took care of him, yes.  He died of cancer. |
| 4 | Q. | And how long were you off in January of |
| 5 | | '03? |
| 6 | A. | I was off for 30 days. |
| 7 | Q. | Was that a personal leave of absence? |
| 8 | A. | Yes, sir. |
| 9 | Q. | I didn't mean to upset you. |
| 10 | A. | I guess it was personal. |
| 11 | Q. | I apologize for upsetting you. |
| 12 | A. | That's all right.  It's just very sensitive |
| 13 | | still. |
| 14 | Q. | I understand.  Did you have any problems |
| 15 | | related to that leave of absence? |
| 16 | A. | No. |
| 17 | Q. | Did you return to your former job at the |
| 18 | | end of the leave? |
| 19 | A. | Yes. |
| 20 | Q. | Making the same amount of money? |
| 21 | A. | Yes. |
| 22 | Q. | Did anybody ever say or do anything to you |
| 23 | | that made you think that they were unhappy |

35

1    that you took that leave?

2    A.    No, sir.

3                 (Defendant's Exhibit 6 was marked

4                  for identification.)

5    Q.    All right.  Let me hand you a letter dated

6          January 6, 2003 that's been marked Exhibit

7          6 from Mr. Ashbury.  Do you recall

8          receiving a copy of that letter?

9    A.    Vaguely.  I was just real upset then.  I

10         vaguely remember something like that.

11                (Defendant's Exhibit 7 was marked

12                 for identification.)

13   Q.    Let me hand you a letter dated --

14         handwritten letter dated December 11, 2003

15         that I think you wrote.  It's been marked

16         Exhibit 7.  Do you recognize that document?

17   A.    Yes, sir.

18   Q.    Did you write this letter?

19   A.    Yes.

20   Q.    What prompted you to write this letter?

21   A.    Nerves, I guess.  He was very ill and I

22         was -- I just didn't want to hinder the

23         facility, you know, with what was going

39

1        this and that.  I mean, nothing specific.

2        You know, I was happy there.  I mean, you

3        know ...

4  Q.  At some point did you need to request a

5        leave of absence because of a problem with

6        your feet?

7  A.  I had to have surgery.

8  Q.  All right.  What was the surgery for?

9  A.  He had to take out some bone and I had

10       spurs and it was inflamed and all.  And I

11       had to have surgery on my foot and stay off

12       of it two or three weeks, however long it

13       was.

14 Q.  Who did you tell that you were going to

15       have surgery and needed time off?

16 A.  Whoever -- I guess it was -- Let's see.  I

17       guess it was Denise or it might have been

18       Karen at that point.  I'm confused at that

19       point now.  I can't even remember dates.  I

20       think it was Denise that was still there.

21 Q.  Did they give you any trouble about taking

22       time off?

23 A.  No, sir.

40

1    MR. FRENCH:  If we could mark that

2        as Exhibit 8, please.

3        (Defendant's Exhibit 8 was marked

4        for identification.)

5    Q.   Do you recall receiving a copy of Exhibit

6        8?

7    A.   Yes, sir.  I vaguely remember that.

8    Q.   If you look at the end of page 2 under the

9        signature line.

10   A.   Uh-huh (positive response).

11   Q.   Do you see where it says PLA note?

12   A.   Uh-huh (positive response).

13   Q.   I assume that's --

14   A.   Yes, sir.

15   Q.   -- PL Ashbury, PLA?

16   A.   I would assume that maybe, too, I guess.

17   Q.   Would you take a minute or two and read

18       those two short paragraphs for me.  Not out

19       loud.  Just to yourself.  I wanted to ask

20       you if any of that information is

21       incorrect.

22       (Brief pause.)

23   Q.   To the best of your recollection is that

41

1          information accurate?

2     A.   To the best of my recollection, yes.

3     Q.   When you came back from the leave of

4          absence in December of '04, did you come

5          back to your same job?

6     A.   Yes, sir.

7     Q.   Same pay?

8     A.   Yes, sir.

9     Q.   Any change in benefits?

10    A.   No, sir.

11    Q.   Any change in your hours or

12         responsibilities?

13    A.   No, sir.

14    Q.   Anybody ever make any negative comments to

15         you about taking that FMLA leave in 2004?

16    A.   No, sir.

17    Q.   Do you recall any significant problems at

18         work between December of '04 and May of

19         '05?

20    A.   All right.  Now, December '04 to May '05?

21    Q.   Right.  That's when you came back from your

22         foot surgery leave and then you had your

23         heart attack in May of '05.

44

```
 1   A.   10 hours until whenever.
 2   Q.   I understand you would work over if the
 3        patient was still there and needed ...
 4   A.   (Witness nods head).
 5   Q.   But the normal expectation was four days a
 6        week, 10 hours a day?
 7   A.   Correct.
 8   Q.   Who were the other RNs at that time?
 9   A.   Bertha Baker.  I think Teresa Haskell was
10        still there.  Yeah, I believe she was.  Me
11        and, of course, Karen Hamilton.  That's all
12        I can remember at this moment.
13   Q.   All right.  Did all of the RNs work four
14        days a week 10 hours a day?
15   A.   To the best of my knowledge, yes.
16   Q.   How about the patient care technicians, did
17        they mirror y'all's schedule --
18   A.   Yes, sir.
19   Q.   -- four days a week, 10 hours a day?
20   A.   Yes, sir.
21   Q.   Do you know who set the work schedules for
22        the RNs?
23   A.   Well, when I started there it was always
```

47

1       day or the next day; right?

