# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET A. CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:07-cv-682-WKW** |
| | ) | |
| **DIALYSIS CLINIC, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, Margaret A. Carter, by and through her attorneys of record, and respectfully submits this brief in opposition to Defendant's motion for summary judgment. Genuine issues of material fact exist, and Defendant is not entitled to judgment as a matter of law.

## I.    STATEMENT OF FACTS.

After returning from FMLA leave taken to recuperate from a heart attack, Margaret Carter was unable to work twelve-hour shifts because she was still not completely well.  (Plaintiff's Exhibit 1: Deposition of Margaret Carter, 100). Previously, Ms. Carter had been willing and able to work whatever hours Defendant assigned her. (*Id.*).  "My physician thought it best that I work less hours for a couple of weeks so I could ease back into the situation.  I was very nervous and upset about my health, and he just thought that it would be best if I worked lighter hours just for a couple of weeks and then I could resume full hours." (*Id.*, 18-19).

Carter's job description as Charge Nurse expressly states, under the headings "Qualification Requirements," "Physical Demands," and "Work Environment," "Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions [of the job]." (Plaintiff's Exhibit 2: Margaret Carter's[1] Job Description at I-2.73).  Carter informed Nurse Manager Karen Hamilton (the highest ranking person at the Union Springs facility) that her physician, Dr. Ireno Domingo, had instructed her to work eight-hour shifts for a couple of weeks.  (Pl.'s Ex. 1, 19-20).  Ms. Hamilton informed Carter there "wasn't nothing she could do" to accommodate Carter.  (*Id.*, 21).  Hamilton

---

[1]At the time, she was Margaret Hinson.  (*Id.*, I-2.74.)

reported to Lee Ashbury. (*Id.*). Mr. Ashbury "was kind of in and out sporadically....
He wasn't there much.... We might see him once every two or three months and then
we might see him in a month and then it might be three months." (*Id.*, 26-27).

Both Ashbury and Hamilton understood that Carter needed only a brief
accommodation: "When [Hamilton] made the remark that there's nothing we can do
to help you, it was my understanding that was going on...that I was trying to just work
eight-hour shifts for the first couple of weeks until I can get back on my feet all the
way." (*Id.*, 28). Other employees took leave and came back on light duty. (*Id.*, 29).
Hazel Goshay and Bobby Streeter returned to work on light duty after returning from
leave. (*Id.*, 30).

Carter took FMLA leave in December 2004. After having foot surgery, Carter
"became violently ill at work.... My stomach was ulcerating and it ulcerated at the
bottom of the stomach where it goes into the intestines and I had a partial blockage.
So they hospitalized me and I was under a doctor's care tying to get my stomach all
back in shape." (*Id.*, 42). Carter returned to her same job once her leave was
finished. (*Id.*, 41).

Before Carter's heart attack, she "was working 10-, 11-hour shifts four days a
week. If they needed me an extra day, I'd work. I always volunteered to work if they
were short. And when Denise was out or anything, I was always there." (*Id.*, 43).

3

Carter's normal (pre-heart attack) weekly schedule was four days a week, ten hours a day. (*Id.*, 44). Work schedules were set by Karen Hamilton. (*Id.*, 45). Carter learned her work schedule was to be changed while she was on FMLA leave recuperating from her heart attack. (*Id.*, 46).

Carter had her heart attack on May 9, 2005. (*Id.*, 46). Carter's physicians took her off work for several weeks. (*Id.*, 47). As of the date of her heart attack, Carter still held the position of charge nurse. (*Id.*). Carter updated Defendant regarding her condition every week. "While I was out I would talk to Karen Hamilton. If she was busy, I would talk to the secretary, Carolyn Green." (*Id.*, 48). Ms. Green reported to Hamilton. (*Id.*). Hamilton instructed Carter to "keep us posted." (*Id.*, 49).

