# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET A. CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 2:07-cv-682-WKW** |
| | ) | |
| **DIALYSIS CLINIC, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Plaintiff, Margaret A. Carter, and, in opposition to the Motion for Summary Judgment of Defendant, respectfully submits the following evidence:

1. Deposition of Margaret Carter.

2. Margaret Carter's Job Description.

3. July 20, 2005 Letter from Dr. Domingo.

4. July 21, 2005 Letter from Dr. Domingo.

5. July 26, 2005 Letter from Dr. Domingo.

6. Margaret Carter's Termination Letter.

7. Margaret Carter's Notice of Employee Termination.

8.    Defendant's Response to Plaintiff's First Set of Interrogatories.

9.    Lee Ashbury's Job Description as Administrator.

**Respectfully submitted,**

**/s/ John D. Saxon**
**John D. Saxon**
**Alabama Bar No. ASB-3258-071J**
**Russell P. Parker**
**Alabama Bar No. ASB-7571-S74P**
**Attorneys for Plaintiff**

**OF COUNSEL:**

**JOHN D. SAXON, P.C.**
**2119 3rd Avenue North**
**Birmingham, AL 35203**
**Telephone:  (205) 324-0223**
**Facsimile:  (205) 323-1853**
**Email:        jsaxon@saxonattorneys.com**
**                 rparker@saxonattorneys.com**

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment on the following counsel of record by filing same with the CM/ECF system, which will provide electronic notice to:

Davidson French
Tim K. Garrett
**BASS, BERRY & SIMS, PLC**
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6240

Henry C. Barnett, Jr.
**CAPELL & HOWARD P.C.**
150 South Perry Street
Montgomery, Alabama 36104
(334) 241-8000

**DONE** this the 7th day of July, 2008.

/s/ John D. Saxon
**OF COUNSEL**

# DEPOSITION OF MARGARET CARTER

## May 14, 2008

## Pages 1 through 105

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5   MARGARET A. CARTER,
 6        Plaintiff,
 7   vs.                    CIVIL ACTION NO.
                            2:07CV682WKW
 8
     DIALYSIS CLINIC, INC.,
 9
10        Defendant.
11
12
13          * * * * * * * * * * * * *
14
15        DEPOSITION OF MARGARET ANN CARTER, taken
16   pursuant to stipulation and agreement before Lyn
17   Daugherty, ACCR #66, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of John D. Saxon, 2119 3rd Avenue
20   North, Birmingham, Alabama, on Wednesday, May 14th,
21   2008, commencing at approximately 1:05 p.m.
22
            * * * * * * * * * * * * *
23
```

Page 2

```
 1                    APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. John D. Saxon
     JOHN D. SAXON, P.C.
 4   Attorneys at Law
     2119 3rd Avenue North
 5   Birmingham, Alabama 35203-3314
 6
     FOR THE DEFENDANT:
 7
     Mr. Davidson French
 8   BASS, BERRY & SIMS
     Attorneys at Law
 9   315 Deaderick Street, Suite 2700
     Nashville, Tennessee 37238-3001
10
11   ALSO PRESENT: Mr. Daniel Watson
12
          * * * * * * * * * * * * *
13
                EXAMINATION INDEX
14
15   MARGARET ANN CARTER
16        BY MR. FRENCH . . . . . . . . . . .  6
17        BY MR. SAXON . . . . . . . . . . . 100
18        BY MR. FRENCH . . . . . . . . . . . 101
19
                 EXHIBIT INDEX
20
                              PAGE
21   Defendant
22    1  Job description for charge nurse    17
23         (Index continued on next page)
```

Page 3

```
 1    2  Receipt for the DCI benefits package    22
         book
 2
      3  Family and medical leave of absence     22
 3       policy
 4    4  Personal leave policy              23
 5    5  Leave of absence dated /13/03       32
 6    6  Letter dated 1/6/03 to Margaret Carter   35
         from Lee Ashbury
 7
      7  Handwritten note dated 12/11/03 to      35
 8       Denise Damron from Margaret Carter
 9    8  Letter dated 11/30/04 to Margaret Carter   40
         from Lee Ashbury
10
      9  Complaint                         47
11
     10  Work schedule for April 2005        67
12
     11  Work schedule for May 2005          69
13
     12  Plaintiff's response to defendant's     70
14       first set of interrogatories and
         requests for production of documents to
15       plaintiff
     13  Letter dated 5/30/05 to Margaret Carter   82
16       from Lee Ashbury
17
     14  Short-term disability application       83
18
     15  Letter dated 6/20/05 from Ireno Domingo,   85
19       M.D. To Whom It May Concern
     16  Letter dated 6/27/05 to Margaret Carter    86
20       from Lee Ashbury
21
     17  Letter dated 7/20/05 from I. Domingo,    86
22       M.D. To Whom It May Concern
23         (Index continued on next page)
```

Page 4

```
 1   18  Letter dated 7/21/05 from I. Domingo,    88
         M.D. To Whom It May Concern
 2
     19  Letter dated 7/26/05 from I. Domingo,    89
 3       M.D. To Whom It May Concern
 4   20  Letter dated 7/26/05 to Margaret Carter    92
         from Lee Ashbury
 5
     21  Notice of employee termination       93
 6
 7
 8
 9
10
11        * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 5

1    STIPULATIONS
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of MARGARET ANN CARTER is taken pursuant
5    to the Federal Rules of Civil Procedure and that
6    said deposition may be taken before Lyn Daugherty,
7    Certified Shorthand Reporter, and Commissioner for
8    the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and

Page 6

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4                * * * * * * * * * * * *
5            MARGARET ANN CARTER
6        The witness, after having first been duly sworn
7    to speak the truth, the whole truth and nothing but
8    the truth testified as follows:
9                EXAMINATION
10   BY MR. FRENCH:
11   Q.  Would you state your full name, please.
12   A.  Margaret Ann Carter.
13   Q.  Ms. Carter, my name is Davidson French.
14       I'm here on behalf of Dialysis Clinic,
15       Inc. I'm going to ask you a series of
16       questions to find out about the lawsuit
17       that you have filed.
18   A.  Yes, sir.
19   Q.  If I ask you a question that you don't
20       understand, just tell me that you don't
21       understand it; okay?
22   A.  Okay.
23   Q.  If it's not clear, tell me it's not clear.

Page 7

1        If I say something that you think is not
2        accurate, I hope that you'll say that's not
3        the way it happened, that's not accurate.
4    A.  Okay.
5    Q.  I want to be on the same page with you.
6        This is my one chance to really understand
7        the nature of your lawsuit and find out why
8        you believe that you've been discriminated
9        against; all right?
10   A.  Okay.
11   Q.  If you ever need to take a break, please
12       just let us know and we'll take a break.
13   A.  Sure. Thank you.
14   Q.  What is your -- What was your maiden name?
15   A.  Carter is my maiden name.
16   Q.  Have you ever been married?
17   A.  Yes, sir.
18   Q.  What was your husband's name?
19   A.  Hinson, H-I-N-S-O-N.
20   Q.  How long were you married to Mr. Hinson?
21   A.  Approximately three to four years.
22   Q.  Are you divorced?
23   A.  Yes.

Page 8

1    Q.  When did you get divorced?
2    A.  In '99, 1999.
3    Q.  What's your current address?
4    A.  1824 Fitzpatrick Road, Fitzpatrick,
5        Alabama, which is Bullock County.
6    Q.  And how long have you lived in Fitzpatrick?
7    A.  Since May 2000.
8    Q.  Where did you live prior to that?
9    A.  I lived with my mother for approximately
10       six or eight months until I bought my --
11       got my double-wide trailer. Do you want to
12       go back further than that or --
13   Q.  Where did you live with your mother?
14   A.  In Union Springs.
15   Q.  And how about right before that where did
16       you live?
17   A.  I was in Florida for a year doing --
18       learning acute dialysis, doing acute
19       dialysis and then I moved back to --
20   Q.  So that was before the year 2000?
21   A.  Correct.
22   Q.  Do you have any children?
23   A.  No, sir.

Page 9

| | |
|---|---|
| 1 | Q. Any siblings? |
| 2 | A. One brother and one sister. |
| 3 | Q. Do they live in Alabama? |
| 4 | A. My sister lives in Union Springs, Alabama. |
| 5 | Q. What is her name? |
| 6 | A. Mary Jane Tompkins without an H. |
| 7 | Q. And are you a member of any churches? |
| 8 | A. I was raised catholic. As a matter of fact |
| 9 | across the street at St. Paul's Cathedral. |
| 10 | I'm originally from Birmingham. We all |
| 11 | are. There's a church in Union Springs I |
| 12 | don't go to too much because I work -- my |
| 13 | working schedule. But St. Pius. |
| 14 | Q. St. Pius? |
| 15 | A. Uh-huh (positive response). |
| 16 | Q. How long have you been a member of |
| 17 | St. Pius? |
| 18 | A. I guess since we moved to Bullock County |
| 19 | from here. 20, 30 years on and off. |
| 20 | Q. Did you graduate high school? |
| 21 | A. Yes, sir. |
| 22 | Q. What year and what high school? |
| 23 | A. It was in 1968 and it was Phillips High |

Page 10

| | |
|---|---|
| 1 | School here in Birmingham. |
| 2 | Q. Any formal education after high school? |
| 3 | A. I had two years junior college and then I |
| 4 | had two years of nursing, ASN degree. |
| 5 | Q. Where did you go to junior college? |
| 6 | A. I went to Jefferson State here in |
| 7 | Birmingham as a junior college and then I |
| 8 | went to Troy State in Montgomery. |
| 9 | Q. Did you get an associate's degree? |
| 10 | A. For nursing, yes. |
| 11 | Q. And then you said there was two years of |
| 12 | ASN? |
| 13 | A. That was my nursing, uh-huh (positive |
| 14 | response). I just went two years junior |
| 15 | college. I didn't graduate from there. I |
| 16 | didn't finish. I went roughly two years. |
| 17 | Q. Where did you get your nursing degree? |
| 18 | A. Troy State in Montgomery. |
| 19 | Q. And when did you get that? |
| 20 | A. I believe it was 1983. |
| 21 | Q. If you would, could you quickly run through |
| 22 | your employment history, where you |
| 23 | worked -- |

Page 11

| | |
|---|---|
| 1 | A. Sure. |
| 2 | Q. -- after your nursing degree. |
| 3 | A. I worked Bullock County Hospital in Union |
| 4 | Springs. |
| 5 | Q. What was your position there? |
| 6 | A. I was 11 to 7 charge. |
| 7 | Q. A charge nurse? |
| 8 | A. Uh-huh (positive response). And worked ER |
| 9 | too. I worked -- Let's see. I went to the |
| 10 | VA hospital and did some psychiatric |
| 11 | nursing. And I went to Texas, Houston, |
| 12 | Texas. I moved out there because my cousin |
| 13 | lived out there. Anyway, I went out there |
| 14 | and I did neurology nursing. I worked on |
| 15 | the neurology floor. My sister became |
| 16 | sick. I moved back home. I worked at Edge |
| 17 | Regional in Troy until dialysis -- I was |
| 18 | interested in dialysis from Texas. When I |
| 19 | came home, there was a dialysis clinic in |
| 20 | Troy. That's where Edge Hospital is. And |
| 21 | I got a position in dialysis and that's |
| 22 | basically where I stayed. And that was |
| 23 | with BMA at the time. |

Page 12

| | |
|---|---|
| 1 | Q. And when was that? |
| 2 | A. Let's see. I've been in dialysis -- Let's |
| 3 | see. At that point it was probably -- I |
| 4 | would have to look back on my resume as |
| 5 | exactly the year I started dialysis |
| 6 | nursing. I was with BMA slash Fresenius |
| 7 | for about 11 years. |
| 8 | Q. What does BMA stand for? |
| 9 | A. Biomedical. And then Fresenius bought them |
| 10 | out. |
| 11 | Q. Biomedical Associates? |
| 12 | A. Uh-huh (positive response). I believe |
| 13 | that's correct. |
| 14 | Q. I believe you mentioned that you were in |
| 15 | Florida for a while? |
| 16 | A. Correct. |
| 17 | Q. How long did you live in Florida? |
| 18 | A. One year. |
| 19 | Q. Were you a nurse in Florida? |
| 20 | A. Yes. I was doing acute nursing in the |
| 21 | hospital, which is different than chronic |
| 22 | care in a clinic. I had opportunity to go |
| 23 | down there and learn acute dialysis. |

Page 13

1    Q.  What was the job you held immediately
2         before DCI?
3    A.  It would be the Florida job in Fort Walton
4         Beach.
5    Q.  You came back from Florida and your first
6         job back in Alabama was with DCI?
7    A.  Correct.  They had an opening.  That's why
8         I came on back.  They had an opening there
9         at the clinic.
10   Q.  And you worked at DCI until July of '05?
11   A.  Correct.
12   Q.  And in August of '05 you got a job with BMA?
13   A.  Uh-huh (positive response).  Back with BMA
14        again.
15   Q.  And you worked in Tuskegee, Alabama?
16   A.  Correct.
17   Q.  How far away is Tuskegee from where you
18        live?
19   A.  It's all back roads, little old two by four
20        roads.  It's probably about 25, 28 miles.
21   Q.  And you worked there through March of '07?
22   A.  Yes.
23   Q.  And then after that beginning in April you

Page 14

1         got a job with DaVita Dialysis?
2    A.  Correct.
3    Q.  And you worked there until May of '07?
4    A.  Correct.
5    Q.  And after that you got a job with hospice?
6    A.  Alacare Hospice.
7    Q.  Alacare Hospice?
8    A.  Uh-huh (positive response).
9    Q.  And you were a case manager with them?
10   A.  Correct.
11   Q.  Are you still working with Alacare Hospice?
12   A.  Yes.  But I did leave them briefly.  I
13        thought I was going to go to work at
14        Bullock County Correctional Facility
15        because that would put me back closer to my
16        mother, but I couldn't work in a prison.  I
17        tried it and Alacare wanted me back, so I
18        went back to Alacare.
19   Q.  And what is your current rate of pay with
20        Alacare?
21   A.  It's right -- It's like 27.95 an hour.
22   Q.  Do you have benefits?
23   A.  Oh, yes.  I have -- I have benefits except

Page 15

1         for short-term disability.  I've been
2         denied that because of my heart problem.
3    Q.  You're not covered under their short-term
4         disability plan?
5    A.  Correct.
6    Q.  Do you have a retirement plan with Alacare
7         Hospice?
8    A.  I haven't been there long enough to do
9         anything like that.
10   Q.  Do you know when you become eligible to
11        participate in that plan?
12   A.  No, I don't.
13   Q.  Are you interested in participating in that
14        plan?
15   A.  Sure.  Yes.
16   Q.  Now, you were vested in the retirement plan
17        with DCI; correct?
18   A.  Correct.
19   Q.  Do you know what happened -- Are the
20        assets -- Are the funds that were invested
21        through that plan, do you still have them
22        in a --
23   A.  That still remains as it was the day I

Page 16

1         left.
2    Q.  You haven't withdrawn any funds?
3    A.  No, sir.
4    Q.  How did you find out about the opportunity
5         with DCI?
6    A.  I think there was an ad in the paper and I
7         talked to my sister and I called.  And I
8         knew Denise.  We knew each other growing
9         up.  I mean, we weren't like friends, but
10        we knew who each other were.  And I called
11        and talked to her.
12   Q.  Denise Damron?
13   A.  Yes, sir.
14   Q.  And what did she tell you?
15   A.  To come on up for an interview and I did
16        and I got the job.
17   Q.  Do you recall when you started?
18   A.  Let's see.  I was in Florida -- Let me
19        think a minute.  I believe it was May
20        2000.  May 2000.
21   Q.  Were you hired as a charge nurse?
22   A.  Basically I was a floor nurse and then I
23        moved up to charge.

Page 17

1   Q.  Within a year did you become a charge
2       nurse?
3   A.  I would think that would be fair, yeah.
4           MR. FRENCH:  Could we mark this as
5           Exhibit 1, please.
6           (Defendant's Exhibit 1 was marked
7           for identification.)
8   Q.  All right.  Let me hand you a document
9       that's been marked Exhibit 1.  It's a job
10      description for the charge nurse position.
11      If you could review that and tell me if you
12      recognize it.
13          (Brief pause.)
14  A.  Yes, sir.
15  Q.  You do recognize it?
16  A.  After -- Yes.  It's been a long time, but
17      yes.
18  Q.  Is that the job description for the charge
19      nurse position that you held at DCI?
20  A.  Basically, yes, sir.
21  Q.  And on the last page, the highlighted
22      portion under work hours --
23  A.  Yes, sir.

Page 18

1   Q.  -- do you see that section?
2   A.  Uh-huh (positive response).  Yes.
3   Q.  Was that your understanding of DCI's policy
4       when you were employed with them?
5   A.  Yes, sir.  But also -- I was also aware the
6       one above that one in physical demands,
7       too, that reasonable accommodations may be
8       made.
9   Q.  Did you ever ask for reasonable
10      accommodations?
11  A.  Yes, sir, I did.
12  Q.  And what reasonable accommodations did you
13      ask for?
14  A.  Are you referring to when I had my heart
15      attack?  That's the only time I have is
16      when I had my heart attack.
17  Q.  I was referring to any time.  What
18      accommodation did you ask for when you had
19      a heart attack?
20  A.  My physician thought it best that I work
21      less hours for a couple of weeks so I could
22      ease back into the situation.  I was very
23      nervous and upset and worried about my

Page 19

1       health, and he just thought that it would
2       be best if I worked lighter hours just for
3       a couple of weeks and then I could resume
4       full hours.
5   Q.  And who did you have that -- Did you
6       discuss that with somebody at DCI?
7   A.  Yes, I did.
8   Q.  With whom did you discuss that?
9   A.  Karen Hamilton.
10  Q.  And what did she tell you?
11  A.  Do you want just basically what she told
12      me, or do you want the conversation in
13      general?  What do you want from me?
14  Q.  I'll take both of them.
15  A.  Both of them.  Okay.  I'm sorry.
16  Q.  That's okay.
17  A.  When I received that I could come back to
18      work and was telling her that, you know, I
19      needed to work maybe some eight-hour shifts
20      for two or three days a week just for a
21      couple of weeks, the doctor's office sent a
22      fax stating that, but the receptionist at
23      the office made a mistake in the fax.  I

Page 20

1       contacted Karen back, told her that it was
2       a mistake, because she had just eight-hour
3       work schedule, eight-hour shifts.
4   Q.  Who just had eight-hour work shifts?
5   A.  The lady that typed up the fax with
6       Dr. Domingo.  Bertha Tolliver I believe her
7       name was.  I told her that I was going to
8       go up there and get it straight.  And I
9       told her on good faith, professional to
10      professional that it was just eight-hour
11      shifts for like two to three days a week
12      for two weeks.
13  Q.  When you say you told her, who are you
14      talking about?
15  A.  Karen Hamilton.  Anyway, we kept back and
16      forth.  I talked to Karen several times
17      about this.  And finally the last time I
18      talked to her basically she said, well, if
19      I had to work shorter shifts for the first
20      two weeks, just wait and come back to work
21      in two weeks.  And that's when I told her
22      it didn't matter if I came back to work in
23      two weeks or two months, I would still need

Page 21

1   time to get my feet wet, to readjust to the
2   schedule and all like that. She
3   continued -- I remember at some point
4   asking her does Lee know about this,
5   corporate. I was told twice -- two
6   different times that there was nothing we
7   can do for you. It wasn't nothing that she
8   could do. She made the statement a couple
9   of times there's nothing we can do to help
10  you. So ...
11  Q. You just mentioned somebody named Lee.
12  A. Ashbury. He was her boss, I guess.
13  Q. Was he the administrator?
14  A. I believe so. Montgomery.
15  Q. And Karen Hamilton was the nurse manager?
16  A. Nurse manager.
17  Q. Was she the highest ranking person at the
18      Union Springs clinic?
19  A. Yes, sir.
20  Q. Lee Ashbury did not work at the Union
21      Springs clinic, did he?
22  A. No, sir. He was in Montgomery.
23  Q. But Ms. Hamilton reported to Mr. Ashbury?

Page 22

1   A. From my understanding, yes, sir.
2   Q. And Mr. Ashbury is deceased as far as you
3       know?
4   A. Uh-huh (positive response).
5           (Defendant's Exhibit 2 was marked
6            for identification.)
7   Q. Let me hand you another document that's
8       been marked Exhibit Number 2 and ask if
9       that's your signature at the bottom of it.
10  A. Yes, sir. That's my signature.
11  Q. Do you recall getting a copy of the DCI
12      benefits package book?
13  A. Yes, sir.
14  Q. Do you still have a copy of that?
15  A. My -- Mr. Saxon has a copy of it.
16  Q. I think we sent Mr. Saxon a copy. Did you
17      give Mr. Saxon a copy?
18  A. Yes, sir. I gave him -- I brought one to
19      him.
20          MR. FRENCH: If we could mark this
21      document as Exhibit 3, please.
22          (Defendant's Exhibit 3 was marked
23           for identification.)

Page 23

1   Q. Let me ask you to review Exhibit 3 and tell
2       me if you recognize it.
3   A. Yes, sir.
4   Q. Can you tell me what that is?
5   A. Well, it's just about the family medical
6       leave policy.
7   Q. Was it Dialysis Clinic, Inc.'s family
8       medical leave policy?
9   A. Yes, sir.
10          (Defendant's Exhibit 4 was marked
11           for identification.)
12  Q. Let me hand you a document that's been
13      marked Exhibit 4 and ask if you recognize
14      that document.
15  A. Yes, sir.
16  Q. To the best of your recollection, was that
17      DCI's personal leave policy while you were
18      an employee?
19  A. To the best of my recollection, yes, sir.
20  Q. When you started at DCI, who was your
21      immediate supervisor?
22  A. Denise Damron.
23  Q. And she was the nurse manager?

Page 24

1   A. Uh-huh (positive response). Yes, sir.
2   Q. Who followed Denise Damron as the nurse
3       manager?
4   A. When Denise left, it was Karen Hamilton.
5   Q. Did you ever have an immediate supervisor
6       other than Ms. Damron or Ms. Hamilton?
7   A. No, sir.
8   Q. So as of May 2005 Karen Hamilton was your
9       immediate supervisor?
10  A. Yes, sir.
11  Q. Was Denise Damron still working with DCI at
12      that point?
13  A. No, sir.
14  Q. Do you know why she left DCI?
15  A. Her and her family moved to Montgomery and
16      I believe -- and she got a job in
17      Montgomery. That's about all I know.
18  Q. Have you had any contact with Ms. Damron
19      since your employment ended?
20  A. The only -- I've seen her mother because
21      they're from Union Springs. I've seen her
22      mother and asked about her, but I have not
23      personally seen Denise.