2   A.   Correct.

3   Q.   In fact, they took you out of work for

4        several weeks?

5   A.   Yes, sir.

6   Q.   And as of May 9th, 2005 you were still in

7        the charge nurse position?

8   A.   Yes, sir.

9   Q.   And your immediate supervisor at that time

10       was Karen Hamilton?

11  A.   Yes, sir.

12  Q.   And the administrator at that time was Lee

13       Ashbury?

14  A.   Yes, sir.

15              (Defendant's Exhibit 9 was marked

16                  for identification.)

17  Q.   Here's a copy of the complaint that you

18       filed in this lawsuit.  It's marked Exhibit

19       9.  And if you'd turn to page 3, please,

20       ma'am.  And we've covered much of this, but

21       I want to just make sure that this

22       information is accurate.  Would you review

23       paragraph 10 through paragraph 14 on page

48

1          3 --

2    A.    Okay.

3    Q.    -- and tell me if anything in those

4          paragraphs is not correct.

5    A.    That's correct.

6    Q.    All of the information in paragraph 10

7          through paragraph 14 is correct?

8    A.    To the best of my knowledge at this point,

9          yes.

10   Q.    On page 4, paragraph number 15, do you see

11         that?

12   A.    Yes, sir.

13   Q.    It says that you updated defendant

14         regarding your condition every week.  Who

15         did you speak to about your condition while

16         you were out?

17   A.    While I was out I would talk to Karen

18         Hamilton.  If she was busy, I would talk to

19         the secretary, Carolyn Green.

20   Q.    Do you know who Ms. Green reported to?

21   A.    To Karen.

22   Q.    And when you spoke to Ms. Hamilton while

23         you were out, what did she tell you?

53

1   Q.   But did you ever have a conversation with

2         her where she said, I got it, I have it

3         right here?

4   A.   I don't recall at this time because the

5         way -- I just don't recall right now.

6   Q.   All right.  Now, we have talked a little

7         bit about this, the conversations that you

8         had with Ms. Hamilton about coming back to

9         work.  Do you recall when your doctor

10        released you to return to work?

11  A.   I was trying to get back July the 23rd and

12        I think -- I don't know what date that was

13        on, but that's when I was trying to get

14        back was when my leave was up.

15  Q.   Okay.

16  A.   He was aware of that, so ...

17  Q.   All right.  It's your understanding that

18        your leave was up July 23rd of 2005?

19  A.   Yes, sir.

20  Q.   And you were trying to come back as of that

21        date?

22  A.   Correct.

23  Q.   What did your doctor -- Did your doctor

54

1       release you to return to work?

2   A.  Yes, sir.

3   Q.  Was it to return to work light duty?

4   A.  For -- Instead of 13-hour shifts, he wanted

5       me to work just some eight-hour shifts for

6       the first couple of weeks.

7   Q.  Could you work three days a week eight

8       hours a day --

9   A.  Correct.

10  Q.  -- or could you --

11  A.  Correct.

12  Q.  Did he tell you how many days a week you

13      could work?

14  A.  Three.

15  Q.  All right.  So did he tell you you should

16      not work more than three?

17  A.  For the first couple of weeks that's all he

18      wanted me to work.

19  Q.  So it was your understanding from your

20      doctor that you could work three days a

21      week eight hours per day?

22  A.  Correct.

23  Q.  Did he tell you why he thought you could

61

1      wanted my job, you know.

2  Q.  But what did the doctor say?

3  A.  He wanted me to work eight hours, and I was

4      trying to go by what he thought was best

5      for me.

6  Q.  When you found out that the schedules had

7      been changed, was it your understanding

8      that it had been changed for everybody?

9  A.  Correct.  As far as the floor personnel.

10  Q.  It wasn't just your schedule that had been

11      changed?

12  A.  Correct.

13  Q.  All right.  Paragraph 26 of the complaint.

14  A.  Okay.

15  Q.  Who offered you the nurse manager's

16      position?

17  A.  That was Lee Ashbury.  He came down to the

18      clinic.

19  Q.  What did he tell you when he offered you

20      the nurse manager's position?

21  A.  That they wanted to offer it to me first.

22      It was me and Karen.  Karen had applied for

23      it.  I had not applied for it.  They came

65

1    Q.   Why did you feel like you would need more

2         than two weeks to --

3    A.   I didn't.  I never said I did.  I was just

4         trying to do what he said he wanted me to

5         do was work eight-hour shifts for two

6         weeks, like three days a week eight-hour

7         shifts for two weeks.  I never said it was

8         more.

9    Q.   So even if you came back in July of '05,

10        you thought, all right, I'll need to work

11        two weeks.  If you came back in August of

12        '05, you felt like you'd need to work eight

13        hours for two weeks?