After receiving faxes from Dr. Domingo's office reflecting that Carter could work only eight-hour shifts, Hamilton informed Carter that she would not be accommodated. (*Id.*, 49-52). Dr. Domingo was aware that Carter needed to return to work by July 23, 2005 and released her to work eight hours a day, three days a week for the first couple of weeks. (*Id.*, 54). Dr. Domingo "knew how stressful the job was and how long the hours were. I'd had trouble during my recuperation period. They thought I had another heart attack. It wasn't. It was medication. But I still had to go in and have more tests. I had to stop cardiac rehab because of it. He just didn't want me to get in the situation where I'd get sick again." (*Id.*, 55).

Carter spoke with Hamilton several times prior to July 23, 2005. "Each conversation was basically about I was well enough to come back to work, but I might not be able to work a full schedule at first." (*Id.*, 59). Hamilton informed Carter that she would need a doctor's statement. (*Id.*). Carter replied that obtaining a doctor's statement would be "no problem." (*Id.*). When Carter informed Hamilton she would only be able to work eight-hour shifts, "everything turned around." (*Id.*, 60). Hamilton never informed Carter that the schedules had been changed to three days a week, twelve hours a day: "Debbie Tyndal told me that that had changed. But no one officially notified me. And that's when I told [Hamilton] I just didn't know if I could work the...12-, 13-hour shifts like that right off the bat coming back." (*Id.*).

When Carter initially informed Hamilton that she needed to temporarily work eight-hour shifts, Hamilton instructed Carter to "just wait and come back to work in two weeks." (*Id.*, 64). "That's when I told [Hamilton] it didn't matter if I started in two weeks or two months, I still needed time to get on my feet." (*Id.*). Hamilton then responded that "there was nothing we could do to help you." (*Id.*, 66). Carter replied that "it wasn't fair, that I had been there five years. I was only asking for two weeks." (*Id.*). Carter asked Hamilton, "Does Lee [Ashbury] or corporate know what's going on?" (*Id.*, 66-67). Hamilton replied, "There is nothing we can do to help you." (*Id.*, 67).

5

On July 20, 2005, Dr. Domingo sent a letter to Defendant informing it that Carter needed to work eight-hour shifts for two weeks. (Plaintiff's Exhibit 3: July 20, 2005 Letter from Dr. Domingo).  The following day, Dr. Domingo sent a similar letter, adding that Carter would be able to return to work July 25, 2005.  (Plaintiff's Exhibit 4: July 21, 2005 Letter from Dr. Domingo).  On July 26, 2005, Dr. Domingo sent a third letter to Defendant, informing it that Carter could work a full shift two days a week.  (Plaintiff's Exhibit 5: July 26, 2005 Letter from Dr. Domingo).  When asked for the context of the third letter, Carter testified, "When I had the conversation with Karen Hamilton about me coming back to work on eight-hour shifts and two weeks and all like that, the remark was made to me that I could work two 12-hour shifts.  And when I thought that that was going to be my only choice to save my job, then I went to Dr. Domingo and told him that they were not going to work me eight-hour shifts, that I had to go back to 12-hour shifts two days a week."  (Pl.'s Ex. 1, 90).  Dr. Domingo's office apprised Defendant by letter that Carter could work two twelve-hour shifts.  (*Id.*, 90-91; Pl.'s Ex. 5).

In Carter's termination letter, Ashbury stated, "I know that you have discussed with Karen Hamilton, R.N. Nurse Manager the possibility of working two eight-hour shifts.  Eight-hour shifts don't work with the clinics [sic] scheduling.  However, we might be able to accommodate, on a temporary basis, two twelve hour shifts.  Two

twelve-hour shifts per week would also qualify you for single health care coverage. One final note, we must have physician statements that clearly indicate that you can return to work, and clearly identifying any limitations if there are any." (Plaintiff's Exhibit 6: Margaret Carter's Termination Letter). Carter's Notice of Employee Termination form, signed by Hamilton, states as Carter's reason for termination, "Did not return from FMLA and Personal Leave–eligible for rehire." (Plaintiff's Exhibit 7: Margaret Carter's Notice of Employee Termination).