Page 25

1    Q.  Have you had any conversations with
2        Ms. Damron since your employment ended?
3    A.  No, sir.
4    Q.  Have you had any conversations with Karen
5        Hamilton since your employment ended?
6    A.  No, sir.
7    Q.  Have you had any conversations with any
8        employee of DCI since your employment
9        ended?
10   A.  Debbie Tyndal.  She was a patient care
11       tech.  I talked to her.  That was basically
12       the only one I can recall talking to at
13       this point that was still there when I
14       left.
15   Q.  Did you discuss your lawsuit with
16       Ms. Tyndal?
17   A.  No, sir.
18   Q.  You just discussed personal issues?
19   A.  We discussed -- The only thing that we
20       really talked about -- Well, we're friends,
21       so we were chitchatting.  But the 13-hour
22       shifts and I told her that, you know, I
23       couldn't work that apparently and I

Page 26

1    couldn't come back because I wasn't going
2    to work -- wasn't going to be able to work
3    two weeks with an altered schedule.  You
4    know, that was about all.  I didn't say
5    anything about a lawsuit.  You know, we
6    were just talking about everything in
7    general about my heart attack and, you
8    know, trying to work and all like that.
9    Nothing specific about anything like that.
10   Q.  Have you remained in touch with
11       Ms. Tyndal?
12   A.  We talk occasionally.
13   Q.  But nothing about your lawsuit?
14   A.  She's asked about what's going on and I
15       really haven't given her any information.
16       I mean, you know, I'm not -- I don't talk
17       about it.
18   Q.  How often did you see Mr. Ashbury while you
19       worked at Union Springs?  Would he come on
20       a regular basis?
21   A.  He was kind of in and out sporadically.
22       Just at different times.  He wasn't there
23       much.  We might see him once every two or

Page 27

1    three months and then we might see him in a
2    month and then it might be three months.
3    You know, it was just kind of sporadic.
4    Q.  Did you ever have any problems or
5        disagreements or conflicts with
6        Ms. Damron?  Anything significant?
7    A.  I'm trying to think.  With us personally?
8        You mean nurse to nurse?
9    Q.  Anything.  Any significant disagreements or
10       conflicts?
11   A.  No, sir.  Not that I know of, you know,
12       just trying to sit here and recall, no,
13       sir.
14   Q.  I appreciate that.  How about with
15       Ms. Hamilton, any problems, disagreements
16       or conflicts with Ms. Hamilton?
17   A.  I guess the only thing would be about her
18       trying -- you know, when I was trying to
19       get back to work after my heart attack,
20       just, you know, telling her it wasn't fair,
21       that I had been there for five years and I
22       needed some help, you know.
23   Q.  Did you get the sense that Ms. Hamilton was

Page 28

1    making all the decisions regarding your
2    employment, or do you think she was talking
3    with somebody else?
4    A.  I was led -- When I asked about the
5        corporate or Lee know about everything,
6        when she made the remark that there's
7        nothing we can do to help you, it was my
8        understanding that everybody knew what was
9        going on, that there -- that I was trying
10       to just work eight-hour shifts for the
11       first couple of weeks until I can get back
12       on my feet all the way.
13   Q.  Would you --
14   A.  And then when I got that letter from Lee, I
15       didn't know then.
16   Q.  But based on your experience at DCI,
17       dealing with the employment of an RN, would
18       you have expected that Mr. Ashbury would be
19       involved in significant decisions?
20           MR. SAXON:  Object to the form to
21           the extent it calls for
22           speculation.  You can answer.
23   A.  On a guess?  I'm sure he had decisions that

Page 29

1  he did make that overrode maybe what Karen
2  did or Denise, you know, in that aspect. I
3  don't -- I really -- you know, that's the
4  best I could answer that right now at this
5  point.
6  Q. While you worked at DCI, did you ever see
7  any other employees who took leaves of
8  absence for medical reasons?
9  A. Yeah. There were people that like pulled
10  muscles in their back, had to be off, come
11  back on light duty and, you know, things
12  like that. Sure.
13  Q. Do you recall anything happening to any of
14  those employees that you thought was
15  retaliatory?
16  A. I really don't know how I could answer
17  that. I don't -- you know, I didn't get
18  into their business. So, I mean, you
19  know --
20  Q. All those employees who took a leave of
21  absence, did they return to work after
22  their leave of absence?
23  A. To the -- Yes.

Page 30

1  Q. Do you recall if they came back to their
2  former position?
3  A. I wonder -- I honestly believe that Hazel
4  Goshay came back on light duty. I'm
5  thinking Bobby Streeter might have had an
6  incident something happened to him where he
7  had to do light duty. That's the only two
8  I can recall at this moment. That's all I
9  can recall at the moment.
10  Q. Do you recall what Hazel Go --
11  A. Goshay, G-O-S-H-A-Y, Goshay.
12  Q. Do you recall what her problem was, what
13  caused her to need a leave of absence?
14  A. I'm thinking it was her foot or her back or
15  both.
16  Q. What was her position?
17  A. She was part of our reprocessing tech and
18  helped Bobby Streeter and then she became a
19  floor person eventually later, a floor -- a
20  patient care person.
21  Q. A patient care technician?
22  A. Uh-huh (positive response). Correct. But
23  that was after I had left.

Page 31

1  Q. What was Bobby Streeter's position?
2  A. Well, he did all the ordering and machine
3  upkeep and things like that.
4  Q. Another technical position?
5  A. Yes, sir.
6  Q. Do you recall what his problem was that
7  caused him to need a leave of absence?
8  A. I would have to guess on that one.
9  Q. Well, don't guess. Do you remember?
10  A. No. I can't be specific, no.
11  Q. Did Mr. Ashbury ever say anything to you
12  that made you think that he didn't like it
13  when people took leaves of absence?
14  A. No, sir.
15  Q. How about Ms. Hamilton, did she ever say
16  anything to you that made you think she
17  didn't like it when people took a leave of
18  absence?
19  A. Well, I mean, she was only DON or clinical
20  manager a short time before I had my heart
21  attack, so that would -- I really couldn't
22  honestly answer that yes or no because she
23  wasn't there long enough, you know, before

Page 32

1  I had my heart attack.
2  Q. But while she was there, did she ever say
3  anything that made you think that she
4  didn't like it when people took a leave of
5  absence?
6  A. To the best of my knowledge, I don't recall
7  anything.
8  Q. Did any other employees complain to you
9  about Lee Ashbury or Karen Hamilton?
10  A. Well, you know, nobody -- I guess, you
11  know, if you complain you complain to your
12  coworkers. Just trivial -- I mean, nothing
13  major. I can't even remember. You know,
14  just trivial things. Oh, so-and-so did
15  this and I didn't like it. You know, just
16  trivial things. Nothing major.
17  Q. You can't even remember anything today?
18  A. No. I mean, it's just trivial stuff.
19      (Defendant's Exhibit 5 was marked
20      for identification.)
21  Q. Let me hand you a document that's been
22  marked Exhibit 5 and ask if you recognize
23  that.

**Page 33**

1   A.  Yes.
2   Q.  Can you tell me what this is?
3   A.  My fiance died.
4   Q.  But this is a leave of absence form and you
5       requested time off when your fiance passed
6       away?
7   A.  Yes.
8   Q.  And it was January of '03?
9   A.  Yes.
10  Q.  Who did you talk to about needing a leave
11      of absence?
12  A.  Denise Damron.  She was wonderful.
13  Q.  And did DCI approve this?
14  A.  Yes.
15  Q.  Do you know if Mr. Ashbury was involved?
16  A.  No, I don't.
17  Q.  Do you recognize the signature that's under
18      your signature?
19  A.  No, I don't.  It looks like it -- I don't
20      know what that is.
21  Q.  Is that your signature at the bottom of the
22      page?
23  A.  That's mine above it, yes.

**Page 34**

1   Q.  And Ms. Damron was wonderful when you asked
2       her about this leave?
3   A.  I took care of him, yes.  He died of cancer.
4   Q.  And how long were you off in January of
5       '03?
6   A.  I was off for 30 days.
7   Q.  Was that a personal leave of absence?
8   A.  Yes, sir.
9   Q.  I didn't mean to upset you.
10  A.  I guess it was personal.
11  Q.  I apologize for upsetting you.
12  A.  That's all right.  It's just very sensitive
13      still.
14  Q.  I understand.  Did you have any problems
15      related to that leave of absence?
16  A.  No.
17  Q.  Did you return to your former job at the
18      end of the leave?
19  A.  Yes.
20  Q.  Making the same amount of money?
21  A.  Yes.
22  Q.  Did anybody ever say or do anything to you
23      that made you think that they were unhappy

**Page 35**

1       that you took that leave?
2   A.  No, sir.
3           (Defendant's Exhibit 6 was marked
4           for identification.)
5   Q.  All right.  Let me hand you a letter dated
6       January 6, 2003 that's been marked Exhibit
7       6 from Mr. Ashbury.  Do you recall
8       receiving a copy of that letter?
9   A.  Vaguely.  I was just real upset then.  I
10      vaguely remember something like that.
11          (Defendant's Exhibit 7 was marked
12          for identification.)
13  Q.  Let me hand you a letter dated --
14      handwritten letter dated December 11, 2003
15      that I think you wrote.  It's been marked
16      Exhibit 7.  Do you recognize that document?
17  A.  Yes, sir.
18  Q.  Did you write this letter?
19  A.  Yes.
20  Q.  What prompted you to write this letter?
21  A.  Nerves, I guess.  He was very ill and I
22      was -- I just didn't want to hinder the
23      facility, you know, with what was going

**Page 36**

1       on.  I was confused.  He was very ill.
2   Q.  Let me ask you, the document that has been
3       marked Exhibit 5 references a leave of
4       absence in January of 2003.  Exhibit 6
5       references a leave in January of 2003.
6       Exhibit 7 is dated December 11th of 2003.
7   A.  (Witness nods head).
8   Q.  So he was still living at that time but was
9       very sick?
10  A.  He died December -- He died December the
11      29th.
12  Q.  So your recollection is that you wrote this
13      resignation because of your concern for
14      your fiance?
15  A.  Yes.  And I just didn't want to hinder my
16      patients.  I care a lot about my patients
17      and I just didn't want to, you know, be
18      there if I couldn't be there 100 percent.
19      And then John, my fiance, talked to me.  We
20      had a long talk and he said don't do it and
21      I didn't.
22  Q.  Your fiance talked you out of resigning?
23  A.  Yes.

Page 37

1   Q.  Did Denise Damron try to talk you out of
2       resigning?
3   A.  She didn't want me to, but she understood
4       what I was going through. She told me to,
5       you know, just — and I went home and, like
6       I said, I talked to John and we had a long
7       talk and Denise, of course, she was
8       wonderful with me. She said that she would
9       work with me any way she could.
10  Q.  Did you actually give this letter to
11      Ms. Damron?
12  A.  I think I did. It's -- That's such a blur
13      right then in my life. I assume I did.
14      Y'all got it, so I assume I gave it to
15      somebody.
16  Q.  When you went back to Ms. Damron and told
17      her you changed your mind, did she object
18      or have any problem with that?
19  A.  No. She was glad.
20  Q.  All right. Let me ask you about the last
21      sentence of this letter. It says, I will
22      submit a list of reasons for my
23      resignation. I am unable to do so at this

Page 38

1       time due to my total disappointment.
2   A.  Yes. With myself.
3   Q.  You were disappointed with yourself?
4   A.  (Witness nods head).
5   Q.  You were just overburdened at that point?
6   A.  Yes, sir. As far as I can remember. Like
7       I said, that was just a very confusing time
8       for me right then.
9   Q.  All right. You returned -- You were able
10      to return to your job -- same job as a
11      charge nurse --
12  A.  Yes, sir.
13  Q.  -- after you had told her you had changed
14      your mind?
15  A.  Yes, sir.
16  Q.  And your pay didn't change?
17  A.  No, sir.
18  Q.  And you continued to work throughout that
19      year?
20  A.  Yes, sir.
21  Q.  Were there any problems that you recall --
22      significant problems at work in 2004?
23  A.  Other than just trivial complaints about

Page 39

1       this and that. I mean, nothing specific.
2       You know, I was happy there. I mean, you
3       know ...
4   Q.  At some point did you need to request a
5       leave of absence because of a problem with
6       your feet?
7   A.  I had to have surgery.
8   Q.  All right. What was the surgery for?
9   A.  He had to take out some bone and I had
10      spurs and it was inflamed and all. And I
11      had to have surgery on my foot and stay off
12      of it two or three weeks, however long it
13      was.
14  Q.  Who did you tell that you were going to
15      have surgery and needed time off?
16  A.  Whoever -- I guess it was -- Let's see. I
17      guess it was Denise or it might have been
18      Karen at that point. I'm confused at that
19      point now. I can't even remember dates. I
20      think it was Denise that was still there.
21  Q.  Did they give you any trouble about taking
22      time off?
23  A.  No, sir.

Page 40

1           MR. FRENCH: If we could mark that
2       as Exhibit 8, please.
3           (Defendant's Exhibit 8 was marked
4           for identification.)
5   Q.  Do you recall receiving a copy of Exhibit
6       8?
7   A.  Yes, sir. I vaguely remember that.
8   Q.  If you look at the end of page 2 under the
9       signature line.
10  A.  Uh-huh (positive response).
11  Q.  Do you see where it says PLA note?
12  A.  Uh-huh (positive response).
13  Q.  I assume that's --
14  A.  Yes, sir.
15  Q.  -- PL Ashbury, PLA?
16  A.  I would assume that maybe, too, I guess.
17  Q.  Would you take a minute or two and read
18      those two short paragraphs for me. Not out
19      loud. Just to yourself. I wanted to ask
20      you if any of that information is
21      incorrect.
22          (Brief pause.)
23  Q.  To the best of your recollection is that

Page 41

1    information accurate?
2    A.  To the best of my recollection, yes.
3    Q.  When you came back from the leave of
4        absence in December of '04, did you come
5        back to your same job?
6    A.  Yes, sir.
7    Q.  Same pay?
8    A.  Yes, sir.
9    Q.  Any change in benefits?
10   A.  No, sir.
11   Q.  Any change in your hours or
12       responsibilities?
13   A.  No, sir.
14   Q.  Anybody ever make any negative comments to
15       you about taking that FMLA leave in 2004?
16   A.  No, sir.
17   Q.  Do you recall any significant problems at
18       work between December of '04 and May of
19       '05?
20   A.  All right.  Now, December '04 to May '05?
21   Q.  Right.  That's when you came back from your
22       foot surgery leave and then you had your
23       heart attack in May of '05.

Page 42

1    A.  Now, I had my foot surgery.  But, now, that
2        next hospitalization was not due to my
3        foot.  I had a partial blockage.  I became
4        extremely sick at work and ended up in the
5        emergency room.
6    Q.  You tried to come back?
7    A.  I did come back for however long.
8    Q.  A day or so?
9    A.  Right.  And then I became violently ill at
10       work.  Throwing up.  Could not stop
11       throwing up.  My sister came and got me and
12       took me to the emergency room, which is
13       across the street.  My stomach was
14       ulcerating and it ulcerated at the bottom
15       of the stomach where it goes into the
16       intestines and I had a partial blockage.
17       So they hospitalized me and I was under a
18       doctor's care trying to get my stomach and
19       all back in shape.
20   Q.  After you returned to work from that leave
21       until your heart attack were there any
22       problems --
23   A.  Not that I can recall.

Page 43

1    Q.  -- issues at work that you remember?
2    A.  Not that I can recall.
3    Q.  As of May of 2005 what was your work
4        schedule?
5    A.  Repeat that, please.
6    Q.  As of May of 2005 what was your work
7        schedule?
8    A.  May 2005?  Are you talking about when I had
9        my heart attack?  That's when I had my
10       heart attach.
11   Q.  Yes, ma'am.  Right before your heart
12       attack.
13   A.  I was working as needed when needed.  I was
14       working 10-, 11-hour shifts four days a
15       week.  If they needed me an extra day, I'd
16       work.  I always volunteered to work if they
17       were short.  And when Denise was out or
18       anything, I was always there.
19   Q.  But what was the average or the normal work
20       schedule?  Was it four days a week?
21   A.  Four days a week 10 to -- yeah.  Four days
22       a week.
23   Q.  10 hour --

Page 44

1    A.  10 hours until whenever.
2    Q.  I understand you would work over if the
3        patient was still there and needed ...
4    A.  (Witness nods head).
5    Q.  But the normal expectation was four days a
6        week, 10 hours a day?
7    A.  Correct.
8    Q.  Who were the other RNs at that time?
9    A.  Bertha Baker.  I think Teresa Haskell was
10       still there.  Yeah, I believe she was.  Me
11       and, of course, Karen Hamilton.  That's all
12       I can remember at this moment.
13   Q.  All right.  Did all of the RNs work four
14       days a week 10 hours a day?
15   A.  To the best of my knowledge, yes.
16   Q.  How about the patient care technicians, did
17       they mirror y'all's schedule --
18   A.  Yes, sir.
19   Q.  -- four days a week, 10 hours a day?
20   A.  Yes, sir.
21   Q.  Do you know who set the work schedules for
22       the RNs?
23   A.  Well, when I started there it was always

Page 45

1    four days a week 10 hours — what I can
2    remember. And then the schedule was done
3    by the clinical manager slash DON as far as
4    weekly schedules.
5  Q.  And as of May of '05 was that Karen
6    Hamilton?
7. A.  Yes, sir.
8  Q.  She set the weekly schedules?
9  A.  To my knowledge, yes, sir.
10  Q.  And before that was Denise Damron in charge
11    of setting the schedule?
12  A.  Correct.
13  Q.  And I think you just told me that when you
14    started you worked four days a week?
15  A.  Yes, sir.
16  Q.  Were there ever any changes to your
17    schedule prior to your heart attack? Did
18    you ever go to five days a week or three
19    days a week?
20  A.  Just when I'd work extra, you know, and
21    they needed an RN I'd volunteer when I
22    could.
23  Q.  But from the time you started until the

Page 46

1    time you had your heart attack the normal
2    workweek was four days a week, 10 hours a
3    day?
4  A.  To the best of my knowledge, yes, sir.
5  Q.  Before you had your heart attack, did you
6    ever hear any discussion or did you ever
7    receive any communication that DCI was
8    considering changing the work schedule?
9  A.  No, sir.
10  Q.  You didn't find out about a change to your
11    work schedule until you were on a leave of
12    absence?
13  A.  Correct.
14  Q.  And I think as we've alluded to you had a
15    heart attack on May 9th, 2005 that required
16    hospitalization?
17  A.  Yes, sir.
18  Q.  And the doctors decided that you should not
19    go back to work; correct?
20  A.  Now, what do you mean by do not go back to
21    work? I mean, could you explain that a
22    little bit what you mean?
23  Q.  You weren't able to go back to work that

Page 47

1    day or the next day; right?
2  A.  Correct.
3  Q.  In fact, they took you out of work for
4    several weeks?
5  A.  Yes, sir.
6  Q.  And as of May 9th, 2005 you were still in
7    the charge nurse position?
8  A.  Yes, sir.
9  Q.  And your immediate supervisor at that time
10    was Karen Hamilton?
11  A.  Yes, sir.
12  Q.  And the administrator at that time was Lee
13    Ashbury?
14  A.  Yes, sir.
15      (Defendant's Exhibit 9 was marked
16      for identification.)
17  Q.  Here's a copy of the complaint that you
18    filed in this lawsuit. It's marked Exhibit
19    9. And if you'd turn to page 3, please,
20    ma'am. And we've covered much of this, but
21    I want to just make sure that this
22    information is accurate. Would you review
23    paragraph 10 through paragraph 14 on page

Page 48

1    3 —
2  A.  Okay.
3  Q.  — and tell me if anything in those
4    paragraphs is not correct.
5  A.  That's correct.
6  Q.  All of the information in paragraph 10
7    through paragraph 14 is correct?
8  A.  To the best of my knowledge at this point,
9    yes.
10  Q.  On page 4, paragraph number 15, do you see
11    that?
12  A.  Yes, sir.
13  Q.  It says that you updated defendant
14    regarding your condition every week. Who
15    did you speak to about your condition while
16    you were out?
17  A.  While I was out I would talk to Karen
18    Hamilton. If she was busy, I would talk to
19    the secretary, Carolyn Green.
20  Q.  Do you know who Ms. Green reported to?
21  A.  To Karen.
22  Q.  And when you spoke to Ms. Hamilton while
23    you were out, what did she tell you?

Page 49

1   A.  I would just briefly tell her that, you
2       know, I was getting better and things were
3       looking better.  And I was just giving her
4       a weekly report or however they wanted me
5       to call is how I would call, you know.
6   Q.  Do you recall any of her responses to that
7       information?
8   A.  Basically just, you know, keep us posted,
9       you know.
10  Q.  All right.  Paragraph 22 on page 4 --
11  A.  Yes, sir.
12  Q.  -- do you see that one?
13  A.  Yes, sir.
14  Q.  It says, Ms. Carter informed Dr. Domingo's
15      office of the mistake and a corrected
16      letter was faxed to defendant.  Do you know
17      who faxed that letter?
18  A.  To my knowledge it was probably the
19      receptionist at Dr. Domingo's office, which
20      would have been Bertha Tolliver.
21  Q.  Really what I'm curious, how do you know it
22      was faxed to them?  Did somebody tell you
23      that or were you there when it was faxed or

Page 50

1       did you talk to Karen Hamilton and she told
2       you that she received a second fax?  How
3       did you know that a second letter was faxed
4       to DCI?
5   A.  Because when I went up there and she wrote
6       it out and I told her that was right and
7       she was faxing it right then.
8   Q.  She told you that she was faxing it?
9   A.  Right.
10  Q.  Did you see her fax it?
11  A.  No, sir.  I don't think I did, no.
12  Q.  This is just a lawyer being a lawyer just
13      trying to make sure I know what -- I
14      understand what you actually know.  Did
15      Karen Hamilton and you ever discuss this
16      second letter that was faxed?
17          MR. SAXON:  The one referenced in
18          paragraph 22?
19          MR. FRENCH:  Yes.
20  A.  As far as I'm aware, she was aware that
21      there was an error and that the correct one
22      was being faxed.  And that's when she told
23      me there was nothing they could do to help

Page 51

1       me.  By what she was telling me, I was led
2       to believe that she had all the faxes.
3   Q.  Okay.  Based on a conversation that you had
4       with Ms. Hamilton, you got the impression
5       that she did receive this letter referenced
6       in paragraph 22?
7   A.  Yes, sir.
8   Q.  During the -- any conversation that you had
9       with Ms. Hamilton, did she tell you that
10      she had received the fax referenced in
11      paragraph 22?
12  A.  Just pointblank said I have the corrected
13      fax?
14  Q.  Yes, ma'am.
15  A.  I don't recall at this time.  I don't.
16  Q.  Well, all I'm trying to do -- It definitely
17      was your impression that she had it --
18  A.  Correct.
19  Q.  -- but you don't know for sure if she did?
20  A.  Well, between Bertha, the receptionist at
21      Dr. Domingo's office, telling me she faxed
22      it and then me having the conversation with
23      Karen, you know, yeah, I was a hundred

Page 52

1       percent sure that it was all out there, you
2       know.
3   Q.  Okay.  That's your impression.  But you're
4       not sure if she had that letter?
5   A.  Well, I don't -- I don't know how I could
6       be sure than I took it to her myself.  I
7       don't understand --
8   Q.  That's my point.  That's exactly how you
9       could be sure.
10  A.  Yeah.
11  Q.  If you took it to her or if she said I got
12      it or if you were there and you saw her
13      looking at it.
14  A.  I remember I told her if I needed to I
15      would hand deliver it, and I was told that
16      wasn't necessary.
17  Q.  So you and Ms. Hamilton talked about
18      this --
19  A.  The corrected fax.
20  Q.  -- fax was coming?
21  A.  Uh-huh (positive response).  Yes.  And I
22      told her I would hand deliver it if
23      necessary.