14    A.   Correct.

15    Q.   Just to kind of get your feet under you and

16        get used to working again.  Is that --

17    A.   Yes, sir.  When I had that heart attack, it

18        pretty well -- it scared me.  I was

19        scared.  I'll be honest with you.  I was

20        scared.  And then when I thought I was

21        having another heart attack I was double

22        scared.  So I just -- Yeah.

23    Q.   So when you told Ms. Hamilton that it

66

```
 1          doesn't matter when you come back, you're
 2          still going to need to work eight-hour
 3          shifts for two weeks, what did she say?
 4    A.    I've already told you.  That's when she --
 5          She just said there was nothing that we can
 6          do to help you.  You know, I just
 7          thought ...
 8    Q.    Was that how the conversation ended?
 9    A.    Pretty much.
10    Q.    After that conversation with Ms. Hamilton,
11          did you have any other conversations with
12          her or anybody else with DCI?
13    A.    No, sir.  I just, you know, told her it
14          wasn't fair, that I had been there five
15          years.  I was only asking for two weeks.
16    Q.    Did you try to get in touch with
17          Mr. Ashbury?
18    A.    I went through the chain of command.  From
19          my understanding -- I'm a firm believer in
20          chain of command.
21    Q.    I understand.  I understand why you spoke
22          to Ms. Hamilton.
23    A.    Because I asked her, I said, does Lee or
```

67

1        corporate know what's going on.  Her

2        statement to me was, there is nothing we

3        can do to help you.  So that included

4        everybody.

5    Q.  I understand.  After that conversation with

6        Ms. Hamilton, did you try to get in touch

7        with Mr. Ashbury?

8    A.  No, sir.

9    Q.  Did you try to get in touch with any other

10       manager or supervisor at DCI --

11   A.  No.

12   Q.  -- after your conversation with

13       Ms. Hamilton?

14   A.  No, sir.

15   Q.  Did you try to contact human resources?

16   A.  No, sir.  At that point I felt like she

17       just didn't want me there.

18               (Defendant's Exhibit 10 was marked

19                   for identification.)

20   Q.  Let me hand you a copy of a work schedule

21       for April of 2005 and ask if you recognize

22       that.

23   A.  Well, it's just a work schedule.  Yeah.

76

1        three or four days again and then you had a

2        week off.  So it was a lot of bunched up

3        time with a span off.  That was too

4        stressful for me.  That was just pushing it

5        a little bit too much.

6  Q.   All right.  I apologize if this is

7        redundant.  But to the best of your

8        knowledge, when the schedule was changed at

9        DCI, all of the floor personnel had to work

10       three days a week 12 to 13 hours per day?

11  A.   From my understanding, yes.

12  Q.   Do you have any reason to think that that's

13        not accurate?

14  A.   Well, considering I was never officially,

15        you know, sent any documentation about

16        that, this is just what I was being told,

17        I'm just, you know --

18  Q.   What I'm getting at -- and I'm not asking a

19        very good question.  Did anybody ever tell

20       you that that was not true, that there were

21       only some people who were working that?

22  A.   I don't -- No.  I don't think so.

23  Q.   Did Ms. Tyndal's schedule change?

82

1          or depression?

2     A.   No, sir.

3     Q.   Were you ever -- Did anyone other than your

4          primary care physician or your cardiologist

5          ever treat you for stress, anxiety or

6          depression?

7     A.   Just them.

8     Q.   Dr. Domingo?

9     A.   Yes, sir.

10    Q.   He's the one who treated you for -- or is

11         it a she?

12    A.   He.

13    Q.   He treated you for stress, anxiety and

14         depression?

15    A.   Yes, sir.

16    Q.   But you're not currently taking any

17         medications for any of those conditions?

18    A.   No, sir.

19              (Defendant's Exhibit 13 was marked

20                  for identification.)

21    Q.   Let me hand you a letter from Mr. Ashbury

22         dated May 30, 2005 -- it's been marked

23         Exhibit 13 -- and ask if you recognize that

83

1   letter.

2 A. Yes, sir.

3 Q. Do you recall receiving a copy of this

4   letter from Mr. Ashbury?

5 A. Yes, sir.

6 Q. Did you ever have any questions about your

7   FMLA leave?

8 A. No, sir.

9 Q. Did the company help you in every way that

10   you thought was appropriate with respect to

11   your FMLA leave?

12 A. You mean during my leave?

13 Q. Getting the leave established and during

14   the leave.

15 A. Yes, sir.

16      (Defendant's Exhibit 14 was marked

17       for identification.)

18 Q. Let me hand you a document that's been

19   marked Exhibit 14 and ask if you recognize

20   that.  Well, let me ask you another

21   question.  Is this the short-term

22   disability application form that you

23   submitted to DCI?

84

1  A.   Looks to be, yes, sir.

2  Q.   Is that your signature on the second page

3       next to the date 6/13/05?

4  A.   Yes, sir.

5  Q.   When you filled out this application form,

6       did you have any idea when you might be

7       able to return to work?