When asked in an interrogatory who made the decision to terminate Carter, Defendant responded, "Mr. Lee Ashbury, Jr. Administrator, in consultation with Mr. Dan Watson, Associate Director of Human Resources. Defendant also believes that David Hagewood, Director of Human Resources, was consulted regarding the decision to discharge Plaintiff." (Plaintiff's Exhibit 8: Defendant's Response to Plaintiff's First Set of Interrogatories, at 5). When asked why Plaintiff was terminated, Defendant responded, "DCI discharged Plaintiff because, after using all FMLA leave and personal leave to which she was entitled, she was not able to return to her full-time work schedule, and she declined the potential opportunity to work two, twelve-hour shifts per week." (*Id.*).

When asked why she was terminated, Carter testified, "I was given medical leave, but I wasn't allowed to come back." (Pl.'s Ex. 1, 98). If Carter had not taken

the leave she would not have been terminated. (*Id.*, 102). "I was a good employee, good nurse. I was offered a clinical manager job. They thought apparently enough of me to want me to do that. I got sick, I had to take leave, and then I was terminated. So why was I terminated? Because I took leave and had a heart attack." (Pl.'s Ex. 101).

## II.    STANDARD OF REVIEW.

Summary judgment may be rendered only when the court finds that the papers supporting and opposing the motion reveal that no issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918, 919 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d at 919, quoting *Anderson*, 477 U.S. at 255,

106 S. Ct. at 2513-14.

When viewing the evidence in a light most favorable to Carter, genuine issues of material fact exist, and the Defendant is not entitled to judgment as a matter of law. Carter's claims should await the evaluation of a fair-minded jury.

## III.    ARGUMENT.

### A.  Carter Has Established a Causal Connection between Her FMLA Leave and Her Termination.

Defendant contends that because "DCI took affirmative steps to ensure that its employees understood their rights under the FMLA and made sure that Plaintiff received all of the FMLA leave to which she was entitled" Carter cannot establish a causal connection between her FMLA leave and her termination.  (Def.'s Brief, 8). Carter, however, has not claimed interference with her FMLA rights; **she has claimed retaliation after, and because of, exercising her right to leave under the FMLA.** By not allowing Carter to return to work after her leave came to an end, Defendant retaliated against her.  "Once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA." *Brumbalough v. Camelot Care Ctrs. Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005).  Carter was unable to work twelve-hour shifts because she was recuperating from her heart attack. (Pl.'s Ex. 1, 100).  Before her

9

heart attack, Carter had been willing and able to work whatever hours Defendant assigned her. (*Id.*). "My physician thought it best that I work less hours for a couple of weeks so I could ease back into the situation. I was very nervous and upset about my health, and he just thought that it would be best if I worked lighter hours just for a couple of weeks and then I could resume full hours." (*Id.*, at 18-19).

Defendant's contention that "when Plaintiff exhausted all of her available FMLA leave, she was not able to return to work" is erroneous. (Def.'s Brief, 8). Carter spoke with Hamilton several times prior to the date she planned to return to work, July 23, 2005. "Each conversation was basically about I was well enough to come back to work, but I might not be able to work a full schedule at first." (*Id.*, 59). Hamilton informed Carter that she would need a doctor's statement. (*Id.*). Carter replied that obtaining a doctor's statement would be "no problem." (*Id.*). When Carter informed Hamilton she would only be able to work eight-hour shifts, "everything turned around." (*Id.*, 60). Hamilton never informed Carter that the schedules had been changed to three days a week, twelve hours a day: "Debbie Tyndal told me that that had changed. But no one officially notified me. And that's when I told [Hamilton] I just didn't know if I could work the...12-, 13-hour shifts like that right off the bat coming back." (*Id.*).