Page 53

1  Q.  But did you ever have a conversation with
2      her where she said, I got it, I have it
3      right here?
4  A.  I don't recall at this time because the
5      way -- I just don't recall right now.
6  Q.  All right.  Now, we have talked a little
7      bit about this, the conversations that you
8      had with Ms. Hamilton about coming back to
9      work.  Do you recall when your doctor
10     released you to return to work?
11 A.  I was trying to get back July the 23rd and
12     I think -- I don't know what date that was
13     on, but that's when I was trying to get
14     back was when my leave was up.
15 Q.  Okay.
16 A.  He was aware of that, so ...
17 Q.  All right.  It's your understanding that
18     your leave was up July 23rd of 2005?
19 A.  Yes, sir.
20 Q.  And you were trying to come back as of that
21     date?
22 A.  Correct.
23 Q.  What did your doctor -- Did your doctor

Page 54

1      release you to return to work?
2  A.  Yes, sir.
3  Q.  Was it to return to work light duty?
4  A.  For -- Instead of 13-hour shifts, he wanted
5      me to work just some eight-hour shifts for
6      the first couple of weeks.
7  Q.  Could you work three days a week eight
8      hours a day --
9  A.  Correct.
10 Q.  -- or could you --
11 A.  Correct.
12 Q.  Did he tell you how many days a week you
13     could work?
14 A.  Three.
15 Q.  All right.  So did he tell you you should
16     not work more than three?
17 A.  For the first couple of weeks that's all he
18     wanted me to work.
19 Q.  So it was your understanding from your
20     doctor that you could work three days a
21     week eight hours per day?
22 A.  Correct.
23 Q.  Did he tell you why he thought you could

Page 55

1      only work that?
2  A.  He wanted me to ease -- He knew how
3      stressful the job was and how long the
4      hours were.  I'd had trouble during my
5      recuperation period.  They thought I had
6      another heart attack.  It wasn't.  It was
7      medication.  But I still had to go in and
8      have more tests.  I had to stop cardiac
9      rehab because of it.  He just didn't want
10     me to get in the situation where I'd get
11     sick again.  He just wanted me to take my
12     time.
13 Q.  Were you still on medication as of July 23,
14     2005?
15 A.  I'm on basically the same medication now
16     that I've been on.
17 Q.  What medication is that?
18 A.  I'm on two blood pressure pills, four
19     cholesterol pills.  I'm on a blood
20     thinner -- two blood thinners.  What else?
21     Stomach pill; Prevacid.  Nitroglycerin if I
22     need it, which I haven't needed it in a
23     couple of years.  Do you want me to give

Page 56

1      you -- I have a list in my purse.  Do you
2      want it?
3  Q.  No.  I don't need the exact list.  But all
4      of those medications were medications that
5      had been prescribed to you as of July 23,
6      2005?
7  A.  Basically things have been the same
8      since -- They changed some before July the
9      23rd because they had to change my
10     medications.  But since that point, yes, I
11     have basically been on the same
12     medications.
13 Q.  Were you taking any medication for
14     depression as of July of '05?
15 A.  Correct.  I was doing that.  They had me on
16     Wellbutrin.
17 Q.  Are you still taking something for
18     depression?
19 A.  I came off of it.  I started feeling bad.
20     Dr. Domingo wanted to put me on another
21     type of antidepressant.  I got the
22     prescription and I didn't fill it.  I
23     really just didn't want to depend on a

14 (Pages 53 to 56)

Page 57

1    medication. I really wanted to just try to
2    get it together on my own. And so, no,
3    right now I'm not taking anything. I don't
4    feel like I need it now.
5  Q.  Good. When did you stop taking medication
6    for depression?
7  A.  This would have to be a guess. I stopped
8    it about a year ago and then maybe three or
9    four months later I started taking it again
10    for a couple of months and then I stopped
11    it. That's just the best I can guess at
12    that.
13  Q.  All right. Had you ever taken -- Prior to
14    having your heart attack in 2005, had you
15    ever taken any medication for depression or
16    anxiety?
17  A.  I think I have at some point. But when or
18    why or who -- No. I'm going to have to say
19    no to that. Huh-uh (negative response).
20    I'm going to have to say no to that. I've
21    had something to help me sleep or something
22    like that, you know, years ago, but
23    nothing --

Page 58

1  Q.  As of May of 2005 were you on any
2    medications?
3  A.  May 2005?
4  Q.  Prior to your heart attack.
5  A.  All right. Let's see. Prior to my heart
6    attack basically I was taking a blood
7    pressure pill and my stomach pill and I
8    think that was pretty much it. I was on
9    one blood pressure pill and a stomach pill
10    best of my knowledge.
11  Q.  All right. Just so I'm clear, you had a
12    conversation -- Did you have more than one
13    conversation with Ms. Hamilton about coming
14    back to work?
15  A.  Oh, yes.
16  Q.  Can you tell me about each one of those
17    conversations?
18  A.  Just pertaining about my work schedule
19    coming back to work or from the time I was
20    recuperating and --
21  Q.  Well, I understand that you kept her
22    updated about what your condition was and
23    the fact that you still -- you still were

Page 59

1    not able to come back. But at the point at
2    which you got released you started -- you
3    had a conversation with Ms. Hamilton about
4    my doctor has released me?
5  A.  Correct. Okay. That. Okay. I talked to
6    her several times in that week prior to the
7    23rd, July the 23rd trying to get
8    everything situated so I could come back to
9    work. I talked to her several times. I
10    couldn't tell you how many. And each
11    conversation was basically about I was well
12    enough to come back to work, but I might
13    not be able to work a full schedule at
14    first, that kind of thing.
15  Q.  And what did she tell you?
16  A.  She said to give -- that she needed -- that
17    I would need a doctor's statement and all
18    like that before I could come back to
19    work. Of course, I already knew that. And
20    I told her no problem, that he was going to
21    be -- you know, that's no problem, what
22    else did I need to get or do or anything
23    like that. Just getting an update, you

Page 60

1    know, as to what I might need to do or
2    whatever with the schedule and all like
3    that.
4  Q.  Did she say you needed to do anything else?
5  A.  Well, at the point when I said I was only
6    going to be able to work eight-hour shifts,
7    that's when everything turned around.
8  Q.  Did you and Ms. Hamilton discuss the fact
9    that the schedules had been changed to a
10    three days per week 12 hours a day?
11  A.  It came up during that conversation. Now,
12    she never informed me during my
13    recuperation period that that was changed.
14    Debbie Tyndal told me that that had
15    changed. But no one officially notified
16    me. And that's when I told her I just
17    didn't know if I could work the 13-hour
18    shifts -- you know, 12-, 13-hour shifts
19    like that right off the bat coming back.
20  Q.  But you wouldn't have been able to work the
21    old 10-hour shifts either; right?
22  A.  I don't know about that. If they had
23    offered it, I might -- you know, I mean, I

Page 61

1    wanted my job, you know.
2  Q. But what did the doctor say?
3  A. He wanted me to work eight hours, and I was
4    trying to go by what he thought was best
5    for me.
6  Q. When you found out that the schedules had
7    been changed, was it your understanding
8    that it had been changed for everybody?
9  A. Correct. As far as the floor personnel.
10 Q. It wasn't just your schedule that had been
11    changed?
12 A. Correct.
13 Q. All right. Paragraph 26 of the complaint.
14 A. Okay.
15 Q. Who offered you the nurse manager's
16    position?
17 A. That was Lee Ashbury. He came down to the
18    clinic.
19 Q. What did he tell you when he offered you
20    the nurse manager's position?
21 A. That they wanted to offer it to me first.
22    It was me and Karen. Karen had applied for
23    it. I had not applied for it. They came

Page 62

1    to me. They wanted to offer it to me first
2    because of my experience, my longevity with
3    the clinic and all like that that they
4    wanted me to -- you know, offer it to me
5    first. And like it said here, I declined
6    because I was dealing with those health
7    problems, my foot and my stomach. I knew
8    that I just wasn't really able to do it at
9    that point. And I thanked him and told him
10    if it came available again to please give
11    me a chance again. But I turned it down at
12    that point.
13 Q. You had several very good evaluations while
14    you were employed at DCI; correct?
15 A. Yes, sir. As far as -- To my knowledge,
16    yes, sir.
17 Q. And you received several raises throughout
18    your employment; correct?
19 A. Yes, sir.
20 Q. Did anybody ever indicate to you there was
21    any problems with your employment or your
22    performance?
23 A. No, sir.

Page 63

1  Q. All right. Paragraph 25 of the complaint
2    you reference a letter that you received
3    from Mr. Ashbury.
4  A. Correct.
5  Q. And we've talked about the fact that you
6    had conversations with Karen Hamilton about
7    coming back to work. While you were on
8    your leave of absence, did you have any
9    conversations with Mr. Ashbury about coming
10    back to work?
11 A. No, sir. I went to the chain of command,
12    which was Karen.
13 Q. All right. After your heart attack, did
14    you have any conversations with Mr. Ashbury
15    before you were terminated?
16 A. No, sir.
17 Q. After you were terminated, did you have any
18    conversations with Mr. Ashbury?
19 A. Only letter, you know, by memo or letter.
20    No verbal conversation.
21 Q. So after May of 2005 you had no
22    conversations with Mr. Ashbury?
23 A. Not that I can recall.

Page 64

1  Q. Other than Ms. Hamilton -- Did you have any
2    conversations with any other manager or
3    supervisor at DCI other than Ms. Hamilton?
4  A. No, sir.
5  Q. All right. When you told Ms. Hamilton that
6    you didn't think you'd be able to work the
7    12- or 13-hour shifts, what did she say?
8  A. That's when she said that if I had to do
9    that, you know, just wait and come back to
10    work in two weeks.
11 Q. What was going to happen in two weeks?
12 A. I guess she thought -- I don't know what
13    she thought. That's when I told her, you
14    know, I needed to do that for two weeks.
15    She said, well, since I had to do that for
16    two weeks, just wait and start back to work
17    in two weeks. That's when I told her it
18    didn't matter if I started in two weeks or
19    two months, I still needed time to get on
20    my feet.
21 Q. Did your doctor ever tell you how long he
22    wanted you to work eight-hour shifts?
23 A. Dr. Domingo -- Yeah. Two weeks.

Page 65

1  Q.  Why did you feel like you would need more
2      than two weeks to --
3  A.  I didn't.  I never said I did.  I was just
4      trying to do what he said he wanted me to
5      do was work eight-hour shifts for two
6      weeks, like three days a week eight-hour
7      shifts for two weeks.  I never said it was
8      more.
9  Q.  So even if you came back in July of '05,
10     you thought, all right, I'll need to work
11     two weeks.  If you came back in August of
12     '05, you felt like you'd need to work eight
13     hours for two weeks?
14 A.  Correct.
15 Q.  Just to kind of get your feet under you and
16     get used to working again.  Is that --
17 A.  Yes, sir.  When I had that heart attack, it
18     pretty well -- it scared me.  I was
19     scared.  I'll be honest with you.  I was
20     scared.  And then when I thought I was
21     having another heart attack I was double
22     scared.  So I just -- Yeah.
23 Q.  So when you told Ms. Hamilton that it

Page 66

1      doesn't matter when you come back, you're
2      still going to need to work eight-hour
3      shifts for two weeks, what did she say?
4  A.  I've already told you.  That's when she --
5      She just said there was nothing that we can
6      do to help you.  You know, I just
7      thought ...
8  Q.  Was that how the conversation ended?
9  A.  Pretty much.
10 Q.  After that conversation with Ms. Hamilton,
11     did you have any other conversations with
12     her or anybody else with DCI?
13 A.  No, sir.  I just, you know, told her it
14     wasn't fair, that I had been there five
15     years.  I was only asking for two weeks.
16 Q.  Did you try to get in touch with
17     Mr. Ashbury?
18 A.  I went through the chain of command.  From
19     my understanding -- I'm a firm believer in
20     chain of command.
21 Q.  I understand.  I understand why you spoke
22     to Ms. Hamilton.
23 A.  Because I asked her, I said, does Lee or

Page 67

1      corporate know what's going on.  Her
2      statement to me was, there is nothing we
3      can do to help you.  So that included
4      everybody.
5  Q.  I understand.  After that conversation with
6      Ms. Hamilton, did you try to get in touch
7      with Mr. Ashbury?
8  A.  No, sir.
9  Q.  Did you try to get in touch with any other
10     manager or supervisor at DCI --
11 A.  No.
12 Q.  -- after your conversation with
13     Ms. Hamilton?
14 A.  No, sir.
15 Q.  Did you try to contact human resources?
16 A.  No, sir.  At that point I felt like she
17     just didn't want me there.
18          (Defendant's Exhibit 10 was marked
19          for identification.)
20 Q.  Let me hand you a copy of a work schedule
21     for April of 2005 and ask if you recognize
22     that.
23 A.  Well, it's just a work schedule.  Yeah.

Page 68

1  Q.  Is this a work schedule that would be --
2      that was posted?
3  A.  Correct.  And we'd all get copies.
4  Q.  So you -- this was posted and every RN was
5      given a copy of the work schedule?
6  A.  Sure.  As far as I know.  I mean, I always
7      got -- made a copy of it.
8  Q.  All right.  It's got the name Margaret
9      RN --
10 A.  Correct.
11 Q.  -- down there.  It's your understanding
12     that's you?
13 A.  Yes, sir.
14 Q.  What do the W's stand for?
15 A.  That's work.
16 Q.  And the zeroes?
17 A.  Is off.
18 Q.  And how about the W slash one, what does
19     that stand for?
20 A.  Leave at one maybe.  To be honest, I don't
21     recall what that would be.
22 Q.  Do you have any reason to believe this is
23     not the work schedule for April of 2005?

Deposition of Margaret Carter                                                    May 14, 2008

---

Page 69

1   A.  No, sir.
2          (Defendant's Exhibit 11 was marked
3            for identification.)
4   Q.  Here's a copy of what I think is the work
5       schedule for May of 2005. Would you take a
6       look at that and tell me if you agree that
7       that is the May 2005 work schedule?
8   A.  Well, I wasn't there after this point, so I
9       mean --
10  Q.  Well, you were there for part of May;
11      right?
12  A.  2005? I had my heart attack May the 9th,
13      so, no, I wasn't there.
14  Q.  So you weren't there for any part of this
15      schedule?
16  A.  No, sir.
17  Q.  Do you happen to know -- Next to your name
18      there it has S listed. Do you happen to
19      know what S stands for on these work
20      schedules?
21  A.  I believe it's sick, sick days, sick.
22  Q.  And now it looks like instead of O's
23      there's X's on the work schedule. Do you

---

Page 70

1       know what the X's stand for?
2   A.  The X's are like falling on Sundays and we
3       were closed on Sundays. The clinic was
4       closed.
5   Q.  But there's also some X's during the week.
6       Like Bertha has an X next to Tuesday the
7       10th.
8   A.  Well, it looks like that might be an off
9       day, then. I don't know.
10  Q.  Do you recall what the X's were used for on
11      the schedules?
12  A.  No, sir. This was after I had already had
13      my heart attack. I don't remember that.
14          MR. SAXON: Can we take a short
15          break?
16          MR. FRENCH: Yeah.
17          (Brief recess was taken.)
18          (Defendant's Exhibit 12 was marked
19            for identification.)
20  Q.  Ms. Carter, I've just handed you a copy of
21      your discovery responses that have been
22      marked as Exhibit Number 12, and I just
23      wanted to ask you a few questions about

---

Page 71

1       your responses. If you could turn to page
2       number 4.
3   A.  Okay.
4   Q.  We have discussed this information
5       briefly. Your response to question number
6       five you list all the places that you have
7       worked including DCI. And I just wanted
8       you to take a minute and look at that
9       information and just verify that it is
10      accurate.
11  A.  It appears to be, yes.
12  Q.  The job you had after DCI was BMA
13      Tuskegee. That's Biomedical Associates;
14      correct?
15  A.  Correct.
16  Q.  And you were a dialysis nurse with them?
17  A.  Yes, sir.
18  Q.  You were a team leader. What's a team
19      leader?
20  A.  Well, it's less than a charge nurse. They
21      did away with charge nurse. Basically it's
22      just there was two RNs there and the room
23      was split in two. And that was your

---

Page 72

1       responsibility over here and then the other
2       one had their responsibilities over there.
3   Q.  But you made more per hour than you did at
4       DCI; correct?
5   A.  Yes, sir. Yes, sir.
6   Q.  What was your schedule at BMA Tuskegee?
7   A.  When I went there after my heart attack, I
8       worked eight-hour shifts. I was in
9       classroom for two weeks for eight hours and
10      then I was put on the floor after that.
11  Q.  And what was your shifts after the
12      eight-hour shifts?
13  A.  It was basically still four days a week, 10
14      hours.
15  Q.  So was that your shift with BMA for most of
16      your employment with them?
17  A.  Yes, sir.
18  Q.  Four days a week, 10 hours a day?
19  A.  Yes, sir. I might have worked three days a
20      week some. I can't remember.
21  Q.  Were there any significant differences
22      between the benefit package with BMA versus
23      the benefit package at DCI?

---

Page 73

1    A.   The best I can remember it was probably
2         about the same.
3    Q.   Now, why did you leave BMA?
4    A.   Because they had capped my salary.
5    Q.   What does that mean?
6    A.   They wasn't going to pay me anymore.
7    Q.   What was your salary capped at?
8    A.   Right at $25. And they said I wouldn't
9         be -- I wouldn't be getting any more
10        raises. I've just never been capped before.
11   Q.   The last sentence in the paragraph
12        discussing BMA says, I was also too
13        stressed given the location and having to
14        travel the distance alone. What do you
15        mean there?
16   A.   Where I live it was all back roads, little
17        two by four back country roads.
18   Q.   To get to Tuskegee?
19   A.   To get to Tuskegee from where I lived.
20   Q.   And you were just nervous about the travel?
21   A.   Correct. And at night coming home by
22        myself and the cell phone reception was
23        horrible through there.

Page 74

1    Q.   If they had continued to give you raises,
2         would you have continued to work at BMA?
3    A.   I really don't know about that. Probably.
4         I don't know. Because like I said, it was
5         just -- it was a very stressful trip and
6         all.
7    Q.   Did you ever consider reapplying at DCI?
8    A.   I was scared to.
9    Q.   Why?
10   A.   Because I was scared they'd do the same
11        thing to me again if I got sick.
12   Q.   What did they -- What do you mean?
13   A.   Well, wouldn't take me back after I had my
14        heart attack.
15   Q.   And you worked at DaVita Dialysis from
16        April of '07 to May of '07. Your position
17        there was team leader again.
18   A.   Uh-huh (positive response).
19   Q.   What was that job?
20   A.   Basically the same thing as the other one
21        was. You had a section that you were
22        responsible for. You didn't cover the
23        whole floor. You just had a section.

Page 75

1    Q.   And you made $25 an hour there?
2    A.   Correct.
3    Q.   Why did you leave DaVita?
4    A.   Because the scheduling was awful. I was on
5         my feet from 5:30 in the morning and I
6         didn't get a break until like 2:30 in the
7         afternoon. And I was just -- I couldn't do
8         that. They kept telling me it was going to
9         get better, it was going to get better, but
10        I just -- I couldn't take that. That's too
11        much on my -- I was literally on my feet.
12        Because the way they staggered the patients
13        going on the machine, there was always
14        somebody going on or somebody coming off
15        and you had to be there.
16   Q.   Too much on your feet time?
17   A.   Correct.
18   Q.   What was the work schedule there? Days per
19        week?
20   A.   They worked -- Now, the best I -- All
21        right. You'd work like Tuesday, Wednesday,
22        Thursday -- or like Wednesday, Thursday,
23        Friday, Saturday, off Sunday, and then work

Page 76

1         three or four days again and then you had a
2         week off. So it was a lot of bunched up
3         time with a span off. That was too
4         stressful for me. That was just pushing it
5         a little bit too much.
6    Q.   All right. I apologize if this is
7         redundant. But to the best of your
8         knowledge, when the schedule was changed at
9         DCI, all of the floor personnel had to work
10        three days a week 12 to 13 hours per day?
11   A.   From my understanding, yes.
12   Q.   Do you have any reason to think that that's
13        not accurate?
14   A.   Well, considering I was never officially,
15        you know, sent any documentation about
16        that, this is just what I was being told,
17        I'm just, you know --
18   Q.   What I'm getting at -- and I'm not asking a
19        very good question. Did anybody ever tell
20        you that that was not true, that there were
21        only some people who were working that?
22   A.   I don't -- No. I don't think so.
23   Q.   Did Ms. Tyndal's schedule change?

Page 77

1   A. Yes, sir.

2   Q. Did she have to work three days a week 12

3       to 13 hours a day?

4   A. Yes, sir.

5   Q. All right. Paragraph 17 on page 9.

6   A. 17. Okay.

7   Q. The response to number 17. It says, I had

8       to seek employment at a lesser position and

9       eventually in a different nursing field.

10      What did you mean by a lesser position?

11  A. I lost — I was no longer charge. I was

12     dropped down to team leader. I just — I

13     lost my seniority. You know, I had no

14     seniority. I had to start all over.

15  Q. But you feel like the position as team

16     leader is —

17  A. It's lesser than charge, yes, sir.

18  Q. A less position in some way?

19  A. Yes, sir.

20  Q. But the pay was greater; right?

21  A. Well, depending on what company you worked

22     with, their pay scale.

23  Q. The company you worked with was BMA. When

Page 78

1     you went to work at BMA, you made more than

2     you made per hour at DCI; right?

3  A. Yes, sir.

4  Q. And you still got 40 hours a week; right?

5  A. Correct.

6  Q. All right. And it says you — I think what

7     the implication is that you had to seek

8     employment in a different nursing field.

9     Did you not want to work in hospice

10     nursing?

11  A. Well, after I had taken care of John, I

12     guess I was doing hospice nursing, my

13     fiance that had cancer. I didn't have

14     hospice come in. I took care of him. I

15     wanted to stay in dialysis. That's what I

16     specialized in. That's what I love to do.

17     But after, of course, DCI and then trying

18     to get comfortable in other dialysis

19     clinics and that not working out, I decided

20     to try hospice since I was familiar with it

21     in a personal sense.

22  Q. But when you started doing hospice work,

23     you also made $27 an hour, right, which was

Page 79

1     more than you'd ever made —

2  A. Correct.

3  Q. — in dialysis?

4  A. Correct. At that point, yes.

5  Q. You also say, I have less time to care for

6     my 95-year-old mother. What are you

7     referring to there?

8  A. My mother is basically homebound. She has

9     to have 24-hour care, sitters, things like

10     that. When I worked in Union Springs, I

11     was able to go over there after work and

12     relieve — our main problem with sitters is

13     in the evening. So my sister has to go

14     over there every day after work now who has

15     lupus, who has had quadruple bypass

16     surgery. I can no longer do that, so she's

17     having to do it. And when she can't do it,

18     we're having to have more sitters come in

19     now and try to fill gaps and things like

20     that. It's a financial strain. I helped

21     out a lot since she just lived four blocks

22     from DCI. She was right there.

23  Q. Were you able to help out a good bit when

Page 80

1     you worked at BMA?

2  A. In Tuskegee? No, sir.

3  Q. What about the three days a week that you

4     weren't there?

5  A. When I'm off I help. When I'm off. When

6     I'm not working, I'm taking care of my

7     mother or helping her, seeing about my

8     sister or doing whatever I need to do.

9  Q. If you had continued at DCI, you would have

10     had to work three days a week 12 or 13

11     hours a day; correct?

12  A. From my understanding, yes, sir.

13  Q. And there wouldn't have been any

14     restrictions on your helping out the four

15     other days of the week; right?

16  A. As far as?

17  Q. Your job requirements with DCI.

18  A. I would work any time they needed me to

19     work.

20  Q. If you had four days a week off at DCI, you

21     would have been able to help with your

22     mother then; right?