8  A.   Probably not if it was filled out right

9       after the heart attack.  I wouldn't have

10      been able to have known right then.

11 Q.   Do you recall when your doctor -- Never

12      mind.  Horrible thought.  It would have

13      been a worse question.

14          Do you feel like -- To the best of your

15      knowledge, did you receive all of the FMLA

16      leave that you were entitled to?

17 A.   To the best of my knowledge, yes.

18 Q.   To the best of your knowledge, did you

19      receive all of the personal leave that you

20      were entitled to under the DCI personal

21      leave policy?

22 A.   To the best of my knowledge, yes.

23 Q.   You just feel like they should have brought

86

1        didn't.  I'm just trying to find out what

2        you know.  Did you take this letter to DCI?

3  A.   No.

4  Q.   Did you ever have a conversation with

5        anyone at DCI about this letter?

6  A.   Well, when I would talk and call in to

7        Karen, you know, and give my report I

8        would, you know, basically tell them what

9        was going on, you know.

10  Q.   But do you recall having any conversation

11        with them about this letter?

12  A.   I would have to guess on that.  I -- Really

13        I don't recall if it would be specifically

14        this letter.

15                (Defendant's Exhibit 16 was marked

16                  for identification.)

17  Q.   All right.  Let me hand you a letter from

18        Mr. Ashbury dated June 27, 2005 that's been

19        marked Exhibit 16.  Do you recall receiving

20        a copy of that letter?

21  A.   Yes, sir.

22                (Defendant's Exhibit 17 was marked

23                 for identification.)

90

1          2005.  It's been marked Exhibit 19.  Have

2          you ever seen that letter before?

3     A.   I've seen it when I picked up my medical

4          records, but I know the context.

5     Q.   What's the context for this letter?

6     A.   When I had the conversation with Karen

7          Hamilton about me coming back to work on

8          eight-hour shifts and two weeks and all

9          like that, the remark was made to me that I

10         could work two 12-hour shifts.  And when I

11         thought that that was going to be my only

12         choice to save my job, then I went to

13         Dr. Domingo and told him that they were not

14         going to work me eight-hour shifts, that I

15         had to go back to 12-hour shifts two days a

16         week that I felt like in order to save my

17         job.

18    Q.   Did you take this letter to DCI?

19    A.   I don't think so.

20    Q.   Do you know if Dr. Domingo's office sent it

21         to DCI?

22    A.   They were supposed to.

23    Q.   Did you ever have a conversation with

91

1        anybody at DCI about this letter?

2   A.   I don't know if it pertained to this

3        letter.  But when I got to thinking about

4        it, I didn't contact them anymore.  I just

5        didn't want to go against what my doctor

6        wanted me to do.  I didn't want to work

7        12-hour shifts.  He wanted me to work

8        eight.  He just changed it to 12 because my

9        job depended on it.

10  Q.   So he changed it because you asked him to

11       change it?

12  A.   Because I asked him to.  I begged him to.

13  Q.   But you never called Karen Hamilton or

14       Mr. Ashbury back and told them that your

15       doctor said that you could do that, work

16       two days a week 12 hours a day?

17  A.   I had come to the conclusion that I wasn't

18       going to jeopardize my health.  The doctor

19       knew better.  He knew what my work was like

20       over there and what I had to do and I just

21       had to make a decision.  And I was going to

22       put my health -- what he wanted me to do

23       first.

92

1   Q.   Okay.  I just want to make sure I

2         understand.  So either the comment was made

3         or it appeared in a letter where they told

4         you that they would consider allowing you

5         to work two days a week a full shift of 12

6         or 13 hours?

7   A.   Correct.

8   Q.   You went to the doctor, told him that and

9         he said, okay, I'll write you this letter.

10        But you never followed up with DCI about

11        wanting to do two days a week 12 hours a

12        day?

13   A.   No, sir, I did not.

14                (Defendant's Exhibit 20 was marked

15                   for identification.)

16   Q.   Here's a letter from Mr. Ashbury dated July

17        26, 2005.  It's been marked Exhibit Number

18        20.  Did you receive a copy of that letter?

19   A.   Yes, sir.

20   Q.   After you received this letter from

21        Mr. Ashbury, did you have any conversation

22        with Karen Hamilton or Mr. Ashbury about

23        returning to work?

93

1    A.    To my knowledge, no, sir.

2    Q.    Did you ever receive a -- any other notice

3          or communication from DCI about your

4          termination?

5    A.    It seems like there -- Are these all the

6          letters you have?  There might have been --

7          I'm trying to think if there was another

8          letter.  Let's see.  There was -- You have

9          what I have.  So if that's all you have,

10         then that's all that I have.

11   Q.    Well, today you don't recall receiving

12         another letter from them about your

13         termination?

14   A.    After this July the 26th?

15   Q.    Correct.

16   A.    Oh, no, sir.

17                    (Defendant's Exhibit 21 was marked

18                      for identification.)

19   Q.    Let me hand you a notice of employee

20         termination dated August 9 of '05.  Have

21         you ever seen that document before?

22   A.    (Witness shakes head).

23   Q.    Did DCI send you a copy of that document?

96

1           to work other than you?