When Carter initially informed Hamilton that she needed to temporarily work

eight-hour shifts, Hamilton instructed Carter to "just wait and come back to work in two weeks." (*Id.*, 64). "That's when I told [Hamilton] it didn't matter if I started in two weeks or two months, I still needed time to get on my feet." (*Id.*). Hamilton then responded, in violation of the accommodation language inherent in Plaintiff's job description, that "there was nothing we could do to help you." (*Id.*, 66). Carter replied that "it wasn't fair, that I had been there five years. I was only asking for two weeks." (*Id.*). Carter asked Hamilton, "Does Lee [Ashbury] or corporate know what's going on?" (*Id.*, 66-67). Hamilton replied, "There is nothing we can do to help you." (*Id.*, 67).[2]

On July 20, 2005, Dr. Domingo sent a letter to Defendant informing it that Carter needed to work eight-hour shifts for two weeks. (Pl.'s Ex. 3). The following day, Dr. Domingo sent a similar letter, adding that Carter would be able to return to work July 25, 2005. (Pl.'s Ex. 4). On July 26, 2005, Dr. Domingo sent a third letter to Defendant, informing it that Carter could work a full shift two days a week. (Pl.'s Ex. 5). When asked for the context of the third letter, Carter testified, "When I had the conversation with Karen Hamilton about me coming back to work on eight-hour shifts and two weeks and all like that, the remark was made to me that I could work

---

[2]The requirement that an employee be afforded reasonable accommodations to enable individuals with disabilities to perform the job's essential functions is apparently company policy. See, e.g., Lee Ashbury's Job Description as Administrator, Plaintiff's Exhibit 9, I-2.64.

two 12-hour shifts. And when I thought that that was going to be my only choice to save my job, then I went to Dr. Domingo and told him that they were not going to work me eight-hour shifts, that I had to go back to 12-hour shifts two days a week." (Pl.'s Ex. 1, 90). Dr. Domingo's office apprised Defendant by letter that Carter could work two twelve-hour shifts. (*Id.*, 90-91; Pl.'s Ex. 5).

Under the FMLA, Defendant was obligated to allow Carter to return to her old position with doctor's restrictions unless it can demonstrate that "the doctor's work restriction render the employee unable to perform the essential functions of her job." *Brumbalough v. Camelot Care Ctrs. Inc.*, *supra*. **Determining what functions are essential to a particular position is a question of fact for the jury to decide.** *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314-15 (6th Cir. 2001). In *Brumbalough v. Camelot Care Ctrs. Inc.*, the Court of Appeals reversed the granting of summary judgment by a district court which had concluded that the plaintiff's work restrictions would render her unable to perform the essential functions of the State Clinical Director position because the position required her to be on-call twenty-four hours per day, seven days a week. The district court reasoned that even if Brumbalough were able to complete a forty-five hour workweek, she still would not be able to work more hours if a crisis arose requiring her attention and additional travel. Addressing whether Brumbalough's inability to be on call at all times

12

constituted an essential function of her job, the Court of Appeals concluded, "Although it may be the case that Brumbalough could not fulfill all her obligations given her medical restrictions, we conclude that further findings by the fact-finder are necessary to determine what constitutes the essential functions of the job and whether Brumbalough was able to perform such functions."  427 F. 3d 996, 1006.

Carter was able to perform the essential functions of her job.  Carter's job description states, "Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions [of the job]."  (Pl.'s Ex. 2).  Thus her job description, as with that of Ashbury, both contemplated, and required, reasonable accommodations as a component thereof.  Carter informed Nurse Manager Karen Hamilton (the highest ranking person at the Union Springs facility) that her physician, Dr. Domingo, had instructed her to work eight hours shifts for a couple of weeks.  (Pl.'s Ex. 1, 19-20).  Hamilton informed Carter there "wasn't nothing she could do" to accommodate Carter.  (*Id.*, 21).  Hamilton reported to Lee Ashbury.  (*Id.*).  Both Ashbury and Hamilton understood that Carter needed only a brief accommodation: "When [Hamilton] made the remark that there's nothing we can do to help you, it was my understanding that was going on...that I was trying to just work eight-hour shifts for the first couple of weeks until I can get back on my feet all the way."  (*Id.*, 28).