23  A. Well, other than recuperating from the long

Page 81

1    hours that I would have had to have done,
2    you know, after that stretch of long
3    hours. But I could have probably helped
4    more, yes.
5  Q.  The last thing you say here is I have lost
6    my retirement benefits. What retirement
7    benefits did you lose?
8  A.  Well, my chance to continue to be vested in
9    the company and add to that.
10  Q.  When you went to work at BMA, were you
11    eligible for a retirement plan?
12  A.  Yes, sir. And I believe I might have been
13    started in one, but it had just started
14    when I left.
15  Q.  And to the best of your -- To the best of
16    your knowledge, you're not eligible for the
17    Alacare Hospice retirement plan yet?
18  A.  To the best of my knowledge, no, sir, not
19    yet.
20  Q.  Do you intend to enroll in that if you can?
21  A.  Yes, sir.
22  Q.  Are you currently under the care of any
23    physician or counselor for stress, anxiety

Page 82

1    or depression?
2  A.  No, sir.
3  Q.  Were you ever -- Did anyone other than your
4    primary care physician or your cardiologist
5    ever treat you for stress, anxiety or
6    depression?
7  A.  Just them.
8  Q.  Dr. Domingo?
9  A.  Yes, sir.
10  Q.  He's the one who treated you for -- or is
11    it a she?
12  A.  He.
13  Q.  He treated you for stress, anxiety and
14    depression?
15  A.  Yes, sir.
16  Q.  But you're not currently taking any
17    medications for any of those conditions?
18  A.  No, sir.
19        (Defendant's Exhibit 13 was marked
20        for identification.)
21  Q.  Let me hand you a letter from Mr. Ashbury
22    dated May 30, 2005 -- it's been marked
23    Exhibit 13 -- and ask if you recognize that

Page 83

1    letter.
2  A.  Yes, sir.
3  Q.  Do you recall receiving a copy of this
4    letter from Mr. Ashbury?
5  A.  Yes, sir.
6  Q.  Did you ever have any questions about your
7    FMLA leave?
8  A.  No, sir.
9  Q.  Did the company help you in every way that
10    you thought was appropriate with respect to
11    your FMLA leave?
12  A.  You mean during my leave?
13  Q.  Getting the leave established and during
14    the leave.
15  A.  Yes, sir.
16        (Defendant's Exhibit 14 was marked
17        for identification.)
18  Q.  Let me hand you a document that's been
19    marked Exhibit 14 and ask if you recognize
20    that. Well, let me ask you another
21    question. Is this the short-term
22    disability application form that you
23    submitted to DCI?

Page 84

1  A.  Looks to be, yes, sir.
2  Q.  Is that your signature on the second page
3    next to the date 6/13/05?
4  A.  Yes, sir.
5  Q.  When you filled out this application form,
6    did you have any idea when you might be
7    able to return to work?
8  A.  Probably not if it was filled out right
9    after the heart attack. I wouldn't have
10    been able to have known right then.
11  Q.  Do you recall when your doctor -- Never
12    mind. Horrible thought. It would have
13    been a worse question.
14        Do you feel like -- To the best of your
15    knowledge, did you receive all of the FMLA
16    leave that you were entitled to?
17  A.  To the best of my knowledge, yes.
18  Q.  To the best of your knowledge, did you
19    receive all of the personal leave that you
20    were entitled to under the DCI personal
21    leave policy?
22  A.  To the best of my knowledge, yes.
23  Q.  You just feel like they should have brought

Page 85

1      you back to work when the doctor released
2      you to return to work on light duty?
3    A.  Yes, sir.
4          (Defendant's Exhibit 15 was marked
5            for identification.)
6    Q.  Let me hand you a letter from Dr. Domingo
7      dated June 20th of 2005.  Have you ever
8      seen this letter before?
9    A.  Yes, sir.
10   Q.  Do you know if you or Dr. Domingo submitted
11      this letter to DCI?
12   A.  I didn't.
13   Q.  Do you know if Dr. Domingo did?
14   A.  I guess his office did.  I don't --
15   Q.  But do you know?  Do you know if he did?
16   A.  Well, I have no reason not to believe they
17      didn't.  If they would have told me that
18      they wasn't getting information, that they
19      needed something and -- no one ever told me
20      they needed anything from him other than
21      what he -- they already had.
22   Q.  But you don't know if anybody ever sent
23      this letter to DCI?  I'm not saying they

Page 86

1      didn't.  I'm just trying to find out what
2      you know.  Did you take this letter to DCI?
3    A.  No.
4    Q.  Did you ever have a conversation with
5      anyone at DCI about this letter?
6    A.  Well, when I would talk and call in to
7      Karen, you know, and give my report I
8      would, you know, basically tell them what
9      was going on, you know.
10   Q.  But do you recall having any conversation
11      with them about this letter?
12   A.  I would have to guess on that.  I -- Really
13      I don't recall if it would be specifically
14      this letter.
15          (Defendant's Exhibit 16 was marked
16            for identification.)
17   Q.  All right.  Let me hand you a letter from
18      Mr. Ashbury dated June 27, 2005 that's been
19      marked Exhibit 16.  Do you recall receiving
20      a copy of that letter?
21   A.  Yes, sir.
22          (Defendant's Exhibit 17 was marked
23            for identification.)

Page 87

1    Q.  Let me hand you a copy of a letter dated
2      July 20, 2005 from Dr. Domingo's office.
3      It's been marked Exhibit 17.
4    A.  Yes, sir.
5    Q.  Have you ever seen this letter before?
6    A.  Yes, sir.
7    Q.  When have you seen this letter?
8    A.  When I went and got copies of my medical
9      records.
10   Q.  We talked earlier today about an incorrect
11      letter that was sent to DCI and then a
12      second letter being faxed to DCI.  Do you
13      remember that conversation?
14   A.  Yes, sir.
15   Q.  Do you know if -- Do you know if this is
16      one of those two letters that you were
17      talking about?
18   A.  This would be -- Yes, sir.  This would be
19      one of them.
20   Q.  Is this one the correct one, or is this one
21      the incorrect one?
22   A.  It appears to be the correct one because it
23      says to work eight-hour shifts for two

Page 88

1      weeks, should you have any questions ...
2    Q.  So based on your recollection that
3      information is the same information that
4      the doctor told you?
5    A.  Yes, sir.
6          (Defendant's Exhibit 18 was marked
7            for identification.)
8    Q.  Let me hand you a letter dated July 21,
9      2005 from Dr. Domingo's office that's been
10      marked Exhibit 18.  Have you ever seen that
11      letter before?
12   A.  Yes, sir.
13   Q.  All right.  This letter has the same
14      eight-hour shift for two weeks information,
15      but it adds the return to work date of July
16      25, 2005.  Do you see that?
17   A.  Yes, sir.
18   Q.  Do you have any idea why Dr. Domingo's
19      office created this letter?
20   A.  No, sir, I don't.
21   Q.  Do you know if anybody sent this letter to
22      DCI?
23   A.  Actually see it done, no, sir, I did not.

Deposition of Margaret Carter

Page 89

```
 1   Q.  Did you ever discuss this letter with
 2       anybody at DCI?
 3   A.  Just the same context about working
 4       eight-hour shifts for two weeks, you know.
 5   Q.  Did you ever have a discussion with Karen
 6       Hamilton about the date on which you could
 7       return to work?
 8   A.  Well, it was always we were trying to get
 9       there July the 23rd. That was the big, you
10       know, cutoff day. So it was all trying to
11       take place by July the 23rd. I don't
12       remember what July the 23rd fell on,
13       but ...
14   Q.  Do you ever recall discussing -- I know you
15       were trying to get there by July 23rd, but
16       do you recall any discussions with Karen
17       Hamilton about being released to return to
18       work on July 25th?
19   A.  No, sir.
20               (Defendant's Exhibit 19 was marked
21                for identification.)
22   Q.  All right. Here's another letter from
23       Dr. Domingo's office dated July 26th,
```

Page 90

```
 1   2005. It's been marked Exhibit 19. Have
 2   you ever seen that letter before?
 3   A.  I've seen it when I picked up my medical
 4       records, but I know the context.
 5   Q.  What's the context for this letter?
 6   A.  When I had the conversation with Karen
 7       Hamilton about me coming back to work on
 8       eight-hour shifts and two weeks and all
 9       like that, the remark was made to me that I
10       could work two 12-hour shifts. And when I
11       thought that that was going to be my only
12       choice to save my job, then I went to
13       Dr. Domingo and told him that they were not
14       going to work me eight-hour shifts, that I
15       had to go back to 12-hour shifts two days a
16       week that I felt like in order to save my
17       job.
18   Q.  Did you take this letter to DCI?
19   A.  I don't think so.
20   Q.  Do you know if Dr. Domingo's office sent it
21       to DCI?
22   A.  They were supposed to.
23   Q.  Did you ever have a conversation with
```

```
 1       anybody at DCI about this
 2   A.  I don't know if it pertained to this
 3       letter. But when I got to thinking about
 4       it, I didn't contact them anymore. I just
 5       didn't want to go against what my doctor
 6       wanted me to do. I didn't want to work
 7       12-hour shifts. He wanted me to work
 8       eight. He just changed it to 12 because my
 9       job depended on it.
10   Q.  So he changed it because you asked him to
11       change it?
12   A.  Because I asked him to. I begged him to.
13   Q.  But you never called Karen Hamilton or
14       Mr. Ashbury back and told them that your
15       doctor said that you could do that, work
16       two days a week 12 hours a day?
17   A.  I had come to the conclusion that I wasn't
18       going to jeopardize my health. The doctor
19       knew better. He knew what my work was
20       over there and what I had to do and I just
21       had to make a decision. And I was going
22       put my health -- what he wanted me to do
23       first.
```

```
 1   Q.  Okay. I just want to make sure I
 2       understand. So either in a letter where they told
 3       or it appeared in a letter that they would consider allowing
 4       you that they would consider allowing y
 5       to work two days a week a full shift of
 6       or 13 hours?
 7   A.  Correct.
 8   Q.  You went to the doctor, told him that
 9       he said, okay, I'll write you this letter.
10       But you never followed up with DCI
11       wanting to do two days a week 12 hou
12       day?
13   A.  No, sir, I did not.
14               (Defendant's Exhibit 20 was m
15                for identification.)
15   Q.  Here's a letter from Mr. Ashbury da
16       26, 2005. It's been marked Exhibit
17       20. Did you receive a copy of that l
18   A.  Yes, sir.
19   Q.  After you received this letter from
20       Mr. Ashbury, did you have any con
21       with Karen Hamilton or Mr. Ashb
22       returning to work?
```

23

**Page 93**

1   A.   To my knowledge, no, sir.

2   Q.   Did you ever receive a -- any other notice

3      or communication from DCI about your

4      termination?

5   A.   It seems like there -- Are these all the

6      letters you have? There might have been --

7      I'm trying to think if there was another

8      letter. Let's see. There was -- You have

9      what I have. So if that's all you have,

10      then that's all that I have.

11   Q.   Well, today you don't recall receiving

12      another letter from them about your

13      termination?

14   A.   After this July the 26th?

15   Q.   Correct.

16   A.   Oh, no, sir.

17         (Defendant's Exhibit 21 was marked

18         for identification.)

19   Q.   Let me hand you a notice of employee

20      termination dated August 9 of '05. Have

21      you ever seen that document before?

22   A.   (Witness shakes head).

23   Q.   Did DCI send you a copy of that document?

**Page 94**

1   A.   No, sir.

2   Q.   And you haven't seen it before today?

3   A.   No, sir.

4   Q.   Did you ever work for a company called

5      Physician's Choice Dialysis?

6   A.   Was that in Florida?

7   Q.   Well, what I'm looking at is information

8      that y'all produced in discovery.

9   A.   I'm trying to remember who that might have

10      been. That might have been -- Let me look

11      at it. I'm trying to remember what the

12      date of that would have been. That might

13      have been DaVita. I believe that was --

14      Well, Physician's Choice. I'm trying to

15      look at dates on it. That might have been

16      DaVita. I'm not sure about that with the

17      way they sent their checks. I believe that

18      might have been DaVita. If I had a date on

19      it, I could tell you. I believe that was

20      DaVita, though.

21   Q.   This says it's a wage -- a W-2 wage and tax

22      statement from 2007.

23   A.   So that would have had to -- and it was

**Page 95**

1      just for the 3,000 something?

2   Q.   Yes, ma'am.

3   A.   That would have been DaVita, then, because

4      I was only there for a few weeks.

5   Q.   Biomedical Applications, is that BMA?

6   A.   Yes, sir.

7   Q.   So it's not Biomedical Associates?

8   A.   Applications. I'm sorry. They became

9      Fresenius.

10   Q.   I'm sorry, because I'm the one who

11      suggested that it might be Associates. But

12      BMA is Biomedical Applications?

13   A.   If that's what -- Yes, sir.

14   Q.   Have you ever been self-employed in any

15      way?

16   A.   I had a store at one point in Midway,

17      Alabama, which is Bullock County.

18   Q.   Was this before 2000?

19   A.   Yes.

20   Q.   Ms. Carter, are you aware or do you recall

21      any employees who have worked for DCI who

22      went out on a personal leave and at the end

23      of that leave were not allowed to come back

**Page 96**

1      to work other than you?

2   A.   Not that I'm aware of.

3   Q.   Are you aware of any employees who went out

4      on a personal leave of absence and were

5      allowed to come back to work in a light

6      duty capacity?

7   A.   Like I said previously, I believe Hazel

8      Goshay, Bobby Streeter from that clinic

9      right there.

10   Q.   But neither one of them were RNs, were

11      they?

12   A.   No, sir.

13   Q.   What were their positions?

14   A.   Technical machine, technical -- they were

15      all technical, you know, supplying, stuff

16      like that, keeping up with supplies,

17      machines.

18   Q.   Are you aware of any nurse at DCI who was

19      allowed to come back to work in a light

20      duty capacity following the expiration of a

21      leave of absence?

22   A.   Give me a minute. At this point, no, I

23      can't recall anybody.

Page 97

1  Q.  Do you recall any supervisor or manager at
2      DCI making any negative remarks to you or
3      about you taking a leave of absence?
4  A.  No, sir.
5  Q.  At any time during your employment did you
6      ever hear them -- any supervisor or manager
7      make a negative remark about an employee
8      taking an FMLA leave or a personal leave of
9      absence?
10 A.  To my knowledge, no.
11 Q.  All right.  The claim asserted in this
12     lawsuit is a FMLA retaliation claim.  And
13     this is my -- I'm going to tell you what I
14     think it is; all right?  I think it is you
15     have asserted that you believe that the
16     company terminated you because you took a
17     leave of absence that you were entitled to
18     under the Family and Medical Leave Act.  Is
19     that what you believe?
20 A.  The only thing -- Do you want me to put it
21     in my words or --
22 Q.  Your words would be great.
23 A.  The way I see it, I got -- I had a heart

Page 98

1      attack.  I tried to come back with some
2      accommodations for a couple of weeks and
3      they wouldn't let me.
4  Q.  Do you think you were terminated because
5      you took a leave of absence under the
6      Family and Medical Leave Act?
7          MR. SAXON:  Object to the form to
8              the extent it calls for a
9              legal conclusion.  You can
10             answer.
11 A.  I really don't know exactly how to answer
12     that.  I'm not a lawyer.  I was given
13     medical leave, but I wasn't allowed to come
14     back.  Now, I don't know how those two --
15 Q.  Right.  Well, I'm not asking you to be a
16     lawyer.  I wouldn't wish that on anyone.
17     What I'm trying to understand is what your
18     belief is.
19 A.  All right.
20 Q.  You took this leave of absence under the
21     Family and Medical Leave Act.  Do you think
22     you were terminated because you took that
23     leave?

Page 99

1          MR. SAXON:  Same objection.  You
2              can answer.
3  A.  I was given the leave.  I wasn't denied the
4      leave.
5  Q.  I understand.  But do you think you were
6      terminated because you took that leave?
7  A.  I think it's all wrapped in together
8      because I -- I couldn't come back and work
9      like they wanted me to work.  I don't know
10     how to separate the two is my point.  I
11     really don't.
12 Q.  All right.  So you do believe that they
13     should have just let you come back and
14     worked light duty --
15 A.  Correct.
16 Q.  -- at the end of your leave?
17         MR. FRENCH:  Let me take a couple
18             of minutes; okay?
19         MR. SAXON:  Okay.
20         (Brief recess was taken.)
21         MR. FRENCH:  I don't have any more
22             questions.  Thank you very
23             much.

Page 100

1          THE WITNESS:  Okay.
2          EXAMINATION
3  BY MR. SAXON:
4  Q.  I've got a couple real quick.  Margaret,
5      let me ask you this:  At DCI prior to your
6      heart attack, had you always worked the
7      schedule that they gave you?
8  A.  Yes, sir.
9  Q.  Did you ever complain about the schedule,
10     or did you just work it --
11 A.  I just worked it.  If something needed
12     changing, there was no problem there.
13 Q.  You worked the number of hours on the
14     number of days they gave you?
15 A.  Yes, sir.  Unless something happened that I
16     couldn't, you know --
17 Q.  Okay.
18 A.  -- I was there.
19 Q.  And is the only reason you weren't going to
20     be able to work three days a week for 12 or
21     13 hours when you returned from your heart
22     attack was because you were still
23     recuperating?

Page 101

1   A.   Yes, sir.
2   Q.   And did you ask them for accommodation to
3        let you work eight-hour days?
4   A.   Yes, sir.
5   Q.   And you told Mr. French that you were aware
6        of some people who had been given light
7        duty or -- and that was Mr. Streeter and
8        Ms. Goshay?
9   A.   Yes, sir.
10  Q.   And why do you think you were terminated by
11       DCI?
12  A.   Well, I was a good employee, good nurse. I
13       was offered a clinical manager job. They
14       thought apparently enough of me to want me
15       to do that. I got sick, I had to take
16       leave, and then I was terminated. So why
17       was I terminated? Because I took leave and
18       had a heart attack, I guess. I don't know
19       how else to phrase it. I don't. It's all
20       combined.
21           MR. SAXON: That's all I've got.
22              EXAMINATION
23  BY MR. FRENCH:

Page 102

1   Q.   I've got a follow-up question. Do you
2        believe you were terminated because you
3        took FMLA leave?
4   A.   In a sense, yes. Because if I hadn't taken
5        the leave, I wouldn't have got -- I
6        wouldn't have had the problem. If I hadn't
7        had the heart attack, I wouldn't have had
8        the problem.
9   Q.   Tell me every reason you believe that you
10       got terminated because you took FMLA
11       leave.
12  A.   Because I couldn't come back and work full
13       force wide open, I guess.
14  Q.   Did anybody ever say anything negative to
15       you about having taken leave?
16  A.   Not personally, I mean, no.
17  Q.   Did anybody ever tell you that anybody had
18       said something negative about you taking
19       leave?
20  A.   No, sir.
21  Q.   When we just took a break, did you and your
22       lawyer discuss how you answered any
23       questions in this deposition?

Page 103

1   A.   Just -- Not specifically, no.
2   Q.   So did you and your lawyer discuss how you
3        answered the question about why you believe
4        you were terminated?
5   A.   Is that client-attorney privilege?
6   Q.   Not if you're discussing how to answer a
7        question in a deposition.
8   A.   I was not told how to answer; okay? I
9        mean, I just told what I felt about
10       everything being combined. I couldn't --
11       You know, it all happened in steps.
12  Q.   Did you and your lawyer discuss that during
13       this last break?
14  A.   No, sir.
15  Q.   You didn't discuss with your lawyer how you
16       had answered any questions?
17  A.   What do you want me to say? You know, I --
18       No, sir.
19  Q.   I just want you to tell the truth.
20  A.   I'm telling the truth. No, sir. He was
21       just telling me I was doing good, you know,
22       slow down, you know. What else, I mean ...
23       What I've already said is what I've already

Page 104

1        said.
2           MR. FRENCH: Okay. I don't have
3           any more questions.
4           MR. SAXON: That's all I've got.
5           (Deposition was concluded at
6           approximately 3:15 p.m.)
7
8        * * * * * * * * * * * * *
9        FURTHER DEPONENT SAITH NOT
10       * * * * * * * * * * * * *
11
12       REPORTER'S CERTIFICATE
13  STATE OF ALABAMA:
14  MONTGOMERY COUNTY:
15       I, Lyn Daugherty, Certified Shorthand
16  Reporter and Commissioner for the State of Alabama
17  at Large, do hereby certify that I reported the
18  deposition of:
19       MARGARET ANN CARTER
20  who was duly sworn by me to speak the truth, the
21  whole truth and nothing but the truth, in the
22  matter of:
23       MARGARET A. CARTER,

Page 105

```
1              Plaintiff,
2              vs.
3              DIALYSIS CLINIC, INC.,
4              Defendant.
5              IN THE UNITED STATES DISTRICT COURT
6              FOR THE MIDDLE DISTRICT OF ALABAMA
7              NORTHERN DIVISION
8              Civil Action No. 2:07CV682WKW
9    on Wednesday, May 14th, 2008.
10           The foregoing 104 computer-printed pages
11   contain a true and correct transcript of the
12   examination of said witness by counsel for the
13   parties set out herein.  The reading and signing is
14   hereby waived.
15           I further certify that I am neither of kin
16   nor of counsel to the parties to said cause nor in
17   any manner interested in the results thereof.
18           This 29th day of May 2008.
19
20
21           _____
             Lyn Daugherty, ACCR #66
22           Expiration Date:  9-30-2008
             Certified Court Reporter
23           And Commissioner for the
```

| A | | | |
|---|---|---|---|

**A**

**able** 26:2 38:9 46:23
  59:1,13 60:6,20 62:8
  64:6 79:11,23 80:21
  84:7,10 100:20
**about** 6:16 8:15 12:7
  13:20 16:4 18:23
  20:14,17 21:4 23:5
  24:17,22 25:20 26:4
  26:5,6,7,9,13,14,17
  31:15 32:9 33:10
  34:2 36:16 37:20
  38:23 39:21 41:15
  43:8 44:16 46:10
  48:15 52:17 53:7,8
  57:8 58:13,16,18,22
  59:3,11 60:22 63:5,6
  63:9 68:18 70:23
  73:2,20 74:3 76:15
  80:3,7 83:6 86:5,11
  87:10,17 89:3,6,17
  90:7 91:1,3 92:10,22
  93:3,12 94:16 97:3,7
  100:9 102:15,18
  103:3,9
**above** 18:6 33:23
**absence** 3:2,5 29:8,21
  29:22 30:13 31:7,13
  31:18 32:5 33:4,11
  34:7,15 36:4 39:5
  41:4 46:12 63:8 96:4
  96:21 97:3,9,17 98:5
  98:20
**accommodation** 18:18
  101:2
**accommodations** 18:7
  18:10,12 98:2
**ACCR** 1:17 105:21
**accurate** 7:2,3 41:1
  47:22 71:10 76:13
**across** 9:9 42:13
**Act** 97:18 98:6,21
**Action** 1:7 105:8
**actually** 37:10 50:14
  88:23
**acute** 8:18,18 12:20,23
  ad 16:6
**add** 81:9
**address** 8:3
**adds** 88:15
**administrator** 21:13
  47:12
**after** 6:6 10:2 11:2
  13:23 14:5 17:16
  27:19 29:21 30:23
  38:13 42:20 63:13,17
  63:21 66:10 67:5,12