2    A.    Not that I'm aware of.

3    Q.    Are you aware of any employees who went out

4          on a personal leave of absence and were

5          allowed to come back to work in a light

6          duty capacity?

7    A.    Like I said previously, I believe Hazel

8          Goshay, Bobby Streeter from that clinic

9          right there.

10   Q.    But neither one of them were RNs, were

11         they?

12   A.    No, sir.

13   Q.    What were their positions?

14   A.    Technical machine, technical -- they were

15         all technical, you know, supplying, stuff

16         like that, keeping up with supplies,

17         machines.

18   Q.    Are you aware of any nurse at DCI who was

19         allowed to come back to work in a light

20         duty capacity following the expiration of a

21         leave of absence?

22   A.    Give me a minute.  At this point, no, I

23         can't recall anybody.

97

1   Q.   Do you recall any supervisor or manager at

2         DCI making any negative remarks to you or

3         about you taking a leave of absence?

4   A.   No, sir.

5   Q.   At any time during your employment did you

6         ever hear them -- any supervisor or manager

7         make a negative remark about an employee

8         taking an FMLA leave or a personal leave of

9         absence?

10  A.   To my knowledge, no.

11  Q.   All right.  The claim asserted in this

12        lawsuit is a FMLA retaliation claim.  And

13        this is my -- I'm going to tell you what I

14        think it is; all right?  I think it is you

15        have asserted that you believe that the

16        company terminated you because you took a

17        leave of absence that you were entitled to

18        under the Family and Medical Leave Act.  Is

19        that what you believe?

20  A.   The only thing -- Do you want me to put it

21        in my words or --

22  Q.   Your words would be great.

23  A.   The way I see it, I got -- I had a heart

RECEIPT FOR THE DCI BENEFITS PACKAGE BOOK

I have received a copy of the DCI Benefits Package Book for Dialysis Clinic, Inc. (2001 edition). I understand that the policies and procedures contained in this manual may be modified or amended by DCI at any time and are in no way to be interpreted as a contract between DCI and any of its employees. I further understand and acknowledge that my employment is not for a specific term, but shall be deemed to be an employment at will which can be terminated either by DCI or by me at any time.

I agree to read and keep my DCI Benefits Package Book for future reference and observe all present and future personnel policies and rules outlined in the DCI Benefits Package Book.

_Margaret Carter_
Signature

_6/8/01_
Date


DEFENDANT'S EXHIBIT
2

## FAMILY AND MEDICAL LEAVE OF ABSENCE POLICY

Employees who have worked for DCI for at least 12 months and at least 1,250 hours during the prior 12 months preceding the start of the leave may take up to 12 weeks of unpaid leave for any one of the following reasons:

1.  Birth and/or care of a child of the employee (expires 12 months after birth);

2.  Placement of a child into the employee's family by adoption or by a foster care arrangement (expires 12 months after placement);

3.  In order to care for the employee's spouse, child, or parent who has a serious health condition; or

4.  A serious health condition which renders the employee unable to perform the essential functions of the employee's position.

In the case of unpaid leave for the birth of and/or care for a child, intermittent leave or working a reduced number of hours is not permitted unless both the employee and DCI agree.

In case of unpaid leave for serious health conditions, the leave may be taken intermittently or on a reduced hours basis only if such leave is certified as being medically necessary.



53

03/01

If intermittent or reduced hours leave is required, DCI may at its sole discretion temporarily transfer the employee to another job with equivalent pay and benefits that better accommodates that type of leave.

During a FMLA leave, coverage under DCI's group health, life, accidental death and dismemberment, and long-term disability plans will be continued provided the employee continues to pay any applicable employee contribution. Failure by the employee to pay such contribution before the expiration of a 30-day grace period will result in loss of coverage. If the employee does not return to work after the expiration of the leave, the employee will be required to reimburse DCI for total payment of insurance premiums during the FMLA leave, unless the employee does not return due to a serious health condition which prevents the employee from performing their essential job functions with reasonable accommodation or circumstances beyond the control of the employee.

Employees are required to use any earned but unused vacation or bonus holiday hours as part of the approved period of leave. The only exception to this will be for employee's on an FMLA that is the result of a claimed worker's comp injury.

Employee's are required to use sick time if the FMLA is for the birth of a child, to care for the employee's spouse, child, or parent who has a serious health condition; or a serious health condition which renders the employee unable to perform the essential functions of the employee's position.

A maximum of twelve weeks' leave may be taken for any and all of the above reasons during any 12-month period

measured backward from the date an employee uses any FMLA leave (but not extending back before August 5, 1993).

Employees who return to work from a FMLA leave within or on the business day following the expiration of the 12 weeks are entitled to return to their job or an equivalent position without loss of benefits, pay or status.

Benefit accruals, such as vacation, sick leave, or holiday time, will be suspended during the leave, and the employee's evaluation date will be extended by a period equal to the duration of the leave. Any employee who is on a leave of absence at the end of the calendar year will not be entitled to receive pay for any unused sick time, employee's on a leave of absence when Year End Bonuses are paid the following criteria will be used:

1. No year end bonuses will be paid to anyone not working for DCI the day the bonus checks are passed out. (If an individual is no longer a DCI employee when the checks are passed out they will not receive a bonus.)