13

Under Defendant's own policy and federal law, Carter was entitled to a reasonable accommodation. (Pl.'s Ex. 2; Pl.'s Ex. 9). An accommodation of two weeks of eight-hour shifts for an experienced and valuable employee recovering from a heart attack is reasonable. Defendant does not contend and provides no evidence to demonstrate that Carter was otherwise unable to perform the essential functions of her job, or that she had failed to do so pre-heart attack. In Carter's termination letter, Lee Ashbury stated, "I know that you have discussed with Karen Hamilton, R.N. Nurse Manager the possibility of working two eight-hour shifts. Eight-hour shifts don't work with the clinics [sic] scheduling. However, we might be able to accommodate, on a temporary basis, two twelve hour shifts. Two twelve-hour shifts per week would also qualify you for single health care coverage. One final note, we must have physician statements that clearly indicate that you can return to work, and clearly identifying any limitations if there are any." (Pl.'s Ex. 6). Defendant has never alleged or demonstrated that Carter's requested accommodation, documented by her physician, as required, would cause anything more than a slight, temporary inconvenience to Defendant.

The evidence further demonstrates that Plaintiff was even willing to go so far as to endanger her health by convincing her doctor to go against his better judgement and authorize her to work **two twelve-hour shifts**, as Ashbury expressly said she

could do, after she realized that Defendant would not allow her to work eight-hour shifts. (Pl.'s Ex. 5). Defendant's ignorance or disregard of its obligations under federal law and its own policy caused it to refuse Carter the accommodation she needed. Defendant had all the information it needed to understand that Carter needed only a brief accommodation before she would be able to work the longer shifts. Before Carter's heart attack, she "was working 10-, 11-hour shifts four days a week. If they needed me an extra day, I'd work. I always volunteered to work if they were short. And when Denise was out of anything, I was always there." (*Id.*, 43). Carter's physician, Dr. Domingo, "knew how stressful the job was and how long the hours were. I'd had trouble during my recuperation period. They thought I had another heart attack. It wasn't. It was medication. But I still had to go in and have more tests. I had to stop cardiac rehab because of it. He just didn't want me to get in the situation where I'd get sick again." (*Id.*, 55). Carter asked for a two-weeks accommodation so that she would not have another heart attack: instead of accommodating Carter, as required by her own job description, Defendant terminated her.

Defendant contends, "No manager or supervisor ever said or did anything that indicated that he or she was upset about Plaintiff's use of FMLA leave." (Def.'s Brief, 9). No, they only changed her shift requirements while she was on approved

FMLA leave to recover from a heart attack. Defendant presented Carter with a stark choice: her job or her life. Aware that Carter's physician advised her that working twelve-hour shifts would risk another heart attack, Defendant made clear that it was twelve-hours shifts or termination. As explained above, such callous behavior demonstrates an ignorance or disregard of Defendant's obligations under federal law and its own policy. Regardless of whether Defendant was upset, it did not provide Carter with the reasonable accommodation she requested, her physician documented, and its own policy required.

Defendant contends that Plaintiff cannot establish a prima facie case because "Plaintiff cannot identify any similarly situated, full-time nurse at DCI who was allowed to work a reduced hours schedule following the expiration of a leave of absence." (*Id.*, 9). Plaintiff is not required to produced a comparator to establish a prima facie case of FMLA retaliation. Carter must merely demonstrate that (1) she engaged in statutorily protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). The undisputed taking of FMLA leave and Carter's termination satisfy the first two elements. The above discussion underlines the causal connection between Ms. Carter's FMLA leave and her termination.

Carter, however, has provided instances of at least two of Defendant's employees who were allowed to work reduced hours: Bobby Streeter and Hazel Goshay. (Pl.'s Ex. 1, 30). In addition, the evidence indicates that Carter was the first nurse to request reduced hours under the new schedule. Hamilton never informed Carter that the nurses' schedules had been changed to three days a week, twelve hours a day: while Carter was on leave, "Debbie Tyndal told me that that had changed." (*Id.*, 59). Carter should not be penalized for being the first person under the new regime–which changes are themselves suspect–to exercise her rights under Defendant's policy and federal law.