69:8 70:12 71:12
  72:7,10,11 74:13
  78:11,17 79:11,14
  81:2 84:9 92:20
  93:14
**afternoon** 75:7
**again** 13:14 55:11 57:9
  62:10,11 65:16 74:11
  74:17 76:1
**against** 7:9 91:5
**ago** 57:8,22
**agree** 69:6
**agreed** 5:2,16,23
**agreement** 1:16
**Alabama** 1:2,18,20 2:5
  5:8 8:5 9:3,4 13:6,15
  95:17 104:13,16
  105:6
**Alacare** 14:6,7,11,17
  14:18,20 15:6 81:17
**allowed** 95:23 96:5,19
  98:13
**allowing** 92:4
**alluded** 46:14
**alone** 73:14
**already** 59:19 66:4
  70:12 85:21 103:23
  103:23
**altered** 26:3
**always** 43:16,18 44:23
  68:6 75:13 89:8
  100:6
**amount** 34:20
**Ann** 1:15 2:15 5:4 6:5
  6:12 104:19
**another** 22:7 31:4 55:6
  56:20 65:21 83:20
  89:22 93:7,12
**answer** 28:22 29:4,16
  31:22 98:10,11 99:2
  103:6,8
**answered** 102:22 103:3
  103:16
**antidepressant** 56:21
**anxiety** 57:16 81:23
  82:5,13
**anybody** 34:22 41:14
  62:20 66:12 76:19
  85:22 88:21 89:2
  91:1 96:23 102:14,17
  102:7
**anymore** 73:6 91:4
**anyone** 82:3 86:5 98:16
**anything** 15:9 26:5,9
  27:6,9 29:13 31:11
  31:16 32:3,7,17
  34:22 43:18 48:3
  57:3 59:22 60:4
  85:20 102:14

**Anyway** 11:13 20:15
**apologize** 34:11 76:6
**apparently** 25:23
  101:14
**APPEARANCES** 2:1
**appeared** 92:3
**appears** 71:11 87:22
**application** 3:17 83:22
  84:5
**Applications** 95:5,8,12
**applied** 61:22,23
**appreciate** 27:14
**appropriate** 83:10
**approve** 83:13
**approximately** 1:21
  7:21 8:9 104:6
**April** 3:11 13:23 67:21
  68:23 74:16
**around** 60:7
**Ashbury** 3:6,9,16,20
  4:4 21:12,20,23 22:2
  26:18 28:18 31:11
  32:9 33:15 35:7
  40:15 47:13 61:17
  63:3,9,14,18 65:2,22
  66:17 67:7 82:21
  83:4 86:18 91:14
  92:16,21,22
**asked** 24:22 26:14 28:4
  34:1 66:23 91:10,12
**asking** 21:4 66:15
  76:18 98:15
**ASN** 10:4,12
**aspect** 29:2
**asserted** 97:11,15
**assets** 15:20
**Associates** 12:11 71:13
  95:7,11
**associate's** 10:9
**assume** 37:13,14 40:13
  40:16
**attach** 43:10
**attack** 18:15,16,19 26:7
  27:19 31:21 32:1
  41:23 42:21 43:9,12
  45:17 46:1,5,15 55:6
  57:14 58:4,6 63:13
  65:17,21 69:12 70:13
  72:7 74:14 84:9 98:1
  100:6,22 101:18
  102:7
**Attorneys** 2:4,8
**August** 13:12 65:11
  93:20
**available** 62:10
**Avenue** 1:19 2:4
**average** 43:19
**aware** 18:5 50:20,20
  53:16 95:20 96:2,3

**96:18 101:5**
**away** 13:17 33:6 71:21
**awful** 75:4

| B | | | |
|---|---|---|---|

**B**

**back** 8:12,19 11:16
  12:4 13:5,6,8,13,19
  14:15,17,18 18:22
  19:17 20:1,15,20,22
  26:1 27:19 28:11
  29:10,11 30:1,4,14
  37:16 41:3,5,21 42:6
  42:7,19 46:19,20,23
  53:8,11,14,20 58:14
  58:19 59:1,8,12,18
  60:19 63:7,10 64:9
  64:16 65:9,11 66:1
  73:16,17 74:13 85:1
  90:7,15 91:14 95:23
  96:5,19 98:1,14 99:8
  99:13 102:12
**bad** 56:19
**Baker** 44:9
**based** 28:16 51:3 88:2
**basically** 11:22 16:22
  17:20 19:11 20:18
  25:11 49:8 55:15
  56:7,11 58:6 59:11
  71:21 72:13 74:20
  79:8 86:8
**basis** 26:20
**BASS** 2:8
**bat** 60:19
**Beach** 13:4
**became** 11:15 30:18
  42:3,9 95:8
**become** 15:10 17:1
**before** 1:16 5:6 8:15,20
  13:2 31:20,23 43:11
  45:10 46:5 56:8
  59:18 63:15 73:10
  85:8 87:5 88:11 90:2
  93:21 94:2 95:18
**begged** 91:12
**beginning** 13:23
**behalf** 6:14
**being** 50:12,22 76:16
  87:12 89:17 103:10
**belief** 98:18
**believe** 7:8 10:20 12:12
  12:14 16:19 20:6
  21:14 24:16 30:3
  44:10 51:22 65:23
  69:21 81:12 85:16
  94:13,17,19 96:7
  97:15,19 99:12 102:2
  102:9 103:3
**believer** 66:19
**benefit** 72:22,23

**benefits** 3:1 14:22,23
  22:12 41:9 81:6,7
**BERRY** 2:8
**Bertha** 20:6 44:9 49:20
  51:20 70:6
**best** 18:20 19:2 23:16
  23:19 29:4 32:6
  40:23 41:2 44:15
  46:4 48:8 57:11
  58:10 61:4 73:1
  75:20 76:7 81:15,15
  81:18 84:14,17,18,22
**better** 49:2,3 75:9,9
  91:19
**between** 5:3,17 6:1
  41:18 51:20 72:22
**big** 89:9
**Biomedical** 12:9,11
  71:13 95:5,7,12
**Birmingham** 1:20 2:5
  9:10 10:1,7
**bit** 46:22 53:7 76:5
  79:23
**blockage** 42:3,16
**blocks** 79:21
**blood** 55:18,19,20 58:6
  58:9
**blur** 37:12
**BMA** 11:23 12:6,8
  13:12,13 71:12 72:6
  72:15,22 73:3,12
  74:2 77:23 78:1 80:1
  81:10 95:5,12
**Bobby** 30:5,18 31:1
  96:8
**bone** 39:9
**book** 3:1 22:12
**boss** 21:12
**both** 19:14,15 30:15
**bottom** 22:9 33:21
  42:14
**bought** 8:10 12:9
**break** 7:11,12 70:15
  75:6 102:21 103:13
**Brief** 17:13 40:22
  70:17 99:20
**briefly** 14:12 49:1 71:5
**brother** 9:2
**brought** 22:18 84:23
**Bullock** 8:5 9:18 11:3
  14:14 95:17
**bunched** 76:2
**business** 29:18
**busy** 48:18
**bypass** 79:15

| C | | | |
|---|---|---|---|

**C**

**call** 49:5,5 86:6
**called** 16:7,10 91:13

94:4
calls 28:21 99:8
came 11:19 13:5,8
20:22 30:1,4 41:3,21
42:11 56:19 60:11
61:17,23 62:10 65:9
65:11
cancer 34:3 78:13
capacity 96:6,20
capped 73:4,7,10
cardiac 55:8
cardiologist 82:4
care 12:22 25:10 30:20
30:21 34:3 36:16
42:18 44:16 78:11,14
79:5,9 80:6 81:22
82:4
Carolyn 48:19
Carter 1:5,15 2:15 3:6
3:8,9,16,20 4:4 5:4
6:5,12,13 7:15 49:14
70:20 95:20 104:19
104:23
case 5:18,20 14:9
Cathedral 9:9
catholic 9:8
cause 105:16
caused 30:13 31:7
cell 73:22
**CERTIFICATE**
104:12
Certified 1:17 5:7
104:15 105:22
certify 104:17 105:15
chain 63:11 66:18,20
chance 7:6 62:11 81:8
change 38:16 41:9,11
46:10 56:9 76:23
91:11
changed 37:17 38:13
56:8 60:9,13,15 61:7
61:8,11 76:8 91:8,10
changes 45:16
changing 46:8 100:12
charge 2:22 11:6,7
16:21,23 17:1,10,18
38:11 45:10 47:7
71:20,21 77:11,17
checks 94:17
children 8:22
chitchatting 25:21
choice 90:12 94:5,14
cholesterol 55:19
chronic 12:21
church 9:11
churches 9:7
Civil 1:7 5:5 105:8
claim 97:11,12
classroom 72:9

clear 6:23,23 58:11
client-attorney 103:5
clinic 1:8 6:14 11:19
12:22 13:9 21:18,21
23:7 61:18 62:3 70:3
96:8 105:3
clinical 31:19 45:3
101:13
clinics 78:19
closed 70:3,4
closer 14:15
college 10:3,5,7,15
combined 101:20
103:10
come 16:15 19:17
20:20 26:1,19 29:10
41:4 42:6,7 53:20
59:1,8,12,18 64:9
66:1 78:14 79:18
91:17 95:23 96:5,19
98:1,13 99:8,13
102:12
comfortable 78:18
coming 52:20 53:8
58:13,19 60:19 63:7
63:9 73:21 75:14
90:7
command 63:11 66:18
66:20
commencing 1:21
comment 92:7
comments 41:14
commission 5:9
Commissioner 1:18 5:7
104:16 105:23
communication 46:7
93:3
company 77:21,23 81:9
83:9 94:4 97:16
complain 32:8,11,11
100:9
complaint 3:10 47:17
61:13 63:1
complaints 38:23
computer-printed
105:10
concern 3:19,22 4:1,3
36:13
concluded 104:5
conclusion 91:17 98:9
condition 48:14,15
58:22
conditions 82:17
conflicts 27:5,10,16
confused 36:1 39:18
confusing 38:7
consider 74:7 92:4
considering 46:8 76:14
contact 24:18 67:15

91:4
contacted 20:1
contain 105:11
context 89:3 90:4,5
continue 81:8
continued 2:23 3:23
21:3 38:18 74:1,2
80:9
conversation 19:12
51:3,8,22 53:1 58:12
58:13 59:3,11 60:11
63:20 66:8,10 67:5
67:12 86:4,10 87:13
90:6,23 92:21
conversations 25:1,4,7
53:7 58:17 63:6,9,14
63:18,22 64:2 66:11
copies 68:3 87:8
copy 22:11,14,15,16,17
35:8 40:5 47:17
67:20 68:5,7 69:4
70:20 83:3 86:20
87:1 92:18 93:23
corporate 21:5 28:5
67:1
correct 8:21 12:13,16
13:7,11,16 14:2,4,10
15:5,17,18 30:22
44:7 45:12 46:13,19
47:2 48:4,5,7 50:21
51:18 53:22 54:9,11
54:22 56:15 59:5
61:9,12 62:14,18
63:4 65:14 68:3,10
71:14,15 72:4 73:21
75:2,17 78:5 79:2,4
80:11 87:20,22 92:7
93:15 99:15 105:11
corrected 49:15 51:12
52:19
Correctional 14:14
counsel 5:3,17 105:12
105:16
counselor 81:23
country 73:17
County 8:5 9:18 11:3
14:14 95:17 104:14
couple 18:21 19:3,21
21:8 28:11 54:6,17
55:23 57:10 98:2
99:17 100:4
course 37:7 44:11
59:19 78:17
Court 1:1,17 105:5,22
cousin 11:12
cover 74:22
covered 15:3 47:20
coworkers 32:12
created 88:19

curious 49:21
current 8:3 14:19
currently 81:22 82:16
cutoff 89:10

**D**
D 1:19 2:3,3
Damron 3:8 16:12
23:22 24:2,6,11,18
25:2 27:6 33:12 34:1
37:1,11,16 45:10
Daniel 2:11
date 53:12,21 84:3
88:15 89:6 94:12,18
105:22
dated 3:5,6,7,9,16,18
3:20,21 4:1,2,4 35:5
35:13,14 36:6 82:22
85:7 86:18 87:1 88:8
89:23 92:16 93:20
dates 39:19 94:15
Daugherty 1:17 5:6
104:15 105:21
Davidson 2:7 6:13
DaVita 14:1 74:15 75:3
94:13,16,18,20 95:3
day 15:23 42:8 43:15
44:6,14,19 46:3 47:1
47:1 54:8,21 60:10
70:9 72:18 76:10
77:3 79:14 80:11
89:10 91:16 92:12
105:18
days 19:20 20:11 34:6
43:14,20,21,21 44:5
44:14,19 45:1,14,18
45:19 46:2 54:7,12
54:20 60:10 65:6
69:21 72:13,18,19
75:18 76:1,10 77:2
80:3,10,15,20 90:15
91:16 92:5,11 100:14
100:20 101:3
DCI 3:1 13:2,6,10
15:17 16:5 17:19
19:6 22:11 23:20
24:11,14 25:8 28:16
29:6 33:13 46:7 50:4
62:14 64:3 66:12
67:10 71:7,12 72:4
72:23 74:7 76:9 78:2
78:17 79:22 80:9,17
80:20 83:23 84:20
85:11,23 86:2,5
87:11,12 88:22 89:2
90:18,21 91:1 92:10
93:3,23 95:21 96:18
97:2 100:5 101:11
DCI's 18:3 23:17

Deaderick 2:9
dealing 28:17 62:6
Debbie 25:10 60:14
deceased 22:2
December 35:14 36:6
36:10,10 41:4,18,20
decided 46:18 78:19
decision 91:21
decisions 28:1,19,23
declined 62:5
defendant 1:9 2:6,21
48:13 49:16 105:4
defendant's 3:13 17:6
22:5,22 23:10 32:19
35:3,11 40:3 47:15
67:18 69:2 70:18
82:19 83:16 85:4
86:15,22 88:6 89:20
92:14 93:17
definitely 51:16
degree 10:4,9,17 11:2
deliver 52:15,22
demands 18:16
denied 15:2 99:3
Denise 3:8 16:8,12
23:22 24:2,4,11,23
29:2 33:12 37:1,7
39:17,20 43:17 45:10
depend 56:23
depended 91:9
depending 77:21
DEPONENT 104:9
deposition 1:15 5:4,6
5:13,18 6:2 102:23
103:7 104:5,18
depression 56:14,18
57:6,15 82:1,6,18
description 2:22 17:10
17:18
dialysis 1:8 6:14 8:18
8:19 11:17,18,19,21
12:2,5,23 14:1 23:7
71:16 74:15 78:15,18
79:3 94:5 105:3
died 33:3 34:3 36:10,10
differences 72:21
different 12:21 21:6
26:22 77:9 78:8
disability 3:17 15:1,4
83:22
disagreements 27:5,9
27:15
disappointed 38:3
disappointment 38:1
discovery 70:21 94:8
discriminated 7:8
discuss 19:6,8 25:15
50:15 60:8 89:1
102:22 103:2,12,15

discussed 25:18,19
  71:4
discussing 73:12 89:14
  103:6
discussion 46:6 89:5
discussions 89:16
distance 73:14
DISTRICT 1:1,2 105:5
  105:6
DIVISION 1:3 105:7
divorced 7:22 8:1
doctor 53:9,23,23
  54:20 59:4 61:2
  64:21 84:11 85:1
  88:4 91:5,15,18 92:8
doctors 46:18
doctor's 19:21 42:18
  59:17
document 17:8 22:7,21
  23:12,14 32:21 35:16
  36:2 83:18 93:21,23
documentation 76:15
documents 3:14
doing 8:17,18 12:20
  56:15 78:12,22 80:8
  103:21
Domingo 3:18,21 4:1,2
  20:6 56:20 64:23
  82:8 85:6,10,13
  90:13
Domingo's 49:14,19
  51:21 87:2 88:9,18
  89:23 90:20
DON 31:19 45:3
done 45:2 81:1 88:23
double 65:21
double-wide 8:11
down 12:23 61:17
  62:11 68:11 77:12
  103:22
Dr 20:6 49:14,19 51:21
  56:20 64:23 82:8
  85:6,10,13 87:2 88:9
  88:18 89:23 90:13,20
dropped 77:12
due 38:1 42:2
duly 6:6 104:20
during 51:8 55:4 60:11
  60:12 70:5 83:12,13
  97:5 103:12
duty 29:11 30:4,7 54:3
  85:2 96:6,20 99:14
  101:7

**E**

each 16:8,10 58:16
  59:10
earlier 87:10
ease 18:22 55:2

Edge 11:16,20
education 10:2
eight 8:10 54:7,21 61:3
  65:12 72:9 91:8
eight-hour 19:19 20:2
  20:3,4,10 28:10 54:5
  60:6 64:22 65:5,6
  66:2 72:8,12 87:23
  88:14 89:4 90:8,14
  101:3
either 5:14,20 60:21
  92:2
eligible 15:10 81:11,16
emergency 42:5,12
employed 18:4 62:14
employee 4:5 23:18
  25:8 93:19 97:7
  101:2
employees 29:7,14,20
  32:2 95:21 96:3
employment 10:22
  24:19 25:2,5,8 28:2
  28:17 62:18,21 72:16
  77:8 78:8 97:5
end 34:18 40:8 95:22
  99:16
ended 24:19 25:2,5,9
  42:4 66:8
enough 15:8 31:23
  59:12 101:14
enroll 81:20
entitled 84:16,20 97:17
ER 11:8
error 50:21
established 83:13
evaluations 62:13
even 32:13,17 39:19
  65:9
evening 79:13
eventually 30:19 77:9
ever 7:11,16 18:9 24:5
  27:4 29:6 31:11,15
  32:2 34:22 41:14
  45:16,18 46:6,6
  50:15 53:1 57:13,15
  62:20 64:21 74:7
  76:19 79:1 82:3,5
  83:6 85:7,19,22 86:4
  87:5 88:10 89:1,5,14
  90:2,23 93:2,21 94:4
  95:14 97:6 100:9
  102:14,17
every 26:23 48:14 68:4
  79:14 83:9 102:9
everybody 28:8 61:8
  67:4
everything 26:6 28:5
  59:8 60:7 103:10
evidence 5:13

exact 56:3
exactly 12:5 52:8 98:11
examination 2:13 6:9
  100:2 101:22 105:12
except 14:23
Exhibit 2:19 17:5,6,9
  22:5,8,21,22 23:1,10
  23:13 32:19,22 35:3
  35:6,11,16 36:3,4,6
  40:2,3,5 47:15,18
  67:18 69:2 70:18,22
  82:19,23 83:16,19
  85:4 86:15,19,22
  87:3 88:6,10 89:20
  90:1 92:14,17 93:17
expectation 44:5
expected 28:18
experience 28:16 62:2
expiration 96:20
  105:22
explain 46:21
extent 28:21 98:8
extra 43:15 45:20
extremely 42:4

**F**

facility 14:14 35:23
fact 9:8 47:3 58:23
  60:8 63:5
fair 17:3 27:20 66:14
faith 20:9
falling 70:2
familiar 78:20
family 3:2 23:5,7 24:15
  97:18 98:6,21
far 13:17 22:2 38:6
  45:3 50:20 61:9
  62:15 68:6 80:16
fax 19:22,23 20:5 50:2
  50:10 51:10,13 52:19
  52:20
faxed 49:16,17,22,23
  50:3,16,22 51:21
  87:12
faxes 51:2
faxing 50:7,8
Federal 5:5
feel 57:4 65:1 77:15
  84:14,23
feeling 56:19
feet 21:1 28:12 39:6
  64:20 65:15 75:5,11
  75:16
fell 89:12
felt 65:12 67:16 90:16
  103:9
few 70:23 95:4
fiance 33:3,5 36:14,19
  36:22 78:13

field 77:9 78:8
filed 6:17 47:18
filing 5:18,22
fill 56:22 79:19
filled 84:5,8
finally 20:17
financial 79:20
find 6:16 7:7 16:4
  46:10 86:1
finish 10:16
firm 66:19
first 3:14 6:6 13:5
  20:19 28:11 54:6,17
  59:14 61:21 62:1,5
  91:23
Fitzpatrick 8:4,4,6
five 27:21 45:18 66:14
  71:6
floor 11:15 16:22 30:19
  30:19 61:9 72:10
  74:23 76:9
Florida 8:17 12:15,17
  12:19 13:3,5 16:18
  94:6
FMLA 41:15 83:7,11
  84:15 97:8,12 102:3
  102:10
followed 24:2 92:10
following 96:20
follows 6:8
follow-up 102:1
foot 30:14 39:11 41:22
  42:1,3 62:7
force 102:13
foregoing 105:10
form 5:10 28:20 33:4
  83:22 84:5 98:7
formal 10:2
formality 5:9
former 30:2 34:17
Fort 13:3
forth 20:16
found 61:6
four 7:21 13:19 43:14
  43:20,21,21 44:5,13
  44:19 45:1,14 46:2
  55:18 57:9 72:13,18
  73:17 76:1 79:21
  80:14,20
French 2:7,16,18 6:10
  6:13 17:4 22:20 40:1
  50:19 70:16 99:17,21
  101:5,23 104:2,2
Fresenius 12:6,9 95:9
Friday 75:23
friends 16:9 25:20
from 3:6,8,9,16,18,20
  3:21 4:1,2,4 9:10,19
  10:15 11:18 13:5,17

19:13 22:1 24:21
  28:14 35:7 41:3,21
  42:20 45:23 54:19
  58:19 63:3 66:18
  73:19 74:15 75:5
  76:11 79:22 80:12,23
  82:21 83:4 85:6,20
  86:17 87:2 88:9
  89:22 92:16,20 93:3
  93:12 94:22 96:8
  100:21
full 6:11 19:4 59:13
  92:5 102:12
funds 15:20 16:2
further 5:16,23 8:12
  104:9 105:15

**G**

gaps 79:19
gave 22:18 37:14 100:7
  100:14
general 19:13 26:7
getting 22:11 49:2
  59:23 73:9 76:18
  83:13 85:18
give 22:17 37:10 39:21
  55:23 59:16 62:10
  74:1 86:7 96:22
given 26:15 68:5 73:13
  98:12 99:3 101:6
giving 49:3
glad 37:19
go 8:12 9:12 10:5 12:22
  14:13 20:8 30:10
  45:18 46:19,20,23
  55:7 61:4 79:11,13
  90:15 91:5
goes 42:15
going 6:15 14:13 20:7
  26:1,2,14 28:9 35:23
  37:4 39:14 57:18,20
  59:20 60:6 64:11
  66:2 67:1 73:6 75:8,9
  75:13,14 86:9 90:11
  90:14 91:18,21 97:13
  100:19
good 20:9 57:5 62:13
  76:19 79:23 101:12
  101:12 103:21
Goshay 30:4,11,11
  96:8 101:8
graduate 9:20 10:15
great 97:22
greater 77:20
Green 48:19,20
growing 16:8
guess 9:18 21:12 27:17
  28:23 31:8,9 32:10
  34:10 35:21 39:16,17

Page 4

40:16 57:7,11 64:12
78:12 85:14 86:12
101:18 102:13
G-O-S-H-A-Y 30:11

**H**

H 9:6
**Hamilton** 19:9 20:15
21:15,23 24:4,6,8
25:5 27:15,16,23
31:15 32:9 44:11
45:6 47:10 48:18,22
50:1,15 51:4,9 52:17
53:8 58:13 59:3 60:8
63:6 64:1,3,5 65:23
66:10,22 67:6,13
89:6,17 90:7 91:13
92:22
**hand** 17:8 22:7 23:12
32:21 35:5,13 52:15
52:22 67:20 82:21
83:18 85:6 86:17
87:1 88:8 93:19
**handed** 70:20
**handwritten** 3:7 35:14
**happen** 64:11 69:17,18
**happened** 7:3 15:19
30:6 100:15 103:11
**happening** 29:13
**happy** 39:2
**Haskell** 44:9
**having** 6:6 51:22 57:14
65:21 73:13 79:17,18
86:10 102:15
**Hazel** 30:3,10 96:7
**head** 36:7 38:4 44:4
93:22
**health** 19:1 62:6 91:18
91:22
**hear** 46:6 97:6
**heart** 15:2 18:14,16,19
26:7 27:19 31:20
32:1 41:23 42:21
43:9,10,11 45:17
46:1,5,15 55:6 57:14
58:4,5 63:13 65:17
65:21 69:12 70:13
72:7 74:14 84:9
97:23 100:6,21
101:18 102:7
**held** 13:1 17:19
**help** 21:9 27:22 28:7
50:23 57:21 66:6
67:3 79:23 80:5,21
83:9
**helped** 30:18 79:20
81:3
**helping** 80:7,14
**her** 9:5 16:11 19:18