2. An employee must have worked at least 6 months of the bonus qualifying period (DCI fiscal year) in order to participate in the bonus program for that year. An employee with less than 6 months service in the bonus period, may be paid a bonus at the discretion of the Administrator.

3. If an employee is on a Leave of Absence at the time year end bonuses are paid they will not receive a bonus

until they have returned to an active status with DCI and have worked their regular shift for 90 calendar days.

Application for FMLA leave must be submitted in writing. Employees are required to give DCI at least 30 days advance notice before a family and medical leave begins if the need for the leave is based on pregnancy, adoption, foster care placement or planned medical treatment. If such notice is not possible, notice must be given as soon as is practicable but at the very least within two days after the need for leave becomes known to the employee. The written application must be submitted to the Facility Administrator to initiate leave. Employees requesting medical leave should provide DCI with an appropriate medical certification from a licensed physician. DCI has the right to verify this medical certification or to request a second opinion from a DCI appointed physician. Periodic recertifications may be required to be submitted at 30 day intervals.

Before an employee will be permitted to return to work from medical or maternity leave of absence, you must provide evidence from your doctor that you are physically able to perform the essential functions of your job with or without reasonable accommodation. If, at the time you are released by your doctor, you are offered a job and refuse, your employment will be terminated at that time.

No pyramiding of leave is permitted. An eligible employee is permitted a total of 12 weeks during any 12 month period. Leaves granted under this policy will be identified as family

and medical leave and counted against the Family and
Medical Leave Act entitlement.


NOTE:  This policy is intended to follow the regulations
adopted under the federal Family and Medical Leave Act of
1993.  To the extent that any matters not covered under this
policy arise, DCI will look first to these regulations for
appropriate action.

LEAVE OF ABSENCE

EMPLOYEE: *MARGARET CARTER RN*    DATE: 1/03/03

REASON FOR LEAVE: *FAMILY DEATH*

DURATION OF LEAVE: *. 30 DAYS*

STATUS OF INSURANCE: *SEE ATTACHED LETTER DATED 1/6/03*

CONDITIONS:

APPROVED/DENIED *APPROVED*

_____
Employee's Signature

_____
Supervisor's Signature

DEFENDANT'S EXHIBIT 5

# DIALYSIS CLINIC, INC.

( A Non-Profit Corporation)

544 South McDonough Street
Montgomery, Alabama, 36104

Ph.  334-265-9190
Fax 334-264-1879

RADHA K. KROTHAPALLI, M.D.
Medical Director

P. L. (LEE) ASHBURY, JR.
Administrator

January 6, 2003

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

Dear Margaret:

I am in receipt of your request for a personal leave of absence.  Denise Damron, R.N., Nurse Manager and I are in agreement in approving your request.  This letter is written to advise you of your status during your upcoming personal leave so that there is no misunderstanding of the details of the leave.

I want to advise you that I can only give you a personal leave for 30 days, and during that time your job is not protected.  Benefit accruals, such as vacation, sick leave or holiday time, will be suspended during the leave, and your evaluation date will be extended according to the time off.  According to policy, any unused vacation benefits or holidays must be paid out.  If there are any, they will need to be processed in upcoming payrolls.  If you participate in the health insurance benefit, or any other voluntary insurance program, the premiums will be deducted from monies due you according to pre-established deduction dates.  After the payments of all vacation and holiday benefits are exhausted, it will be necessary for you to make premium payments to Ronnie Debusk in my office in order for those benefits/policies not to lapse.

You have requested that your personal leave commence on January 3, 2003.  The conclusion of this personal leave will be February 3, 2003.  You will need to communicate with Denise Damron, R.N., Nurse Manager about your status during your personal leave.  She will need to be kept informed as to your intentions so that proper scheduling of nurses can take place.

If you have any other questions about the leave, you can find information about it on pages 58-61 of your employee handbook.  If you still have questions or do not totally understand the provisions of the leave, please feel free to call me or Denise Damron, R.N., Nurse Manager, or Ronnie Debusk, Bookkeeper.

I sincerely pray that you will be able to resolve the problems, which have led to your request for a personal leave.

Sincerely yours,

P. L. (Lee) Ashbury, Jr.
Administrator



DEFENDANT'S EXHIBIT
6

# DIALYSIS CLINIC, INC.

( A Non-Profit Corporation)

109 W. Conecuh Street
Union Springs, Alabama, 36089

Ph. 334-738-5715
Fax 334-738-5734

RADHA K. KROTHAPALLI, M.D.
Medical Director

P. L. (LEE) ASHBURY, JR.
Administrator

November 30, 2004

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

Dear Margaret:

I am so sorry to learn of the issues with your feet. They can be very painful. I wish you a speedy recovery.

This letter is written to advise you of your status during the time that you have had off. DCI as with all other employers has an obligation to inform you of your rights under a Family Medical Leave of Absence (FMLA). The provisions of a FMLA stipulate that because you are an employee of over twelve (12) months and have worked more than 1250 hours, you may take an unpaid leave for a health condition that prevents you from performing the essential functions of your position in the Union Springs clinic.