## B. Defendant's Reason for Its Action is Pretext to Discrimination.

Defendant proffers as its reason for Carter's termination that "she was not able to return to her full-time work schedule, and she declined the potential opportunity to work two, twelve-hour shifts per week." (Def.'s Brief, at 10). Plaintiff's response is two-fold. Once, as discussed above, Carter requested a mere two-week accommodation, which Defendant was obligated under its policy and federal law to give her.

Two, Defendant's assertion that "there is no genuine dispute that Plaintiff never responded to Mr. Ashbury's suggestion regarding the possibility of working two twelve-hour shifts" is inaccurate. On July 26, 2005, Dr. Domingo sent a third letter

17

to Defendant, informing it that Carter could work a full shift two days a week. (Pl.'s Ex. 5). It is a question of fact for the jury whether the "full shift for 2 days/one week" which Dr. Domingo expressly authorized (Pl.'s Ex. 5) satisfied Defendant's new requirement of "two twelve-hour shifts" per Ashbury's termination letter of July 26, 2005. When asked for the context of Dr. Domingo's third letter, Carter testified, "When I had the conversation with Karen Hamilton about me coming back to work on eight-hour shifts and two weeks and all like that, the remark was made to me that I could work two 12-hour shifts. And when I thought that that was going to be my only choice to save my job, then I went to Dr. Domingo and told him that they were not going to work me eight-hour shifts, that I had to go back to 12-hour shifts two days a week." (Pl.'s Ex. 1, 90). Dr. Domingo apprised Defendant by letter that Carter could work two twelve-hour shifts. (*Id.*, 90-91; Pl.'s Ex. 5).

Defendant again asserts that Carter cannot identify a similarly situated nurse who was granted an accommodation. For the reasons discussed above, the fact that apparently no other nurse had requested or been granted the accommodation mandated under Defendant's policy and federal law does not prevent Carter from demonstrating that Defendant has violated its own policy and the FMLA.

Defendant cites its prior granting of FMLA leave to Carter in 2004 and her return to her position to justify its later decision not to act in accordance with the

FMLA.  All that the previous granting of the FMLA leave demonstrates is that Defendant understood what the FMLA requires and had no excuse to retaliate against Carter the first time she took leave.  The evidence demonstrates that Defendant's contention that Carter was unable or unwilling to return to work is untrue. "Pretext exists where the ostensible reason for the employment action decision is really a lie contrived to mask unlawful discrimination." *Little v. Illinois Dept. of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004). Defendant's termination of Carter violated federal law and Defendant's own policy.  Carter was able to return to work at the expiration of her leave period and was able to perform the essential functions of her job with a very brief, very reasonable accommodation under her physician's restriction, or, while personally risky to her health, Carter was able to return to work for the two twelve hour shifts Ashbury outlined as permissible.  Carter returned to work only to find that her job was gone.

## IV.    CONCLUSION

Viewing the evidence in light most favorable to Carter, the facts of this case should be evaluated by the members of a fair-minded jury.  It is they who should determine whether retaliation played a part in the termination of Margaret Carter. Summary judgment is due to be denied.

19

Respectfully submitted,

/s/ John D. Saxon
**John D. Saxon**
**Alabama Bar No. ASB-3258-O71J**
**Russell P. Parker**
**Alabama Bar No. ASB-7571-S74P**
**Attorneys for Plaintiff**

**OF COUNSEL:**

**JOHN D. SAXON, C.**
**2119 Third Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 324-0223**
**Facsimile:   (205) 323-1583**
**Email:       jsaxon@saxonattorneys.com**
**             rparker@saxonattorneys.com**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment has been served on the following counsel of record by filing the same with the CM/ECF filing system, which will provide electronic notice to:

Davidson French
Tim K. Garrett
**BASS, BERRY & SIMS, PLC**
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6240

Henry C. Barnett, Jr.
**CAPELL & HOWARD P.C.**
150 South Perry Street
Montgomery, Alabama 36104
(334) 241-8000

**DONE** this the 7th day of July, 2008.

/s/ **John D. Saxon**
**OF COUNSEL**