20:1,6,7,9,13,18,21
21:4,12 24:15,15,20
24:21,22 25:11,22
26:15 27:17,20 30:12
30:13,14,14,16 34:2
37:17 38:13 49:1,3,6
50:6,10 52:6,11,12
52:14,22 53:2 58:21
59:6,9,20 60:16
64:13,17 66:12,13,23
67:1 80:7
**hereto** 5:21 6:1
**high** 9:20,22,23 10:2
**highest** 21:17
**highlighted** 17:21
**him** 22:18,19 26:23
27:1 30:6 31:7 34:3
62:9,9 78:14 85:20
90:13 91:10,12,12
92:8
**hinder** 35:22 36:15
**Hinson** 7:19,20
**hired** 16:21
**history** 10:22
**home** 11:16,19 37:5
73:21
**homebound** 79:8
**honest** 65:19 68:20
**honestly** 30:3 31:22
**hope** 7:2
**horrible** 73:23 84:12
**hospice** 14:5,6,7,11
15:7 78:9,12,14,20
78:22 81:17
**hospital** 11:3,10,20
12:21
**hospitalization** 42:2
46:16
**hospitalized** 42:17
**hour** 14:21 43:23 72:3
75:1 78:2,23
**hours** 17:22 18:21 19:2
19:4 41:11 44:1,6,14
44:19 45:1 46:2 54:8
54:21 55:4 60:10
61:3 65:13 72:9,14
72:18 76:10 77:3
78:4 80:11 81:1,3
91:16 92:6,11 100:13
100:21
**Houston** 11:11
**Huh-uh** 57:19
**human** 67:15
**hundred** 51:23
**husband's** 7:18
**H-I-N-S-O-N** 7:19

**I**

**idea** 84:6 88:18

**identification** 17:7 22:6
22:23 23:11 32:20
35:4,12 40:4 47:16
67:19 69:3 70:19
82:20 83:17 85:5
86:16,23 88:7 89:21
92:15 93:18
**ill** 35:21 36:1 42:9
**immediate** 23:21 24:5
24:9 47:9
**immediately** 13:1
**implication** 78:7
**impression** 51:4,17
52:3
**Inc** 1:8 6:15 23:7 105:3
**incident** 30:6
**included** 67:3
**including** 71:7
**incorrect** 40:21 87:10
87:21
**Index** 2:13,19,23 3:23
**indicate** 62:20
**inflamed** 39:10
**information** 26:15
40:20 41:1 47:22
48:6 49:7 71:4,9
85:18 88:3,3,14 94:7
**informed** 49:14 60:12
**instead** 54:4 69:22
**intend** 81:20
**interested** 11:18 15:13
105:17
**interrogatories** 3:14
**interview** 16:15
**intestines** 42:16
**introduced** 5:19
**invested** 15:20
**involved** 28:19 33:15
**Ireno** 3:18
**issues** 25:18 43:1

**J**

**Jane** 9:6
**January** 33:8 34:4 35:6
36:4,5
**Jefferson** 10:6
**jeopardize** 91:18
**job** 2:22 13:1,3,6,12
14:1,5 16:16 17:9,18
24:16 34:17 38:10,10
41:5 55:3 61:1 71:12
74:19 80:17 90:12,17
91:9 101:13
**John** 1:19 2:3,3 36:19
37:6 78:11
**July** 13:10 53:11,18
55:13 56:5,8,14 59:7
65:9 87:2 88:8,15
89:9,11,12,15,18,23

92:16 93:14
**June** 85:7 86:18
**junior** 10:3,5,7,14
**just** 6:20 7:12 10:14
19:1,2,11,20 20:2,4
20:10,20 21:11 23:5
25:18 26:6,22 27:3
27:12,20 28:10 32:12
32:14,15,18 34:12
35:9,22 36:15,17
37:5 38:5,7,23 40:19
45:13,20 47:21 49:1
49:3,8 50:12,12
51:12 53:5 54:5 55:9
55:11 56:23 57:1,11
58:11,18 59:23 60:16
61:10 62:8 64:9,16
65:3,15,22 66:5,6,13
67:17,23 70:20,22
71:7,9,22 73:10,20
74:5,23 75:7,10 76:4
76:16,17 77:12 79:21
81:13 82:7 84:23
86:1 89:3 91:4,8,20
92:1 95:1 99:13
100:10,11 102:21
103:1,9,19,21

**K**

**Karen** 19:9 20:1,15,16
21:15 24:4,8 25:4
29:1 32:9 39:18
44:11 45:5 47:10
48:17,21 50:1,15
51:23 61:22,22 63:16
63:12 86:7 89:5,16
90:6 91:13 92:22
**keep** 49:8
**keeping** 96:16
**kept** 20:15 58:21 75:8
**kin** 105:15
**kind** 26:21 27:3 59:14
65:15
**knew** 16:8,8,10 28:8
55:2 59:19 62:7
91:19,19
**know** 7:12 15:10,19
19:18 21:4 22:3
24:14,17 25:22 26:4
26:5,8,16 27:3,11,11
27:18,20,22 28:5,15
29:2,3,11,16,17,19
31:23 32:10,11,13,15
33:15,20 35:23 36:17
37:5 39:2,3 44:21
45:20 48:20 49:2,5,8
49:9,16,21 50:3,13
50:14 51:19,23 52:2
52:5 53:12 57:22

59:21 60:1,17,18,22
60:23 61:1 62:4
63:19 64:9,12,14
66:6,13 67:1 68:6
69:17,19 70:1,9 74:3
74:4 76:15,17 77:13
81:2 85:10,13,15,15
85:22 86:2,7,8,9
87:15,15 88:21 89:4
89:10,14 90:4,20
91:2 96:15 98:11,14
99:9 100:16 101:18
103:11,17,21,22
**knowledge** 32:6 44:15
45:9 46:4 48:8 49:18
58:10 62:15 76:8
81:16,18 84:15,17,18
84:22 93:1 97:10
**known** 84:10

**L**

**lady** 20:5
**Large** 1:18 5:8 104:17
**last** 17:21 20:17 37:20
73:11 81:5 103:13
**later** 30:19 57:9
**Law** 1:19 2:4,8
**lawsuit** 6:16 7:7 25:15
26:5,13 47:18 97:12
**lawyer** 50:12,12 98:12
98:16 102:22 103:2
103:12,15
**leader** 71:18,19 74:17
77:12,16
**learn** 12:23
**learning** 8:18
**leave** 3:2,4,5 14:12
23:6,8,17 29:20,22
30:13 31:7,17 32:4
33:4,10 34:2,7,15,18
35:1 36:3,5 39:5 41:3
41:15,22 42:20 46:11
53:14,18 63:8 68:20
73:3 75:3 83:7,11,12
83:13,14 84:16,19,21
95:22,23 96:4,21
97:3,8,8,17,18 98:5,6
98:13,20,21,23 99:3
99:4,6,16 101:16,17
102:3,5,11,15,19
**leaves** 29:7 31:13
**led** 28:4 51:1
**Lee** 3:6,9,16,20 4:4
21:4,11,20 28:5,14
32:9 47:12 61:17
66:23
**left** 16:1 24:4,14 25:14
30:23 81:14
**legal** 98:9

less 18:21 71:20 77:18
  79:5
lesser 77:8,10,17
let 7:12 16:18 17:8 22:7
  23:1,12 32:21 35:5
  35:13 36:2 37:20
  67:20 82:21 83:18,20
  85:6 86:17 87:1 88:8
  93:19 94:10 98:3
  99:13,17 100:5 101:3
letter 3:6,9,16,18,20,21
  4:1,2,4 28:14 35:5,8
  35:13,14,18,20 37:10
  37:21 49:16,17 50:3
  50:16 51:5 52:4 63:2
  63:19,19 82:21 83:1
  83:4 85:6,8,11,23
  86:2,5,11,14,17,20
  87:1,5,7,11,12 88:8
  88:11,13,19,21 89:1
  89:22 90:2,5,18 91:1
  91:3 92:3,9,16,18,20
  93:8,12
letters 87:16 93:6
Let's 11:9 12:2,2 16:18
  39:16 58:5 93:8
life 37:13
light 29:11 30:4,7 54:3
  85:2 96:5,19 99:14
  101:6
lighter 19:2
like 14:21 15:9 16:9
  20:11 21:2 26:8,9
  29:9,12 31:3,12,17
  32:4,15 33:19 35:10
  37:5 38:6 57:4,22
  59:18,23 60:2,19
  62:3,5 65:1,6,12
  67:16 69:22 70:2,6,8
  74:4 75:6,21,22
  77:15 79:9,19 84:14
  84:23 90:9,16 91:19
  93:5 96:7,16 99:9
line 40:9
list 37:22 56:1,3 71:6
listed 69:18
literally 75:11
little 13:19 46:22 53:6
  73:16 76:5
live 8:8,13,16 9:3 12:17
  13:18 73:16
lived 8:6,9 11:13 73:19
  79:21
lives 9:4
living 36:8
location 73:13
long 7:20 8:6 9:16
  12:17 15:8 17:16
  31:23 34:4 36:20

37:6 39:12 42:7 55:3
  64:21 80:23 81:2
longer 77:11 79:16
longevity 62:2
look 12:4 40:8 69:6
  71:8 94:10,15
looking 49:3 52:13
  94:7
looks 33:19 69:22 70:8
  84:1
lose 81:7
lost 77:11,13 81:5
lot 36:16 76:2 79:21
loud 40:19
love 78:16
lupus 79:15
Lyn 1:16 5:6 104:15
  105:21

**M**

machine 31:2 75:13
  96:14
machines 96:17
made 5:11 18:8 19:23
  21:8 28:6 31:12,16
  32:3 34:23 68:7 72:3
  75:1 78:1,2,23 79:1
  90:9 92:2
maiden 7:14,15
main 79:12
major 32:13,16
make 29:1 41:14 47:21
  50:13 91:21 92:1
  97:7
making 28:1 34:20
  97:2
manager 14:9 21:15,16
  23:23 24:3 31:20
  45:3 64:2 67:10 97:1
  97:6 101:13
manager's 61:15,20
manner 5:20 105:17
many 54:12 59:10
March 13:21
Margaret 1:5,15 2:15
  3:6,8,9,16,20 4:4 5:4
  6:5,12 68:8 100:4
  104:19,23
mark 17:4 22:20 40:1
marked 17:6,9,22,23
  22:22 23:10,13 32:19
  32:22 35:3,6,11,15
  36:3 40:3 47:15,18
  67:18 69:2 70:18,22
  82:19,23 83:16,19
  85:4 86:15,19,22
  87:3 88:6,10 89:20
  90:1 92:14,17 93:17
married 7:16,20

Mary 9:6
matter 9:8 20:22 64:18
  66:1 104:22
may 1:20 3:12,19,22
  4:1,3 5:6,11,13,19
  8:7 14:3 16:19,20
  18:7 24:8 41:18,20
  41:23 43:3,6,8 45:5
  46:15 47:6 58:1,3
  63:21 69:5,7,10,12
  74:16 82:22 105:9,18
maybe 19:19 29:1
  40:16 57:8 68:20
ma'am 43:11 47:20
  51:14 95:2
mean 16:9 26:16 27:8
  29:18 31:19 32:12,18
  34:9 39:1,2 46:20,21
  46:22 60:23 68:6
  69:9 73:5,15 74:12
  77:10 83:12 102:16
  103:9,22
medical 3:2 23:5,8 29:8
  87:8 90:3 97:18 98:6
  98:13,21
medication 55:7,13,15
  55:17 56:13 57:1,5
  57:15
medications 56:4,4,10
  56:12 58:2 82:17
member 9:7,16
memo 63:19
mentioned 12:14,21:11
MIDDLE 1:2 105:6
Midway 95:16
might 26:23 27:1,2
  30:5 39:17 59:12
  60:1,23 70:8 72:19
  81:12 84:6 93:6 94:9
  94:10,12,15,18 95:11
miles 13:20
mind 37:17 38:14
  84:12
mine 33:23
minute 16:19 40:17
  71:8 96:22
minutes 99:18
mirror 44:17
mistake 19:23 20:2
  49:15
moment 30:8,9 44:12
money 34:20
Montgomery 10:8,18
  21:14,22 24:15,17
  104:14
month 27:2
months 8:10 20:23 27:1
  27:2 57:9,10 64:19
more 54:16 55:8 58:12

65:1,8 72:3 73:9 78:1
  79:1,18 81:4 99:21
  104:3
morning 75:5
most 72:15
mother 8:9,13 14:16
  24:20,22 79:6,8 80:7
  80:22
moved 8:19 9:18 11:12
  11:16 16:23 24:15
much 9:12 26:23 47:20
  58:8 66:9 75:11,16
  76:5 99:23
muscles 29:10
myself 38:2 52:6 73:22
M.D 3:19,22 4:1,3

**N**

name 6:11,13 7:14,15
  7:18 9:5 20:7 68:8
  69:17
named 21:11
Nashville 2:9
nature 7:7
necessary 52:16,23
need 5:11 7:11 20:23
  30:13 31:7 39:4
  55:22 56:3 57:4
  59:17,22 60:1 65:1
  65:10,12 66:2 80:8
needed 19:19 27:22
  39:15 43:13,13,15
  44:3 45:21 52:14
  55:22 59:16 60:4
  64:14,19 80:18 85:19
  85:20 100:11
needing 33:10
negative 41:14 57:19
  97:2,7 102:14,18
neither 96:10 105:15
Nerves 35:21
nervous 18:23 73:20
neurology 11:14,15
never 60:12 65:3,7
  73:10 76:14 84:11
  91:13 92:10
next 2:23 3:23 42:2
  47:1 69:17 70:6 84:3
night 73:21
Nitroglycerin 55:21
nobody 32:10
nods 36:7 38:4 44:4
normal 43:19 44:5 46:1
North 1:20 2:4
NORTHERN 1:3
  105:7
note 3:7 40:11
nothing 6:7 21:6,7,9
  26:9,13 28:7 32:12

32:16 39:1 50:23
  57:23 66:5 67:2
  104:21
notice 4:5 93:2,19
notified 60:15
number 22:8 48:10
  70:22 71:2,5 77:7
  92:17 100:13,14
nurse 2:22 11:7 12:19
  16:21,22 17:2,10,19
  21:15,16 23:23 24:2
  27:8,8 38:11 47:7
  61:15,20 71:16,20,21
  96:18 101:12
nursing 10:4,10,13,17
  11:2,11,14 12:6,20
  77:9 78:8,10,12

**O**

object 28:20 37:17 98:7
objection 99:1
objections 5:9,10
occasionally 26:12
off 9:19 29:10 33:5
  34:4,6 39:11,15,22
  56:19 60:19 68:17
  70:8 75:14,23 76:2,3
  80:5,5,20
offer 61:21 62:1,4
offered 5:13 60:23
  61:15,19 101:13
office 19:21,23 49:15
  49:19 51:21 85:14
  87:2 88:9,19 89:23
  90:20
Offices 1:19
officially 60:15 76:14
often 26:18
Oh 14:23 32:14 58:15
  93:16
okay 6:21,22 7:4,10
  19:15,16 48:2 51:3
  52:3 53:15 59:5,5
  61:14 71:3 77:6 92:1
  92:9 99:18,19 100:1
  100:17 103:8 104:2
old 13:19 60:21
once 26:23
one 7:6 9:2,2 12:18
  18:6,6 22:18 25:12
  31:8 49:12 50:17,21
  58:9,12,16 60:15
  68:18,20 72:2 74:20
  81:13 82:10 85:19
  87:16,19,20,20,20,21
  87:22 95:10,16 96:10
  only 18:15 24:20 25:12
  25:19 27:17 30:7
  31:19 55:1 60:5

Page 6

63:19 66:15 76:21
90:11 95:4 97:20
100:19
open 102:13
opening 13:7,8
opportunity 12:22 16:4
order 90:16
ordering 31:2
originally 9:10
other 5:10,14,20 16:8
16:10 24:6 29:7 32:8
38:23 44:8 64:1,2,3
66:11 67:9 72:1
74:20 78:18 80:15,23
82:3 85:20 93:2 96:1
out 6:16 7:7 11:12,13
11:13 12:10 16:4
26:21 36:22 37:1
39:9 40:18 43:17
46:10 47:3 48:16,17
48:23 50:6 52:1 61:6
78:19 79:21,23 80:14
84:5,8 86:1 95:22
96:3 105:13
over 44:2 72:1,2 77:14
79:11,14 91:20
overburdened 38:5
overrode 29:1
own 57:2
O's 69:22

**P**

package 3:1 22:12
72:22,23
page 2:20,23 3:23 7:5
17:21 33:22 40:8
47:19,23 48:10 49:10
71:1 77:5 84:2
pages 105:10
paper 16:6
paragraph 47:23,23
48:6,7,10 49:10
50:18 51:6,11 61:13
63:1 73:11 77:5
paragraphs 40:18 48:4
part 30:17 69:10,14
partial 42:3,16
participate 15:11
participating 15:13
parties 5:3,17 6:1
105:13,16
party 5:14,20
passed 33:5
patient 25:10 30:20,21
44:3,16
patients 36:16,16 75:12
Paul's 9:9
pause 17:13 40:22
pay 14:19 38:16 41:7

73:6 77:20,22
people 29:9 31:13,17
32:4 76:21 101:6
per 54:21 60:10 72:3
75:18 76:10 78:2
percent 36:18 52:1
performance 62:22
period 55:5 60:13
person 21:17 30:19,20
personal 3:4 23:17
25:18 34:7,10 78:21
84:19,20 95:22 96:4
97:8
personally 24:23 27:7
102:16
personnel 61:9 76:9
pertained 91:2
pertaining 58:18
Phillips 9:23
phone 73:22
phrase 101:19
physical 18:6
physician 18:20 81:23
82:4
Physician's 94:5,14
picked 90:3
pill 55:21 58:7,7,9,9
pills 55:18,19
Pius 9:13,14,17
PL 40:15
PLA 40:11,15
place 89:11
places 71:6
plaintiff 1:6 2:2 3:15
105:1
Plaintiff's 3:13
plan 15:4,6,11,14,16,21
81:11,17
please 6:11 7:11 17:5
22:21 40:2 43:5
47:19 62:10
point 12:3 21:3 24:12
25:13 29:5 38:5 39:4
39:18,19 48:8 52:8
56:10 57:17 59:1
60:5 62:9,12 67:16
69:8 79:4 95:16
96:22 99:10
pointblank 51:12
policy 3:3,4 18:3 23:6,8
23:17 84:21
portion 17:22
position 11:5,21 17:10
17:19 30:2,16 31:1,4
47:7 61:16,20 74:16
77:8,10,15,18
positions 96:13
positive 9:15 10:13
11:8 12:12 13:13

14:8 18:2 22:4 24:1
30:22 40:10,12 52:21
74:18
posted 49:8 68:2,4
prescribed 56:5
prescription 56:22
PRESENT 2:11
pressure 55:18 58:7,9
pretty 58:8 65:18 66:9
Prevacid 55:21
previously 96:7
primary 82:4
prior 8:8 45:17 57:13
58:4,5 59:6 100:5
prison 14:16
privilege 103:5
probably 12:3 13:20
49:18 73:1 74:3 81:3
84:8
problem 15:2 30:12
31:6 37:18 39:5
59:20,21 79:12
100:12 102:6,8
problems 27:4,15
34:14 38:21,22 41:17
42:22 62:7,21
Procedure 5:5
produced 94:8
production 3:14
professional 20:9,10
prompted 35:20
provided 5:14,21
psychiatric 11:10
pulled 29:9
purpose 5:14
purse 56:1
pursuant 1:16 5:4
pushing 76:4
put 14:15 56:20 72:10
91:22 97:20
P.C 2:3
p.m 1:21 104:6

**Q**

quadruple 79:15
question 5:11 6:19 71:5
76:19 83:21 84:13
102:1 103:3,7
questions 5:10 6:16
70:23 83:6 88:1
99:22 102:23 103:16
104:3
quick 100:4
quickly 10:21

**R**

raised 9:8
raises 62:17 73:10 74:1
ranking 21:17

rate 14:19
read 40:17
reading 105:13
readjust 21:1
real 35:9 100:4
really 7:6 25:20 26:15
29:3,16 31:21 49:21
56:23 57:1 62:8 74:3
86:12 98:11 99:11
reapplying 74:7
reason 68:22 76:12
85:16 100:19 102:9
reasonable 18:7,9,12
reasons 29:8 37:22
recall 16:17 22:11
25:12 27:12 29:13
30:1,8,9,10,12 31:6
32:6 35:7 38:21 40:5
41:17 42:23 43:2
49:6 51:15 53:4,5,9
63:23 68:21 70:10
83:3 84:11 86:10,13
86:19 89:14,16 93:11
95:20 96:23 97:1
Receipt 3:1
receive 46:7 51:5 84:15
84:19 92:18 93:2
received 19:17 50:2
51:10 62:17 63:2
92:20
receiving 35:8 40:5
83:3 86:19 93:11
reception 73:22
receptionist 19:22
49:19 51:20
recess 70:17 99:20
recognize 17:12,15
23:2,13 32:22 33:17
35:16 67:21 82:23
83:19
recollection 23:16,19
36:12 40:23 41:2
88:2
records 87:9 90:4
recuperating 58:20
80:23 100:23
recuperation 55:5
60:13
redundant 76:7
reference 63:2
references 50:17 51:5
51:10
references 36:3,5
referring 18:14,17 79:7
regarding 28:1 48:14
regardless 5:21
Regional 11:17
regular 26:20
rehab 55:9

related 34:15
release 54:1
released 53:10 59:2,4
85:1 89:17
relieve 79:12
remained 26:10
remains 15:23
remark 28:6 90:9 97:7
remarks 97:2
remember 21:3 31:9
32:13,17 35:10 38:6
39:19 40:7 43:1
44:12 45:2 52:14
70:13 72:20 73:1
87:13 89:12 94:9,11
Repeat 43:5
report 49:4 86:7
reported 21:23 48:20
104:17
Reporter 1:17 5:7
104:16 105:22
REPORTER'S 104:12
representing 5:3,17
reprocessing 30:17
request 39:4
requested 33:5
requests 3:14
required 46:15
requirements 80:17
reserved 5:12
resignation 36:13
37:23
resigning 36:22 37:2
resources 67:15
respect 83:10
response 3:13 9:15
10:14 11:8 12:12
13:13 14:8 18:2 22:4
24:1 30:22 40:10,12
52:21 57:19 71:5
74:18 77:7
responses 49:6 70:21
71:1
responsibilities 41:12
72:2
responsibility 72:1
responsible 74:22
restrictions 80:14
results 105:17
resume 12:4 19:3
retaliation 97:12
retaliatory 29:15
retirement 15:6,16
81:6,6,11,17
return 29:21 34:17
38:10 53:10 54:1,3
84:7 85:2 88:15 89:7
89:17
returned 38:9 42:20