A maximum of 12 weeks may be taken during any 12-month period. Employees who return to work from a FMLA within or on the business day following the expiration of the 12 weeks are entitled to return to their job or equivalent position without loss of benefits, pay or status. If an employee is out longer than 12 weeks, the employee's job is no longer protected. Both paid and unpaid leave (sick days, vacation, holiday, etc.) will count against the 12 weeks of family medical leave provided to the employee by law. Sick time is paid out first until exhausted and then the vacation benefit would follow. It is my understanding that this FMLA started on October 29, 2004.

Benefit accruals, such as vacation, sick leave or holiday time, will accrue while you are receiving either sick time benefits or vacation benefits. After the booked benefits are exhausted, all benefits earned will be suspended, and your evaluation date will be extended from that point until you return to work. You will not be required under these circumstances to call in daily but need to let us know approximately every 2 weeks what your status is. Before you can return from this leave of absence, you must provide a doctor's statement stating you are physically able to perform your assigned duties at the clinic with or without reasonable accommodation. The doctor's statement must also contain the date you may return to work.

I know that you have Single Health Insurance of $15.00 per pay period. Additionally, you have several of the optional insurance policies that can be acquired through DCI. These health insurance premiums will

DEFENDANT'S
EXHIBIT
8

be deducted from your paycheck, just as they are currently, as long as there are vacation and/or sick pay benefits paid. Further, if you currently are having retirement monies taken from your paycheck to deposit with VALIC, these will continue to be deducted as long as there is a payroll being processed. If by chance your sick time and vacation benefits exhaust before you return to work, you will need to make arrangements with Carolyn Green for paying the premiums for the continuation of your insurance coverage. The VALIC payments would cease until you return to work.

I know that you planned to return to work on Friday November 26, 2004. You did in fact work that day, but another issue has surfaced that will require your being out sick for additional days. I was remiss in not getting this letter to you sooner. Since you will need more time off, I thought that it would be best for me to send this letter to you now.

If you have any other questions about the leave, you can find information about it on pages 53-57 of your employee handbook. If you still have questions or do not totally understand the provisions of the leave, please feel free to call me or Denise Damron, R.N., Nurse Manager.

Once again, I am sorry that you are experiencing health issues, and offer my sincere wishes for a rapid return to good health.

Sincerely yours,


P. L. (Lee) Ashbury, Jr.
Administrator

PLA Note: Margaret returned to work on her first scheduled day on November 26, 2004. She worked the full day. She worked from 5 to 11 on Saturday November 27, 2004 (a partial day), and was readmitted to the hospital on the same day. She was discharged on November 30, 2004. Finally, she returned to work on December 6, 2004.
It is my opinion that Margaret came back to work prematurely and her return date from the FMLA should be December 6, 2004. With this in mind, Margaret used 5 weeks and 1 day, leaving 6 weeks and 4 days until the anniversary of the FMLA of October 29, 2005.



DEFENDANT'S
EXHIBIT
13

# DIALYSIS CLINIC, INC.

( A Non-Profit Corporation)

109 W. Conecuh Street
Union Springs, Alabama, 36089

Ph. 334-738-5715
Fax 334-738-5734

RADHA K. KROTHAPALLI, M.D.
Medical Director

P. L. (LEE) ASHBURY, JR.
Administrator

May 30, 2005

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

Dear Margaret:

I am so sorry to learn of the current issues with your health. I certainly can relate to on-going health problems.

As in the past, this letter is written to advise you of your status during the time that you will have off. Because of your having a previous FMLA the ground rules change a bit. The following is the standard language. I will follow it with your current status.

DCI as with all other employers has an obligation to inform you of your rights under a Family Medical Leave of Absence (FMLA). The provisions of a FMLA stipulate that because you are an employee of over twelve (12) months and have worked more than 1250 hours, you may take an unpaid leave for a health condition that prevents you from performing the essential functions of your position in the Union Springs clinic.

A maximum of 12 weeks may be taken during any 12-month period. Employees who return to work from a FMLA within or on the business day following the expiration of the 12 weeks are entitled to return to their job or equivalent position without loss of benefits, pay or status. If an employee is out longer than 12 weeks, the employee's job is no longer protected. Both paid and unpaid leave (sick days, vacation, holiday, etc.) will count against the 12 weeks of FMLA provided to the employee by law. Sick time is paid out first until exhausted and then the vacation benefit would follow.

Your previous FMLA started on October 29, 2004, and ended on December 6, 2004. This means that you used 5 weeks and 1 day of the 12-week benefit leaving 6 weeks and 4 days that can be used until October 28, 2005 when the 12-week benefit will again be available.

With the above in mind, this FMLA will expire on June 23, 2005.

Benefit accruals, such as vacation, sick leave or holiday time, will accrue while you are receiving either sick time benefits or vacation benefits. After the booked benefits are exhausted, all benefits earned will

be suspended, and your evaluation date will be extended from that point until you return to work. You will not be required under these circumstances to call in daily but need to let us know approximately every 2 weeks what your status is. Before you can return from this leave of absence, you must provide a doctor's statement stating you are physically able to perform your assigned duties at the clinic with or without reasonable accommodation. The doctor's statement must also contain the date you may return to work.