100:21
returning 92:23
review 17:11 23:1
  47:22
right 7:9 8:15 14:21
  17:8 29:4 34:12 35:5
  37:13,20 38:8,9 39:8
  41:20,21 42:9 43:11
  44:13 47:1 49:10
  50:6,7,9 53:3,5,6,17
  54:15 57:3,13 58:5
  58:11 60:19,21 61:13
  63:1,13 64:5 65:10
  68:8 69:11 73:8
  75:21 76:6 77:5,20
  78:2,4,6,23 79:22
  80:15,22 84:8,10
  86:17 88:13 89:22
  96:9 97:11,14 98:15
  98:19 99:12
RN 28:17 45:21 68:4,9
RNs 44:8,13,22 71:22
  96:10
Road 8:4
roads 13:19,20 73:16
  73:17
room 42:5,12 71:22
roughly 10:16
Rules 5:5
ruling 5:12
run 10:21

_____ S _____

s 23:7 69:18,19
SAITH 104:9
salary 73:4,7
same 5:22 7:5 34:20
  38:10 41:5,7 55:15
  56:7,11 73:2 74:10
  74:20 88:3,13 89:3
  99:1
Saturday 75:23
save 90:12,16
saw 52:12
Saxon 1:19 2:3,3,17
  22:15,16,17 28:20
  50:17 70:14 98:7
  99:1,19 100:3 101:21
  104:4
saying 85:23
says 37:21 40:11 48:13
  49:14 73:12 77:7
  78:6 87:23 94:21
scale 77:22
scared 65:18,19,20,22
  74:8,10
schedule 3:11,12 9:13
  20:3 21:2 26:3 43:4,7
  43:20 44:17 45:2,11

45:17 46:8,11 58:18
  59:13 60:2 61:10
  67:20,23 68:1,5,23
  69:5,7,15,23 72:6
  75:18 76:8,23 100:7
  100:9
schedules 44:21 45:4,8
  60:9 61:6 69:20
  70:11
scheduling 75:4
school 9:20,22 10:1,2
second 50:2,3,16 84:2
  87:12
secretary 48:19
section 18:1 74:21,23
see 11:9 12:2,3 16:18
  18:1 26:18,23 27:1
  29:6 39:16 40:11
  48:10 49:12 50:10
  58:5 88:16,23 93:8
  97:23
seeing 80:7
seek 77:8 78:7
seems 93:5
seen 24:20,21,23 85:8
  87:5,7 88:10 90:2,3
  93:21 94:2
self-employed 95:14
send 93:23
seniority 77:13,14
sense 27:23 78:21
  102:4
sensitive 34:12
sent 19:21 22:16 76:15
  85:22 87:11 88:21
  90:20 94:17
sentence 37:21 73:11
separate 99:10
series 6:15
set 3:14 44:21 45:8
  105:13
setting 45:11
several 20:16 47:4 59:6
  59:9 62:13,17
shakes 93:22
shape 42:19
shift 72:15 88:14 92:5
shifts 19:19 20:3,4,11
  20:19 25:22 28:10
  43:14 54:4,5 60:6,18
  60:18,21 64:7,22
  65:5,7 66:3 72:8,11
  72:12 87:23 89:4
  90:8,10,14,15 91:7
short 31:20 40:18
  43:17 70:14
shorter 20:19
Shorthand 5:7 104:15
short-term 3:17 15:1,3

83:21
siblings 9:1
sick 11:16 36:9 42:4
  55:11 69:21,21,21
  74:11 101:15
signature 6:2 22:9,10
  33:17,18,21 40:9
  84:2
significant 27:6,9
  28:19 38:22 41:17
  72:21
signing 105:13
SIMS 2:8
since 8:7 9:18 24:19
  25:2,5,8 56:8,10
  64:15 78:20 79:21
sir 6:18 7:17 8:23 9:21
  16:3,13 17:14,20,23
  18:5,11 21:19,22
  22:1,10,13,18 23:3,9
  23:15,19 24:1,7,10
  24:13 25:3,6,17
  27:11,13 31:5,14
  34:8 35:2,17 38:6,12
  38:15,17,20 39:23
  40:7,14 41:6,8,10,13
  41:16 44:18,20 45:7
  45:9,15 46:4,9,17
  47:5,8,11,14 48:12
  49:11,13 50:11 51:7
  53:19 54:2 62:15,16
  62:19,23 63:11,16
  64:4 65:17 66:13
  67:8,14,16 68:13
  69:1,16 70:12 71:17
  72:5,5,17,19 77:1,4
  77:17,19 78:3 80:2
  80:12 81:12,18,21
  82:2,9,15,18 83:2,5,8
  83:15 84:1,4 85:3,9
  86:21 87:4,6,14,18
  88:5,12,17,20,23
  89:19 92:13,19 93:1
  93:16 94:1,3 95:6,13
  96:12 97:4 100:8,15
  101:1,4,9 102:20
  103:14,18,20
sister 9:2,4 11:15 16:7
  42:11 79:13 80:8
sit 27:12
sitters 79:9,12,18
situated 59:8
situation 18:22 55:10
six 8:10
slash 12:6 45:3 68:18
sleep 57:21
slow 103:22
some 11:10 19:19 21:3
  27:22 39:4,9 54:5

56:8 57:17 70:5
  72:20 76:21 77:18
  98:1 101:6
somebody 19:6 21:11
  28:3 37:15 49:22
  75:14,14
something 7:1 30:6
  35:10 56:17 57:21,21
  85:19 95:1 100:11,15
  102:18
sorry 19:15 95:8,10
so-and-so 32:14
span 76:3
speak 6:7 48:15 104:20
specialized 78:16
specific 26:9 31:10
  39:1
specifically 86:13
  103:1
speculation 28:22
split 71:23
spoke 48:22 66:21
sporadic 27:3
sporadically 26:21
Springs 8:14 9:4,11
  11:4,21:18,21 24:21
  26:19 79:10
spurs 39:10
St 9:9,13,14,17
staggered 75:12
stand 12:8 68:14,19
  70:1
stands 69:19
start 64:16 77:14
started 12:5 16:17
  23:20 44:23 45:14,23
  56:19 57:9 59:2
  64:18 78:22 81:13,13
state 1:18 5:8 6:11 10:6
  10:8,18 104:13,16
statement 21:8 59:17
  67:2 94:22
STATES 1:1 105:5
stating 19:22
Statute 5:15,21
stay 39:11 78:15
stayed 11:22
steps 103:11
still 14:11 15:21,23
  20:23 22:14 24:11
  25:13 34:13 36:8
  39:20 44:3,10 47:6
  55:7,13 56:17 58:23
  58:23 64:19 66:2
  72:13 78:4 100:22
stipulated 5:2,16,23
stipulation 1:16
STIPULATIONS 5:1
stomach 42:13,15,18

55:21 58:7,9 62:7
stop 42:10 55:8 57:5
stopped 57:7,10
store 95:16
straight 20:8
strain 79:20
street 2:9 9:9 42:13
Streeter 30:5,18 96:8
  101:7
Streeter's 31:1
stress 81:23 82:5,13
stressed 73:13
stressful 55:3 74:5 76:4
stretch 81:2
stuff 32:18 96:15
submit 37:22
submitted 83:23 85:10
suggested 95:11
Suite 2:9
Sunday 75:23
Sundays 70:2,3
supervisor 23:21 24:5
  24:9 47:9 64:3 67:10
  97:1,6
supplies 96:16
supplying 96:15
supposed 90:22
sure 7:13 11:1 15:15
  28:23 29:12 47:21
  50:13 51:19 52:1,4,6
  52:9 68:6 92:1 94:16
surgery 39:7,8,11,15
  41:22 42:1 79:16
sworn 6:6 104:20

_____ T _____

take 7:11,12 19:14 39:9
  40:17 55:11 69:5
  70:14 71:8 74:13
  75:10 86:2 89:11
  90:18 99:17 101:15
taken 11:5 5:4,6 57:13
  57:15 70:17 78:11
  99:20 102:4,15
taking 39:21 41:15
  56:13,17 57:3,5,9
  58:6 80:6 82:16 97:3
  97:8 102:18
talk 26:12,16 33:10
  36:20 37:1,7 48:17
  48:18 50:1 86:6
talked 16:7,11 20:16,18
  25:11,20 36:19,22
  37:6 52:17 53:6 59:5
  59:9 63:5 87:10
talking 20:14 25:12
  26:6 28:2 43:8 87:17
tax 94:21
team 71:18,18 74:17

Deposition of Margaret Carter                                                                                                    May 14, 2008

Page 8

77:12,15
tech 25:11 30:17
technical 31:4 96:14,14
   96:15
technician 30:21
technicians 44:16
tell 6:20,23 16:14 17:11
   19:10 23:1,4 33:2
   39:14 48:3,23 49:1
   49:22 51:9 54:12,15
   54:23 58:16 59:10,15
   61:19 64:21 69:6
   76:19 86:8 94:19
   97:13 102:9,17
   103:19
telling 19:18 27:20
   51:1,21 75:8 103:20
   103:21
Tennessee 2:9
Teresa 44:9
terminated 63:15,17
   97:16 98:4,22 99:6
   101:10,16,17 102:2
   102:10 103:4
termination 4:5 93:4
   93:13,20
testified 6:8
tests 55:8
Texas 11:11,12,18
Thank 7:13 99:22
thanked 62:9
their 15:3 29:10,18,22
   30:1 72:2 77:22
   94:17 96:13
thereof 105:17
they'd 74:10
thing 25:19 27:17
   59:14 74:11,20 81:5
   97:20
things 29:11 31:3 32:14
   32:16 49:2 56:7 79:9
   79:19
think 7:1 16:6,19 17:3
   22:16 27:7 28:2
   31:12,16 32:3 34:23
   35:15 37:12 39:20
   44:9 45:13 46:14
   50:11 53:12 57:17
   58:8 64:6 69:4 76:12
   76:22 78:6 90:19
   93:7 97:14,14 98:4
   98:21 99:5,7 101:10
thinking 30:5,14 91:3
thinner 55:20
thinners 55:20
though 94:20
thought 14:13 18:20
   19:1 29:14 54:23
   55:5 61:4 64:12,13

65:10,20 66:7 83:10
   84:12 90:11 101:14
three 7:21 19:20 20:11
   27:1,2 39:12 45:18
   54:7,14,16,20 57:8
   60:10 65:6 72:19
   76:1,10 77:2 80:3,10
   100:20
through 10:21 13:21
   15:21 37:4 47:23
   48:7 66:18 73:23
throughout 38:18
   62:17
throwing 42:10,11
Thursday 75:22,22
time 5:11,12 11:23
   17:16 18:15,17 20:17
   21:1 31:20 33:5 36:8
   38:1,7 39:15,22 44:8
   45:23 46:1 47:9,12
   51:15 53:4 55:12
   58:19 64:19 75:16
   76:3 79:5 80:18 97:5
times 20:16 21:6,9
   26:22 59:6,9
today 32:17 87:10
   93:11 94:2
together 57:2 99:7
told 19:11 20:1,7,9,13
   20:21 21:5 25:22
   37:4,16 38:13 45:13
   50:1,6,8,22 52:14,15
   52:22 59:20 60:14,16
   62:9 64:5,13,17
   65:23 66:4,13 76:16
   85:17,19 88:4 90:13
   91:14 92:3,8 101:5
   103:8,9
Tolliver 20:6 49:20
Tompkins 9:6
total 38:1
touch 26:10 66:16 67:6
   67:9
trailer 8:11
transcript 105:11
travel 73:14,20
treat 82:5
treated 82:10,13
trial 5:19
tried 14:17 42:6 98:1
trip 74:5
trivial 32:12,14,16,18
   38:23
trouble 39:21 55:4
Troy 10:8,18 11:17,20
true 76:20 105:11
truth 6:7,7,8 103:19,20
   104:20,21,21
try 37:1 57:1 66:16

67:6,9,15 78:20
   79:19
trying 26:8 27:7,12,18
   27:18 28:9 42:18
   50:13 51:16 53:11,13
   53:20 59:7 61:4 65:4
   78:17 86:1 89:8,10
   89:15 93:7 94:9,11
   94:14 98:17
Tuesday 70:6 75:21
turn 47:19 71:1
turned 60:7 62:11
Tuskegee 13:15,17
   71:13 72:6 73:18,19
   80:2
twice 21:5
two 10:3,4,11,14,16
   13:19 19:20 20:11,12
   20:20,21,23,23 21:5
   26:3,23 30:7 39:12
   40:17,18 55:18,20
   64:10,11,14,16,17,18
   64:19,23 65:2,5,7,11
   65:13 66:3,15 71:22
   71:23 72:9 73:17
   87:16,23 88:14 89:4
   90:8,10,15 91:16
   92:5,11 98:14 99:10
Tyndal 25:10,16 26:11
   60:14
Tyndal's 76:23
type 56:21
typed 20:5

_____
          U
_____
uh-huh 9:15 10:13 11:8
   12:12 13:13 14:8
   18:2 22:4 24:1 30:22
   40:10,12 52:21 74:18
ulcerated 42:14
ulcerating 42:14
unable 37:23
under 15:3 17:22 33:17
   40:8 42:17 65:15
   81:22 84:20 97:18
   98:5,20
understand 6:20,21 7:6
   34:14 44:2 50:14
   52:7 58:21 66:21,21
   67:5 92:2 98:17 99:5
understanding 18:3
   22:1 28:8 53:17
   54:19 61:7 66:19
   68:11 76:11 80:12
understood 37:3
unhappy 34:23
Union 8:14 9:4,11 11:3
   21:18,20 24:21 26:19
   79:10

UNITED 1:1 105:5
Unless 100:15
until 8:10 11:17 13:10
   14:3 28:11 42:21
   44:1 45:23 46:11
   75:6
update 59:23
updated 48:13 58:22
upkeep 31:3
upset 18:23 34:9 35:9
upsetting 34:11
used 5:13,20 65:16
   70:10

_____
          V
_____
VA 11:10
vaguely 35:9,10 40:7
verbal 63:20
verify 71:9
versus 72:22
very 18:22 34:12 35:21
   36:1,9 38:7 62:13
   74:5 76:19 99:22
vested 15:16 81:8
violently 42:9
volunteer 45:21
volunteered 43:16
vs 1:7 105:2

_____
          W
_____
W 68:18
wage 94:21,21
wait 20:20 64:9,16
waived 5:19 6:3 105:14
waiving 5:22
Walton 13:3
want 7:5 8:11 19:11,12
   19:13 35:22 36:15,17
   37:3 47:21 55:9,23
   56:2,23 67:17 78:9
   91:5,6 92:1 97:20
   101:14 103:17,19
wanted 14:17 40:19
   49:4 54:4,18 55:2,11
   56:20 57:1 61:1,3,21
   62:1,4 64:22 65:4
   70:23 71:7 78:15
   91:6,7,22 99:9
wanting 92:11
wasn't 21:7 26:1,2,22
   27:20 31:23 52:16
   55:6 61:10 62:8
   66:14 69:8,13 73:6
   85:18 91:17 98:13
   99:3
Watson 2:11
way 7:3 28:12 37:9
   53:5 75:12 77:18
   83:9 94:17 95:15

97:23
Wednesday 1:20 75:21
   75:22 105:9
week 19:20 20:11
   43:15,20,21,22 44:6
   44:14,19 45:1,14,18
   45:19 46:2 48:14
   54:7,12,21 59:6
   60:10 65:6 70:5
   72:13,18,20 75:19
   76:2,10 77:2 78:4
   80:3,10,15,20 90:16
   91:16 92:5,11 100:20
weekly 45:4,8 49:4
weeks 18:21 19:3,21
   20:12,20,21,23 26:3
   28:11 39:12 47:4
   54:6,17 64:10,11,14
   64:16,17,18,23 65:2
   65:6,7,11,13 66:3,15
   72:9 88:1,14 89:4
   90:8 95:4 98:2
well 20:18 23:5 25:20
   31:2,9,19 32:10
   44:23 51:16,20 52:5
   58:21 59:11 60:5
   64:15 65:18 67:23
   69:8,10 70:8 71:20
   74:13 76:14 77:21
   78:11 80:23 81:8
   83:20 85:16 86:6
   89:8 93:11 94:7,14
   98:15 101:12
Wellbutrin 56:16
went 10:6,8,14,16 11:9
   11:11,13 14:18 37:5
   37:16 50:5 63:11
   66:18 72:7 78:1
   81:10 87:8 90:12
   92:8 95:22 96:3
were 7:20 12:14,19
   14:9 15:16,20 16:10
   16:21 18:4 23:17
   25:21 26:6 29:9 34:4
   34:23 38:3,5,9,21
   39:14 42:21 43:17
   44:8 45:16 46:11
   47:6 48:16,23 49:2
   49:23 52:12 53:20
   55:4,13 56:4,13 58:1
   58:23 62:14 63:7,15
   63:17 69:10 70:3,10
   71:16,18 72:21 73:20
   74:21 76:20,21 79:23
   81:10 82:3 84:16,20
   87:16 89:8,15 90:13
   90:22 95:23 96:4,10
   96:10,13,14 97:17
   98:4,22 99:5 100:22

| | | | | |
|---|---|---|---|---|
| 101:5,10 102:2 103:4 | 24:11 43:13,14 65:16 | 67:18 72:13,18 | 21 4:5 88:8 93:17 | 8 3:9 40:2,3,6 |
| weren't 16:9 46:23 | 76:21 78:19 80:6 | 10th 70:7 | 2119 1:19 2:4 | 82 3:16 |
| 69:14 80:4 100:19 | 89:3 | 10-hour 60:21 | 22 3:1,2 49:10 50:18 | 83 3:17 |
| wet 21:1 | workweek 46:2 | 100 2:17 36:18 | 51:6,11 | 85 3:18 |
| we'll 7:12 | worried 18:23 | 101 2:18 | 23 3:4 55:13 56:5 | 86 3:20,21 |
| we're 25:20 79:18 | worse 84:13 | 104 105:10 | 23rd 53:11,18 56:9 | 88 4:1 |
| we've 46:14 47:20 63:5 | wouldn't 60:20 73:8,9 | 11 3:12 11:6 12:7 35:14 | 59:7,7 89:9,11,12,15 | 89 4:2 |
| while 12:15 23:17 | 74:13 80:13 84:9 | 69:2 | 24-hour 79:9 | |
| 26:18 29:6 32:2 | 98:3,16 102:5,6,7 | 11th 36:6 | 25 13:20 63:1 88:16 | **9** |
| 48:15,17,22 62:13 | wrapped 99:7 | 11-hour 43:14 | 25th 89:18 | 9 3:10 47:15,19 77:5 |
| 63:7 | write 35:18,20 92:9 | 11/30/04 3:9 | 26 61:13 92:17 | 93:20 |
| whole 6:7 74:23 104:21 | wrote 35:15 36:12 50:5 | 12 3:13 60:10,18 64:7 | 26th 89:23 93:14 | 9th 46:15 47:6 69:12 |
| wide 102:13 | W's 68:14 | 70:18,22 76:10 77:2 | 27 86:18 | 9-30-2008 105:22 |
| wish 98:16 | W-2 94:21 | 80:10 91:8,16 92:5 | 27.95 14:21 | 92 4:4 |
| withdrawn 16:2 | | 92:11 100:20 | 2700 2:9 | 93 4:5 |
| witness 6:1,2,6 36:7 | **X** | 12-hour 90:10,15 91:7 | 28 13:20 | 95-year-old 79:6 |
| 38:4 44:4 93:22 | X 70:6 | 12/11/03 3:7 | 29th 36:11 105:18 | 99 8:2 |
| 100:1 105:12 | X's 69:23 70:1,2,5,10 | 13 3:16 76:10 77:3 | | |
| wonder 30:3 | | 80:10 82:19,23 92:6 | **3** | |
| wonderful 33:12 34:1 | **Y** | 100:21 | 3 3:2 22:21,22 23:1 | |
| 37:8 | yeah 17:3 29:9 43:21 | 13-hour 25:21 54:4 | 47:19 48:1 | |
| words 97:21,22 | 44:10 51:23 52:10 | 60:17,18 64:7 | 3rd 1:19 2:4 | |
| work 3:11,12 9:12 | 64:23 65:22 67:23 | 13/03 3:5 | 3,000 95:1 | |
| 14:13,16 17:22 18:20 | 70:16 | 14 3:17 47:23 48:7 | 3:15 104:6 | |
| 19:18,19 20:3,4,19 | year 8:17,20 9:22 12:5 | 83:16,19 | 30 9:19 34:6 82:22 | |
| 20:20,22 21:20 25:23 | 12:18 17:1 38:19 | 14th 1:20 105:9 | 315 2:9 | |
| 26:2,2,8 27:19 28:10 | 57:8 | 15 3:18 48:10 85:4 | 32 3:5 | |
| 29:21 37:9 38:18,22 | years 7:21 9:19 10:3,4 | 16 3:20 86:15,19 | 35 3:6,7 | |
| 41:18 42:4,10,20 | 10:11,14,16 12:7 | 17 2:22 3:21 77:5,6,7 | 35203-3314 2:5 | |
| 43:1,3,6,16,16,19 | 27:21 55:23 57:22 | 86:22 87:3 | 37238-3001 2:9 | |
| 44:2,13,21 45:20 | 66:15 | 18 4:1 88:6,10 | | |
| 46:8,11,19,21,23 | y'all 37:14 94:8 | 1824 8:4 | **4** | |
| 47:3 53:9,10 54:1,3,5 | y'all's 44:17 | 19 4:2 89:20 90:1 | 4 3:4 23:10,13 48:10 | |
| 54:7,13,16,18,20 | | 1968 9:23 | 49:10 71:2 | |
| 55:1 58:14,18,19 | **Z** | 1983 10:20 | 40 3:9 78:4 | |
| 59:9,12,13,19 60:6 | zeroes 68:16 | 1999 8:2 | 47 3:10 | |
| 60:17,20 61:3 63:7 | | | | |
| 63:10 64:6,10,16,22 | **$** | **2** | **5** | |
| 65:5,10,12 66:2 | $25 73:8 75:1 | 2 3:1 22:5,8 40:8 | 5 3:5 32:19,22 36:3 | |
| 67:20,23 68:1,5,15 | $27 78:23 | 2:07CV682WKW 1:7 | 5/30/05 3:16 | |
| 68:23 69:4,7,19,23 | | 105:8 | 5:30 75:5 | |
| 74:2 75:18,21,23 | **#** | 2:30 75:6 | | |
| 76:9 77:2 78:1,9,22 | #66 1:17 105:21 | 20 4:4 9:19 87:2 92:14 | **6** | |
| 79:11,14 80:10,18,19 | | 92:18 | 6 2:16 3:6 35:3,6,7 36:4 | |
| 81:10 84:7 85:1,2 | **0** | 20th 85:7 | 6/13/05 84:3 | |
| 87:23 88:15 89:7,18 | 03 33:8 34:5 | 2000 8:7,20 16:20,20 | 6/20/05 3:18 | |
| 90:7,10,14 91:6,7,15 | 04 41:4,18,20 | 95:18 | 6/27/05 3:20 | |
| 91:19 92:5,23 94:4 | 05 13:10,12 41:19,20 | 2003 35:6,14 36:4,5,6 | 67 3:11 | |
| 96:1,5,19 99:8,9 | 41:23 45:5 56:14 | 2004 38:22 41:15 | 69 3:12 | |
| 100:10,20 101:3 | 65:9,12 93:20 | 2005 3:11,12 24:8 43:3 | | |
| 102:12 | 07 13:21 14:3 74:16,16 | 43:6,8 46:15 47:6 | **7** | |
| worked 10:23 11:3,8,9 | | 53:18 55:14 56:6 | 7 3:7 11:6 35:11,16 | |
| 11:14,16 13:10,15,21 | **1** | 57:14 58:1,3 63:21 | 36:6 | |
| 14:3 19:2 26:19 29:6 | 1 2:22 17:5,6,9 | 67:21 68:23 69:5,7 | 7/20/05 3:21 | |
| 45:14 71:7 72:8,19 | 1/6/03 3:6 | 69:12 82:22 85:7 | 7/21/05 4:1 | |
| 74:15 75:20 77:21,23 | 1:05 1:21 | 86:18 87:2 88:9,16 | 7/26/05 4:2,4 | |
| 79:10 80:1 95:21 | 10 3:11 43:14,21,23 | 90:1 92:17 | 70 3:13 | |
| 99:14 100:6,11,13 | 44:1,6,14,19 45:1 | 2007 94:22 | | |
| working 9:13 14:11 | 46:2 47:23 48:6 | 2008 1:21 105:9,18 | **8** | |

# DIALYSIS CLINIC, INC.
## Job Description

**JOB TITLE:** Charge Nurse

---

**EXEMPT:** No          **JOB CODE:** N003
**DIVISION:** Dialysis Clinic          **DEPARTMENT:** Nursing Service
**REPORTS TO:** Clinical Supervisor and/or Nurse Manager

---

**SUMMARY:** Under the direction of the Clinical Supervisor and/or the Nurse Manager, the Charge Nurse is responsible for the clinical management of the dialysis unit and the supervision of all nursing personnel in order to ensure a safe, efficient dialysis for all patients by performing the following duties.