I know that you have Single Health Insurance of $15.00 per pay period. Additionally, you have several of the optional insurance policies that can be acquired through DCI. These health insurance premiums will be deducted from your paycheck, just as they are currently, as long as there are vacation and/or sick pay benefits paid. Further, if you currently are having retirement monies taken from your paycheck to deposit with VALIC, these will continue to be deducted as long as there is a payroll being processed. If by chance your sick time and vacation benefits exhaust before you return to work, you will need to make arrangements with Carolyn Green for paying the premiums for the continuation of your insurance coverage. The VALIC payments would cease until you return to work.

If you have any other questions about the leave, you can find information about it on pages 53-57 of your employee handbook. If you still have questions or do not totally understand the provisions of the leave, please feel free to call me, Karen Hamilton R.N., Nurse Manager, or Carolyn Green.

Once again, I am sorry that you are experiencing health issues, and offer my sincere wishes for a rapid return to good health.

Sincerely yours,


P. L. (Lee) Ashbury, Jr.
Administrator

# DIALYSIS CLINIC, INC.

### ( A Non-Profit Corporation)

109 W. Conecuh Street
Union Springs, Alabama, 36089

Ph. 334-738-5715
Fax 334-738-5734

RADHA K. KROTHAPALLI, M.D.
Medical Director

P. L. (LEE) ASHBURY, JR.
Administrator

June 27, 2005

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

RE: Personal Leave

Dear Margaret:

I hope you are in good spirits and managing well. I just wanted to let you know that your total of 12 weeks of Family Medical Leave (FMLA) expired on June 23, 2005. According to DCI's leave policies, which can be found on pages 53-61 of your blue Benefit Handbook, I will place you on a Personal Leave for up to 30 days.

The Personal Leave will allow you to maintain your benefits for 30 days as long as you pay your portion of the insurance premium while you are off work. You should send your portion of the premium-$15.00- to Carolyn Green. You will continue to have a 30-day grace period in which to pay your insurance. Failure to pay your portion of your insurance could result in your insurance being canceled.

DCI's personal leave policy does not offer a guarantee of re-employment while on a personal leave. However, if your condition changes and your doctor releases you, DCI will be glad to consider you for any open positions we might have. You must submit a physician's release permitting you to return to work before we can consider you for any position.

I wish you the best, if you have any further questions, please do not hesitate to contact me.

Sincerely yours,

P. L. (Lee) Ashbury, Jr.
Administrator


DEFENDANT'S
EXHIBIT
16

2855

**THE MEDICAL BUILDING**
309 N. Prairie St.
Union Springs, AL 36089
Phone # 334-738-2146 Fax # 334-738-5021

July 21, 2005

Re: Margaret Cater

To Whom It May Concern:

 Mr. Carter is able to work 8 hour shift for two weeks.  Ms. Cater will be able to
return to work on July 25, 2005.  Should you have any question, please do not
hesitate to call the above number.

Sincerely,

I. Domingo, MD

DEFENDANT'S
EXHIBIT
18

# DIALYSIS CLINIC, INC.

( A Non-Profit Corporation)

109 W. Conecuh Street
Union Springs, Alabama, 36089

Ph. 334-738-5715
Fax 334-738-5734

RADHA K. KROTHAPALLI, M.D.
Medical Director

P. L. (LEE) ASHBURY, JR.
Administrator

July 26, 2005

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

Dear Margaret:

I am sorry to inform you that you have exhausted all leaves available to DCI employees. You were on Family Medical Leave the first time from October 29, 2004 till December 6, 2004. The second Family Medical Leave started on May 9, 2005, and ended on June 23, 2005. You were granted a Personal Leave from June 23, 2005 through July 23, 2005.

I am sorry you are not able to return to work. It is unfortunate that I must inform you that DCI is removing you from active employment effective yesterday, July 25, 2005. You will receive information regarding your rights to continue your health insurance under COBRA from our corporate insurance department.

I know that you have discussed with Karen Hamilton, R.N. Nurse Manager the possibility of working two eight-hour shifts. Eight-hour shifts don't work with the clinics scheduling. However, we might be able to accommodate, on a temporary basis, two twelve hour shifts. Two twelve-hour shifts per week would also qualify you for single health care coverage. One final note, we must have physician statements that clearly indicate that you can return to work, and clearly identifying any limitations if there are any.

One additional DCI benefit that as far as I know has not been discussed thus far is the Long Term Disability that DCI provides for all employees. If you are interested in pursuing this benefit please let me know.

If none of the above options work, please know that once your condition improves to the point where your doctor fully releases you to work full time, you can call Karen or myself about reapplying for any open positions we might have.

I wish you the best, if you have any further questions, please feel to contact Karen Hamilton or me.

Sincerely,

P. L. (Lee) Ashbury, Jr.
Administrator



DEFENDANT'S EXHIBIT
2D