**ESSENTIAL DUTIES AND RESPONSIBILITIES** include the following. Other duties may be assigned.

Performs all functions and duties as outlined in the job description for a Registered Nurse.

Responsible for patient care staffing, matching patients needs with staff capabilities and experience to maximize staffing resources.

Assures the transcription and implementation of physician orders.

Coordinates with the Clinical Supervisor and/or the Nurse Manager the scheduling of patients to ensure accommodations of all patients per the Clinic's policies.

Assists patient care staff as necessary in initiating, monitoring and termination of dialysis treatments.

Directly or indirectly makes appropriate referrals to dietitian, social worker, physician and transplant center, as necessary.

Supervises initial and ongoing patient teaching. Reviews and documents patient education as necessary to ensure compliance with ESRD Network, regulatory agencies, DCI's CQI Program and the individual clinic's requirements.

Responsible for obtaining consent forms and reviewing clinic policies and information with new patients before initiation of dialysis treatments.

Coordinates obtaining medical release forms and updating of consent forms annually, or as required.

EXHIBIT
2
PENGAD-Bayonne, N.J.

Charge Nurse                                            Page Two

Interacts with hospital and acts as a liaison between in-center dialysis unit and the hospital in order to ensure continuity of care.

Maintains emergency preparedness procedures including CPR certification, fire drills, emergency power failure and routing check of emergency cart supplies.

Reviews patient flow sheets for completeness, appropriateness and accuracy of documentation.

Maintains medication inventory of the unit and coordinates the ordering process with the Clinical Supervisor and/or the Nurse Manager. Works with Technical Manager to ensure adequate stocking of unit supplies.

Assumes responsibility for communicating patient problems to physician and implementing and documenting orders.

Oversees responsibility for monthly patient lab work in accordance with the Clinic's policies and procedures.

Reports housekeeping and equipment problems to technical staff and follows up as necessary.

Coordinates and participates in the completion of short term and long term care plans per the Clinic's policies and procedures.

Reviews patient data in accordance with ESRD Network criteria identifying problems and formulating corrective action plans.

Assists the Clinical Supervisor and/or the Nurse Manager in administrative and supervisory duties.

Oversees primary nursing teams for completion of monthly assessments.

Participates in patient care conferences, medical rounds and reviewing charts.

Maintains a clean and orderly work environment.

Must be able to recognize and respond to emergency situations.

Knowledgeable and able to implement safe and effective infection control procedures in accordance with the Clinic's policies and procedures.

Knows and practices procedures related to hazardous waste disposal.

Actively supports and promotes appropriate attitude and loyalty to management.

Charge Nurse                                              Page Three

Knowledgeable and able to implement emergency, fire and disaster protocols.

Knowledgeable of and utilizes the occurrence reporting system in accordance with guidelines set forth by the Clinic.

Assists in the teaching and training of new staff members as directed and supervised by the Education Coordinator, the Clinical Supervisor and/or the Nurse Manager.

## SUPERVISORY RESPONSIBILITIES:
Is responsible for the overall direction, coordination, and evaluation of all patient care personnel.

Carries out supervisory responsibilities in accordance with the Clinics policies and applicable laws. Responsibilities include interviewing, hiring, and training employees; planning, assigning, and directing work; appraising performance; rewarding and disciplining employees; addressing complaints and resolving problems in coordination with the Clinical Manager and/or the Nurse Manager. –

## QUALIFICATION REQUIREMENTS:
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

## EDUCATION and/or EXPERIENCE:
Completion from an accredited Registered Nursing Program; and six months to one year experience in dialysis is preferred; experience in critical care nursing or in a supervisory role is preferred.  Must successfully complete DCI's comprehensive training program.

## CERTIFICATES, LICENSES, REGISTRATION:
Must possess and maintain a current license in the State of   AL    as a Registered Nurse and maintain certification in CPR.

## LANGUAGE SKILLS:
Ability to read, analyze, and interpret professional journals, technical procedures, or governmental regulations.  Ability to write reports, business  correspondence, and procedure manuals.  Ability to effectively present information and respond to questions from physicians, managers, patients and staff.

## MATHEMATICAL SKILLS:
Ability to add, subtract, multiply, and divide in all units of measure, using whole numbers common fractions, and decimals.  Ability to compute rate, ratio, and percent and to draw and interpret bar graphs.

## REASONING ABILITY:
Ability to define problems, collect data, establish facts, and draw valid conclusions.  Ability to interpret an extensive variety of technical instructions in mathematical or diagram form and deal with several abstract and concrete variables.

Charge Nurse                                            Page Four

**OTHER SKILLS and ABILITIES:**
Interpersonal skills to effectively work with patients and other members of the patient care team.

**PHYSICAL DEMANDS:** The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to stand; walk; use hands to finger, handle, or feel objects, tools, or controls; reach with hands and arms; and talk and hear. The employee frequently is required to sit; climb or balance; and stoop, kneel, crouch, or crawl.

The employee must frequently lift and/or move up to 50 pounds. Specific vision abilities required by this job include distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

**WORK ENVIRONMENT:** The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

Since this is a healthcare environment, there is the possibility of exposure to infectious/contagious diseases, hazardous chemicals and materials, needlesticks, and blood and body fluids. Further information regarding this position's specific work environment and exposure category will be provided during orientation. *This position is classified as a CATEGORY I.*

**WORK HOURS:** DCI reserves the right to alter your work hours and schedule in order to accommodate patient scheduling and staffing.

*I have read and understand the above and have been given the opportunity to ask questions.*


_Margaret Winson RN_____        _6/14/00_____
**Employee Signature**                              **Date**


_Carolyn Dreen_____              _5/11/00_____
**Witness**                                          **Date**

   
**THE MEDICAL BUILDING**
309 N. Prairie St.
Union Springs, AL 36089
Phone # 334-738-2146 Fax # 334-738-5021

*2853*

July 20, 2005

Re: Margaret Cater

To Whom It May Concern:

Mr. Carter is able to work 8 hour shift for two weeks.  Should you have any question, please do not hesitate to call the above number.

Sincerely,

I. Domingo, MD


EXHIBIT
3

2855

**THE MEDICAL BUILDING**
309 N. Prairie St.
Union Springs, AL 36089
Phone # 334-738-2146 Fax # 334-738-5021

July 21, 2005

Re: Margaret Cater

To Whom It May Concern:

Mr. Carter is able to work 8 hour shift for two weeks. Ms. Cater will be able to return to work on July 25, 2005. Should you have any question, please do not hesitate to call the above number.

Sincerely,

I. Domingo, MD



EXHIBIT
4
PENGAD-Bayonne, N. J.

**THE MEDICAL BUILDING**
309 N. Prairie St.
Union Springs, AL 36089
Phone # 334-738-2146 Fax # 334-738-5021

July 26, 2005

Re: Margaret Cater

To Whom It May Concern:

Ms. Carter is able to work a full shift for 2 days/one week.  Ms. Carter will be able to return to her regular duties.  Should you have any question, please do not hesitate to call the above number.

Sincerely,

I. Domingo, MD


EXHIBIT
S

# DIALYSIS CLINIC, INC.

( A Non-Profit Corporation)

109 W. Conecuh Street
Union Springs, Alabama, 36089

Ph. 334-738-5715
Fax 334-738-5734

RADHA K. KROTHAPALLI, M.D.                                P. L. (LEE) ASHBURY, JR.
    Medical Director                                             Administrator

                                                            July 26, 2005

Ms. Margaret Carter
1824 Fitzpatrick Road
Fitzpatrick, Alabama 36029

Dear Margaret:

I am sorry to inform you that you have exhausted all leaves available to DCI employees. You were on Family Medical Leave the first time from October 29, 2004 till December 6, 2004. The second Family Medical Leave started on May 9, 2005, and ended on June 23, 2005. You were granted a Personal Leave from June 23, 2005 through July 23, 2005.

I am sorry you are not able to return to work. It is unfortunate that I must inform you that DCI is removing you from active employment effective yesterday, July 25, 2005. You will receive information regarding your rights to continue your health insurance under COBRA from our corporate insurance department.

I know that you have discussed with Karen Hamilton, R.N. Nurse Manager the possibility of working two eight-hour shifts. Eight-hour shifts don't work with the clinics scheduling. However, we might be able to accommodate, on a temporary basis, two twelve hour shifts. Two twelve-hour shifts per week would also qualify you for single health care coverage. One final note, we must have physician statements that clearly indicate that you can return to work, and clearly identifying any limitations if there are any.

One additional DCI benefit that as far as I know has not been discussed thus far is the Long Term Disability that DCI provides for all employees. If you are interested in pursuing this benefit please let me know.

If none of the above options work, please know that once your condition improves to the point where your doctor fully releases you to work full time, you can call Karen or myself about reapplying for any open positions we might have.

I wish you the best, if you have any further questions, please feel to contact Karen Hamilton or me.

Sincerely,


P. L. (Lee) Ashbury, Jr.
Administrator



DIALYSIS CLINIC. INC.

NOTICE OF EMPLOYEE TERMINATION

NAME _Margaret Carter_

DATE OF TERMINATION _7/24/05_

REASON FOR TERMINATION _Did not return from FMLA and Personal Leave - Eligible for rehire_

APPROVED _Karen Hamilton, RN_        _8/09/05_

EXHIBIT
7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

MARGARET A. CARTER,        )
                            )
    Plaintiff,             )
                            )
v.                          )    Civil Action No. 2:07cv00682-WKW
                            )
DIALYSIS CLINIC, INC.,      )
                            )
    Defendant.             )

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

    Defendant, Dialysis Clinic, Inc. (hereinafter referred to as "Defendant" or "DCI")

submits the following response to Plaintiff's first set of interrogatories.  Defendant has

endeavored to provide these responses based upon the best information now available.

Information obtained by Defendant through future investigation and/or discovery may be

relevant to these requests and Defendant's responses, and accordingly, the following responses

are based upon the records and information presently available to Defendant and are given

without prejudice to Defendant's right to introduce into evidence any subsequently discovered

documents.  Defendant reserves the right to revise, correct or add to the responses supplied

herein.

    Defendant reserves all rights to object to the admission into evidence of any response

contained herein, and any failure to object herein is not a waiver of Defendant's right to object

on any and all grounds as to the admissibility in evidence of any response provided.  All contact

with current and former DCI management employees should be made through counsel.





## INTERROGATORIES

1.    State the name of each individual and his or her job title and position who assisted in providing responses to these interrogatories.

**RESPONSE:** Dan Watson, Associate Director of Human Resources


2.    Does the Defendant have policies and guidelines for management and supervisory personnel relevant to the prevention of FMLA retaliation? If your answer is in the affirmative, please state:

        a.    The name, title and employment history of each person responsible for the development of such policies;

        b.    The name, title, and employment history of each person responsible for the oversight of the policies' administration, and;

        c.    The manner in which employees are informed of any company policies concerning discrimination in the workplace.

To the extent that you refer Plaintiff to a document in response to this request, identify each such document by bates number/label and/or title.

**RESPONSE:** Defendant ("DCI") objects to this interrogatory on the grounds that it is vague and ambiguous. Without waiving this objection, Defendant states: DCI does not have written policies and guidelines for management and supervisory personnel that address specifically the prevention of FMLA retaliation. However, DCI has adopted a Family and Medical Leave of Absence Policy and an Equal Employment Opportunity Policy, both of which are published in its employee handbook, a copy of which has already been produced. Dave Hagewood, Director of Human Resources, and Dan Watson, Associate Director of Human Resources, have been responsible for the development of these policies. All supervisors and managers would be responsible for the administration of DCI policies and procedures. Through orientation, periodic training, on-the-job training, and verbal and written

communications, DCI educates all employees about its policies, procedures, and expectations. As a result of this formal and informal training, in addition to their relevant experience, DCI's managers and supervisors should understand that it is unlawful to take adverse action against employees for exercising their legal rights.

3.    Please state whether the Defendant has received a complaint of FMLA retaliation within the relevant time period, and whether said complaint resulted in litigation or not. If so, please state:

> a.    The name, title, and employment history of each applicant or employee who made such a complaint;
>
> b.    The date of each complaint, a description of the complaint, its basis, the investigation that resulted, and its resolution;
>
> c.    The name, title, and employment history of each person responsible for resolving each such complaint.

To the extent that you refer Plaintiff to a document in response to this request, identify each such document by bates number/label and/or title.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. DCI operates many facilities and employs thousands of individuals throughout the United States, and there is no allegation or evidence of a pattern or practice of systemic discrimination or retaliation in this case. Without waiving this objection, DCI states: Defendant is not aware of any complaint of FMLA retaliation by any employee, excluding Plaintiff, under the supervision of Mr. Lee Ashbury, Jr., who was the Administrator of the Union Springs clinic where Plaintiff worked.

4.    Does the Defendant have any policies and/or procedures in place for handling complaints or allegations of FMLA retaliation? If so, please state;

3

       a.     The name, title, and employment history of each person responsible for the development of the policies and/or procedures;

       b.     The effective date of the policies and/or procedures; and

       c.     The name, title, and employment history of each person responsible for administering the policies and/or procedures.

To the extent that you refer Plaintiff to a document in response to this request, identify each such document by bates number/label and/or title.

**RESPONSE:** DCI would refer Plaintiff to the Equal Employment Opportunity policy, the Unlawful Harassment policy, the Your Supervisor policy, and the Problem Solving Procedures policy, all of which are set forth in DCI's Employee Handbook. These policies have been effective for several years, and they were in effect throughout 2005. Dave Hagewood, Director of Human Resources, and Dan Watson, Associate Director of Human Resources, have been responsible for the development of these policies. All supervisors and managers would be responsible for the administration of DCI policies and procedures.

5.     Has the Defendant taken any additional actions to insure that management is aware of such acts and/or circumstances since Plaintiff was subjected to the alleged acts of FMLA retaliation? If so, please describe what action was taken, including, but not limited to, the action taken, the name and title of each person responsible, and, the date the new measures were implemented.

To the extent that you refer Plaintiff to a document in response to this request, identify each such document by bates number/label and/or title.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that it is vague and ambiguous. Without waiving that objection, and based on its understanding of the interrogatory, DCI states: Defendant did not implement any "new measures" in response to Plaintiff's allegations of FMLA retaliation.

4

6.    Who made the decision to terminate Plaintiff?  Please state the name and title of each person responsible.

**RESPONSE:** Mr. Lee Ashbury, Jr., Administrator, in consultation with Mr. Dan Watson, Associate Director of Human Resources.  Defendant also believes that David Hagewood, Director of Human Resources, was consulted regarding the decision to discharge Plaintiff.


7.    Why was Plaintiff terminated?

**RESPONSE:** DCI discharged Plaintiff because, after using all FMLA leave and personal leave to which she was entitled, she was not able to return to her full-time work schedule, and she declined the potential opportunity to work two, twelve-hour shifts per week.


8.    Why was Ms. Carter's shift changed to three days a week, thirteen or fourteen hours a day while she was out on FMLA leave?

**RESPONSE:** Defendant objects to this interrogatory to the extent that it implies that DCI only changed Plaintiff's shift.  During Plaintiff's leave of absence in 2005, DCI adopted new work schedules for all nurses and patient care technicians at the Union Springs clinic. Under the former schedule, full-time nurses worked approximately ten hours per day, four days per week.  Under the new schedule, full-time nurses worked approximately twelve to thirteen hours per day, three days per week. DCI made the schedule change based on the number of patients, its standards for patient care, and cost considerations, including the desire to reduce overtime. The schedule change applied to all nurses and technicians.


9.    Why was Ms. Carter not allowed to work eight-hour shifts?

**RESPONSE:** DCI determined that, given the clinic's adoption of 12-13 hour shifts for all nurses and technicians, 8 hour shifts were not compatible with the clinic's scheduling requirements.

# VERIFICATION

STATE OF TENNESSEE    )
                      )
COUNTY OF DAVIDSON   )

Dan Watson, being first duly sworn, upon oath deposes and says that he is the Associate Director of Human Resources of Defendant Dialysis Clinic, Inc. and that he is authorized to make this verification on its behalf; that he has read the foregoing Responses to Interrogatories and that said responses were prepared with the assistance and advice of counsel and the assistance of various employees and representatives of the Defendant upon which he has relied; that the Responses set forth herein are subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of these Responses; that the foregoing Responses are thus based upon corporate knowledge and are true and correct to the best of his knowledge and belief; that, consequently, Defendant reserves the right to make any changes in the Responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available; and that subject to the limitations set forth herein, the said Responses are true to the best of his knowledge, information and belief.

_____
Dan Watson

Sworn to and subscribed before me, this _26th_ day of June, 2008.

_____
Notary Public

My Commission Expires:

My Commission Expires NOV. 14, 2009

7

DATED this 27th day of June, 2008.

Respectfully submitted,

Davidson French (TN BPR#015442)
Tim K. Garrett (TN BPR #12083)
Bass, Berry & Sims, PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6240
(615) 742-2740 Fax
Email: dfrench@bassberry.com


Henry C. Barnett, Jr. Esq. (AL BAR 037)
Capell & Howard P.C.
150 South Perry Street
Montgomery, Alabama 36104
(334) 241-8000
(334) 241-8214 Fax
Email: hcb@chlaw.com

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th of June, 2008 a copy of the foregoing Defendant's Response to Plaintiff's First Set of Interrogatories was served by U.S. Mail on:

John D. Saxon
Russell P. Parker
Attorneys for Plaintiffs
2119 Third Avenue North
Birmingham, AL 35203

6840580.1

# DIALYSIS CLINIC, INC.
## Job Descriptions

**JOB TITLE:** Administrator

| | |
|---|---|
| **EXEMPT:** Yes | **JOB CODE:** E040____ |
| **DIVISION:** Administrative Office | **DEPARTMENT:** Administration |
| **REPORTS TO:** Corporate Administrator | |

**SUMMARY:** Responsible for the overall management of the ~~Atlanta~~ *Alabama* facilities in accordance with written policies established by the Board of Trustees and the Medical Director(s).

**ESSENTIAL DUTIES AND RESPONSIBILITIES** includes the following. Other duties may be assigned.

Provides a clean and safe environment for patients, visitors and staff.

Develops, executes and enforces policies relative to:

    (a) the protection of patients' personal and property rights, and

    (b) the general operation of the facility

    All policies will be in writing, clearly stated, dated, reviewed at least annually and revised as necessary with the assistance of appropriate personnel and in coordination with the Board of Trustees, who retain the right to review and/or revise all such policies at any time.

Furnishes Federal and State agencies all data required for certification.

Maintains and submits appropriate records and reports as may be required by Federal and State agencies, and fiscal intermediaries.

Assures that formal means of accountability are established by the Medical Director for those involved in patient care.

Oversees the financial operation of the facility including accounts payable, accounts receivable, payroll, general ledger and purchasing functions and furnishes a monthly statement of operations to the Corporation.



Page I - 2.63

**Administrator**                                        **Page Two**

Participates in contract negotiations into which the facilities may enter with the ESRD Network, vendors, and consultants, providers of services not furnished directly by the facility, et cetera. Assures facilities compliance with ESRD Network, regulatory agencies, DCI Corporate and the individual clinics requirements.

Maintains an open line of communication with the staff through staff meetings, individual conferences, and written memoranda.

Responsible for setting employment policies and procedures within DCI's guidelines and oversees the application of these policies and procedures.

Responsible for overseeing the Quality Assurance and Risk Management Programs in accordance with the policies and procedures of DCI and the individual clinic's.

**SUPERVISORY RESPONSIBILITIES:**

Coordinates with Medical Director(s) the supervision of the Nurse Managers. Supervises the Accounting Manager, the QA/Risk Manager and the Educational Coordinator. Provide indirect supervision for all other employees.

Carries out supervisory responsibilities in accordance with the organization's policies and applicable laws. Responsibilities include interviewing, hiring, and training employees; planning, assigning, and directing work; appraising performance; rewarding and disciplining employees; addressing complaints and resolving problems.

**QUALIFICATION REQUIREMENTS:** To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**EDUCATION and/or EXPERIENCE:**
Baccalaureate degree (B.S. or B.A.) or its equivalent and has at least one year of experience in a ESRD unit; or a registered nurse or physician director as defined in this definition; or has demonstrated capability by acting for at least two years as a chief executive officer in a dialysis unit or transplantation program [Federal Regulations Vol 41, No 108, 405.2102 (a)].

**LANGUAGE SKILLS:**
Ability to read, analyze, and interpret general business periodicals, professional journals, technical procedures, or governmental regulations. Ability to write reports, business correspondence, and procedure manuals. Ability to effectively present information and respond to questions from physicians, managers, patients and staff.

Administrator                                             **Page Three**

**MATHEMATICAL SKILLS:**
Ability to comprehend and apply principles of advanced calculus, modern algebra, and advanced statistical theory. Knowledge of accounting principles.

**REASONING ABILITY:**
Ability to define problems, collect data, establish facts, and draw valid conclusions. Ability to interpret an extensive variety of technical instructions in mathematical or diagram form and deal with several abstract and concrete variables.

**OTHER SKILLS and ABILITIES:**
Ability to establish effective interpersonal relationships with all levels of medical personnel, management and staff.

Ability to effectively relate with patients, families and community agencies.

**PHYSICAL DEMANDS:** The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to use hands to finger, handle, or feel objects, tools, or controls. The employee regularly is required to stand, walk, and reach with hands and arms. The employee is regularly required to sit; stoop, kneel, crouch, or crawl; and talk and hear.

The employee must frequently lift and/or move up to 50 pounds. Specific vision abilities required by this job include distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

**WORK ENVIRONMENT:** The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

Moderate to frequent travel to be expected, therefore a current drivers license and motor vehicle is required. May require flexible hours as dependant upon the facilities needs.

Since this is a healthcare environment, there is the possibility of exposure to infectious/contagious diseases, hazardous chemicals and materials, needlesticks, and blood and body fluids. Further information regarding this position's specific work environment and exposure category will be provided during orientation. ***This position is classified as a CATEGORY II.***

Administrator                                    **Page Four**

**WORK HOURS:** DCI reserves the right to alter your work hours and schedule in order to accommodate patient and staffing needs.

*I have read and understand the above and have been given the opportunity to ask questions.*


_____          _____
*Employee Signature*                                    *Date*


_____          _____
*Witness*                                                *Date*


Approved By:


_____          _____
Tony Messana, Corporate Administrator          Date


1 April 1993

*******************************************************************************
**NOTE:** The above statements are intended to describe the general nature and level of work performed by people assigned to this classification. They are not construed to be an exhaustive list of all job duties performed by the personnel so classified.
*******************************************************************************